# EXHIBIT A

```
 1

 2   IN THE UNITED STATES DISTRICT COURT
     OF THE EASTERN DISTRICT OF PENNSYLVANIA
 3   ------------------------------------------x
     BEY DILEMANI,
 4      52 Brinker Drive
        Doylestown, PA 18901
 5
                    Plaintiff,        CIVIL ACTION
 6                                    FILE NO.
                    -v-               02-CV-2614
 7
     BUCA, INC.,
 8      1300 Nicollet Mall
        Minneapolis, MN 55403
 9
                    Defendants.
10   ------------------------------------------x

11

12              Computer-aided transcript of

13   deposition testimony of BEY DILEMANI taken

14   stenographically in the above-entitled matter

15   before ELIZABETH M. KONDOR, a Certified Shorthand

16   Reporter and Notary Public of the State of New

17   Jersey, at the law offices of Morgan, Lewis &

18   Bockius, LLP, 1701 Market Street, Philadelphia,

19   PA 19102, on Wednesday, January 8, 2003,

20   commencing at 2:00 p.m.

21

22             DAVID FELDMAN & ASSOCIATES (USA)

23               575 Madison Avenue, 10th Floor

24                 New York, New York 10022

25           (212) 921-0771    Fax: (212) 921-0718
```

6

```
1            BEY DILEMANI
2      Q.    G-E-R-H-A-N?
3      A.    G-E-R-H-A-N?
4      Q.    Yes.
5      A.    It's pronounced Gerhan?
6      Q.    Gerhan.
7      A.    Thank you.
8            MR. GOLDBERG: Don't go calling him,
9  now.
10     Q.    Mr. Dilemani, have you ever been a
11 party to a lawsuit, other than this one?
12     A.    No.
13     Q.    Have you ever had anybody threaten
14 legal claims against you?
15     A.    No.
16     Q.    Have you ever had your deposition
17 taken before?
18     A.    No.
19     Q.    Have you ever testified in a trial
20 or a court proceeding or a hearing of any kind?
21     A.    No.
22     Q.    You understand today that you're
23 under oath?
24     A.    Yes.
25     Q.    And you understand the consequences
```

7

```
1            BEY DILEMANI
2  of not telling the truth?
3      A.    Yes.
4      Q.    Have you taken any medication in the
5  last 24 hours?
6      A.    No.
7      Q.    Have you used any alcohol in the
8  last 24 hours?
9      A.    No.
10     Q.    Have you taken any drugs in the last
11 24 hours?
12     A.    No.
13     Q.    Is there any reason, any physical or
14 mental condition that would impair your memory,
15 that you're aware of?
16     A.    No.
17     Q.    Is there any physical or mental
18 condition that would impair your ability to
19 testify truthfully here today?
20     A.    No.
21     Q.    Are you in good health today?
22     A.    Yes.
23     Q.    Can you give us your full name for
24 the record.
25     A.    Sure. Bey Dilemani, B-E-Y,
```

8

```
1            BEY DILEMANI
2  D-I-L-E-M-A-N-I.
3      Q.    Have you been known by any other
4  names?
5      A.    No. I have actually a first name.
6  My full first name is B-E-H-R-O-Z.
7      Q.    How do you pronounce that?
8      A.    Behroz, and Bey is short for that.
9      Q.    And you don't have a middle name or
10 a middle initial?
11     A.    Yes, K.
12     Q.    So your full name as it would
13 appear, for example, on a passport or license is
14 B-E-H-R-O-Z, middle initial K, D-I-L-E-M-A-N-I?
15     A.    Correct.
16     Q.    And what is your date of birth?
17     A.    12/12/1945.
18     Q.    And your Social Security number?
19     A.    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.
20     Q.    And what is your address,
21 Mr. Dilemani?
22     A.    52 Brinker Drive, B-R-I-N-K-E-R,
23 Doylestown, PA 18901.
24     Q.    And your telephone number?
25     A.    215-230-0971.
```

9

```
1            BEY DILEMANI
2      Q.    Is the Doylestown address an
3  apartment or a house?
4      A.    House.
5      Q.    And does anyone live with you at the
6  house?
7      A.    My wife and two children.
8      Q.    How old are the children?
9      A.    Seventeen and thirteen.
10     Q.    How long have you been married?
11     A.    Over 19 years.
12     Q.    How long have you lived at that
13 address?
14     A.    Since January.
15     Q.    January --
16     A.    Since January 2002.
17     Q.    So about a year?
18     A.    Yes.
19     Q.    And prior to January 2002, where did
20 you live?
21     A.    I lived in Chalfont.
22     Q.    Can you spell that, please?
23     A.    Sure. C-H-A-L-F-O-N-T.
24     Q.    That's also in Pennsylvania?
25     A.    Correct. The address was 213 Forest
```

```
                                                    10
 1            BEY DILEMANI
 2   Park Drive. The zip is 18914.
 3       Q.   Is the Forest Park Drive address
 4   within 10 miles of the Doylestown address?
 5       A.   Yes.
 6       Q.   How long did you live at the Forest
 7   Park Drive address?
 8       A.   Forest Park Drive, I would say over
 9   one year, and I believe 14 months.
10       Q.   Was that also a house?
11       A.   Yes.
12       Q.   And did you rent or own that?
13       A.   Rent.
14       Q.   And the Doylestown house you own?
15       A.   Own.
16       Q.   So if you lived in the Forest Park
17   Drive house for approximately 14 months, then you
18   would have moved into it in sometime in August of
19   2000?
20       A.   July of 2000.
21       Q.   July of 2000?
22       A.   Correct.
23       Q.   And did your wife and two children
24   live with you at the Forest Park address the
25   whole time that you were there?
```

```
                                                    11
 1            BEY DILEMANI
 2       A.   Yes.
 3       Q.   When you moved to Pennsylvania from
 4   Arizona, was the Forest Park address the first
 5   place that you lived?
 6       A.   Yes.
 7       Q.   Did you review any documents in
 8   preparation for your deposition today,
 9   Mr. Dilemani?
10       A.   I have reviewed some.
11       Q.   Can you tell me what documents you
12   looked at?
13            MR. GOLDBERG: Don't answer. I'm
14   going to instruct him not to answer on the basis
15   of attorney/client privilege and work product
16   production, documents I've shown this witness.
17            MR. GERHAN: In preparation for his
18   deposition?
19            MR. GOLDBERG: Yes. In preparation
20   of this deposition, I made a determination of
21   which documents to review with Mr. Dilemani,
22   and what documents I chose to review with
23   Mr. Dilemani is a privileged matter.
24            MR. GERHAN: Well, I disagree.
25   I mean, I know there's case law on that issue,
```

```
                                                    12
 1            BEY DILEMANI
 2   Scott.
 3            MR. GOLDBERG: I don't have any
 4   objection if you have a document and you ask him
 5   if he's reviewed it in preparation for the
 6   deposition. I just have an objection to asking
 7   him globally which documents he reviewed, because
 8   they were at my direction.
 9            MR. GERHAN: Well, I mean, if you're
10   going to instruct him not to answer, there's not
11   really much I can do sitting here, but I find
12   your objection to be meritless, and I guess we'll
13   have to mark that on the record.
14       Q.   Other than any documents that your
15   attorney might have shown you or selected for
16   you, were there any documents that you, yourself,
17   reviewed on your own in preparation for your
18   deposition, Mr. Dilemani?
19       A.   No.
20       Q.   Did you talk to anyone other than
21   your attorney about your deposition?
22       A.   No.
23       Q.   Have you been married to anyone
24   other than your current wife, Mr. Dilemani?
25       A.   Yes.
```

```
                                                    13
 1            BEY DILEMANI
 2       Q.   And how long ago were you married to
 3   your other wife?
 4       A.   We separated in 1975.
 5       Q.   And is that your only other
 6   marriage?
 7       A.   Yes.
 8       Q.   Were there any legal proceedings
 9   associated with that divorce?
10       A.   No.
11       Q.   Other than just doing the divorce
12   decree?
13       A.   That's it.
14       Q.   No trial or anything like that?
15       A.   No.
16       Q.   How long were you married the first
17   time?
18       A.   Five years.
19       Q.   I want to talk a little bit about
20   your educational background, Mr. Dilemani.
21            Can you tell me when you graduated
22   from high school?
23       A.   '60 -- I have to think about that a
24   little bit, '66.
25       Q.   What was the name of the high
```

**Page 30**

```
1              BEY DILEMANI
2           Of course, I gave him three months
3    notice.
4       Q.   Does the Kimberly Hotel still exist?
5       A.   Yes.
6       Q.   And is it in Manhattan?
7       A.   Yes.
8       Q.   What's the location of the
9    restaurant that you opened?
10      A.   The location of the restaurant was
11   in Larchmont, New York.
12      Q.   Is Larchmont outside of the city?
13      A.   Twenty miles west of New York City.
14   It's Westchester.
15      Q.   How many employees did you have at
16   Cocconato?
17      A.   God, somewhere over 20 or 25, in
18   that area. It could be 25, 30, some part time,
19   some full time.
20      Q.   How would you describe Cocconato as
21   a restaurant?
22      A.   It was a Northern Italian
23   restaurant, and it was very successful.
24      Q.   Would you call it fine dining?
25      A.   Fine dining, yes. And I received a
```

**Page 31**

```
1              BEY DILEMANI
2    Five Star Diamond award.
3       Q.   How long did you operate the
4    Cocconato?
5       A.   Three years.
6       Q.   From 1994 until --
7       A.   '95 to '98.
8       Q.   And what happened in 1998?
9       A.   I sold it.
10      Q.   To whom did you sell it?
11      A.   To two different individuals or
12   partners.
13      Q.   Do you know if the restaurant is
14   still open?
15      A.   They sold it, too. To the best of
16   my knowledge, they sold it maybe over a year ago.
17      Q.   Do you know if the restaurant is
18   still open?
19      A.   Yes. It's under a different name.
20      Q.   Does it serve the same type of food?
21      A.   I don't know.
22      Q.   Was it the people that you sold it
23   to who changed the name?
24      A.   No. The people I sold it to, they
25   sold it to somebody else, the third party changed
```

**Page 32**

```
1              BEY DILEMANI
2    the name.
3       Q.   When you sold the restaurant to the
4    two partners, did you make a profit on the sale?
5       A.   Yes.
6       Q.   Approximately what was the profit?
7       A.   Anywhere between 50 to $75,000.
8       Q.   Why did you decide to sell?
9       A.   I had a different idea in mind.
10      Q.   What do you mean by a different
11   idea?
12      A.   To do something different in the
13   industry.
14      Q.   In other words, you were thinking of
15   getting out of the restaurant business?
16      A.   No. Prior to that, I took a trip to
17   Arizona and I realized there's a lot of room in
18   Arizona to do something there, so that's why I
19   got prepared to move to Arizona.
20      Q.   In other words, Arizona impressed
21   you as a place that had a lot of potential for
22   development in terms of restaurants?
23      A.   Yes, yes.
24      Q.   When did you make that trip to
25   Arizona?
```

**Page 33**

```
1              BEY DILEMANI
2       A.   I'm not positive, but the end of
3    '98, beginning of '99, in that area.
4       Q.   Was the trip after you had sold
5    Cocconato?
6       A.   Yes.
7       Q.   Does your wife work, Mr. Dilemani?
8       A.   At the present time?
9       Q.   Yes.
10      A.   Yes.
11      Q.   Did she work then in 1998?
12      A.   No.
13      Q.   So you sold Cocconato Restaurant?
14      A.   Yes.
15      Q.   Then you took a trip to Arizona,
16   decided that it was a place that had a lot of
17   potential for restaurant development?
18      A.   I took three trips.
19      Q.   Three trips?
20      A.   Correct.
21      Q.   And at some point in there, on one
22   of those trips or after those trips, is that when
23   you applied for a job with Spaghetti Western?
24      A.   I'm sorry, I didn't understand the
25   question.
```

## Page 34

```
 1                BEY DILEMANI
 2      Q.    I know at some point you were
 3  working for Spaghetti Western in Arizona?
 4      A.    I opened that place.
 5      Q.    And I take it that when you applied
 6  for work with Spaghetti Western, that that was in
 7  conjunction with one of your trips out to
 8  Arizona; is that right?
 9      A.    No.  Actually, this is a little
10  confusing now, the way you're asking about
11  Spaghetti Western and the trips.  To me, it's
12  very confusing.
13      Q.    You've sold the restaurant, you've
14  made some trips; when did you decide to move to
15  Arizona?
16      A.    In '99.
17      Q.    Is that, in fact, when you moved to
18  Arizona?
19      A.    Yes.
20      Q.    And at the time that you moved, had
21  you already applied for work with Spaghetti
22  Western?
23      A.    No.  I opened the Spaghetti Western.
24      Q.    So that was -- were you the owner of
25  the restaurant?
```

## Page 35

```
 1                BEY DILEMANI
 2      A.    Yes.
 3      Q.    Did you have any partners?
 4      A.    Yes.
 5      Q.    How many partners?
 6      A.    There were two.
 7      Q.    In addition to yourself?
 8      A.    Correct.  Three altogether.
 9      Q.    Did you have a one-third share in
10  the restaurant --
11      A.    Yes.
12      Q.    Don't forget to let me finish my
13  question.
14            So each of you had a one-third share
15  in the restaurant?
16      A.    Yes.
17      Q.    When did the Spaghetti Western
18  Restaurant open?
19      A.    To the best of my knowledge,
20  sometime in September of '99.
21      Q.    And did each of the three partners
22  make a contribution to the partnership to fund
23  the opening?
24      A.    Yes.
25      Q.    Was the contribution of each of the
```

## Page 36

```
 1                BEY DILEMANI
 2  partners equal?
 3      A.    Yes.
 4      Q.    And how much was the contribution?
 5      A.    A little bit over $100,000 each.
 6      Q.    So each of the partners invested
 7  somewhat just over $100,000?
 8      A.    Yes.
 9      Q.    How many customers could the
10  Spaghetti Western Restaurant seat?
11      A.    Close to 300, 295.  To be exact,
12  I would say between 295, 300, something like
13  that.
14      Q.    The other two investors or the other
15  two partners, did either of them work at the
16  restaurant?
17      A.    No.
18      Q.    Did you work at the restaurant?
19      A.    Yes.
20      Q.    So you were the only partner who
21  actually was involved in the day-to-day
22  operations?
23      A.    Yes.
24            If it's possible, I'd like to take a
25  little break.
```

## Page 37

```
 1                BEY DILEMANI
 2            (Recess.)
 3      Q.    Mr. Dilemani, let me just jump back
 4  for a second to the Cocconato operation.  That
 5  was a single location restaurant, correct?
 6      A.    Yes.
 7      Q.    And you were the sole owner of it?
 8      A.    Yes.
 9      Q.    And were you also effectively the
10  general manager of the restaurant?
11      A.    Yes.
12      Q.    Did you have any other managers
13  reporting to you?
14      A.    Yes.
15      Q.    How many?
16      A.    Three.
17      Q.    And approximately how many customers
18  could the restaurant seat?
19      A.    160.
20      Q.    Can you give me sort of an average
21  weekly dollar sales figure for it?
22      A.    Sure, 37.
23      Q.    $37,000?
24      A.    Yes.
25      Q.    That's per week?
```

## Page 50

```
1            BEY DILEMANI
2   with Mr. Kahn or Mr. Kahn in touch with you; is
3   that right?
4       A.   Yes, yes.
5       Q.   Did you interview Mr. Kahn?
6       A.   Yes.
7       Q.   Did you interview any more potential
8   partners?
9       A.   No.
10      Q.   Did the other two partners interview
11  Mr. Kahn?
12      A.   Yes.
13      Q.   At the time that you interviewed
14  Mr. Kahn, was he already operating a restaurant?
15      A.   Yes.
16      Q.   And what restaurant was he
17  operating?
18      A.   If I'm not mistaken, the name of the
19  place he was operating was called Bamboo Grill.
20      Q.   Bamboo Grill?
21      A.   Correct.
22      Q.   Do you know if Mr. Kahn had an
23  ownership interest in Bamboo Grill?
24      A.   Yes, he had.
25      Q.   Did he keep that even after he
```

## Page 51

```
1            BEY DILEMANI
2   bought into your partnership?
3       A.   Yes.
4       Q.   How would you characterize the menu
5   at Spaghetti Western?
6       A.   At what time?
7       Q.   When you were operating it.
8       A.   The menu consisted of a choice of
9   pasta, nine-inch pizza and half a pound burger,
10  eight-ounce breast of chicken with all different
11  types of toppings.
12      Q.   Was it a restaurant where you had
13  waiters?
14      A.   Yes.
15      Q.   So it was not a counter-type
16  restaurant, not a self-service restaurant, but a
17  wait/serve restaurant?
18      A.   No.
19      Q.   Let me back up because I'm sure
20  I have the court reporter totally confused.
21           At Spaghetti Western, when you were
22  the general manager there, the method of serving
23  the customers was with a wait staff, correct?
24      A.   Correct.
25      Q.   How did you learn that Buca might be
```

## Page 52

```
1            BEY DILEMANI
2   looking for restaurant managers?
3       A.   I saw an advertisement in Nation's
4   restaurant News.
5       Q.   At the time that you first spoke to
6   someone from Buca about working there, did you
7   have a particular place in mind that you would
8   like to work as a manager?
9       A.   No.
10      Q.   Why did you decide to answer the ad
11  that you saw in Nation's Restaurant News?
12      A.   The first time I went to one of the
13  restaurants in Phoenix and I found it a very
14  interesting place, a very fun place, and that was
15  the reason.
16      Q.   Had you gone to the restaurant
17  before you saw the ad?
18      A.   Yes.
19      Q.   So you were familiar with the
20  restaurant because you had gone there and liked
21  it, and then you saw the ad and decided to see if
22  they had any need for you, fair enough?
23      A.   Yes.
24      Q.   And at the time that you first spoke
25  to them, you didn't have any idea in mind whether
```

## Page 53

```
1            BEY DILEMANI
2   you were going to work in Phoenix or Pennsylvania
3   or anywhere else in the country?
4       A.   No.
5            MR. GERHAN:  Let's mark this as
6   Exhibit 1.
7            (Whereupon, Defendant's Exhibit No.
8   1 was received and marked for Identification and
9   is appended to the transcript.)
10      Q.   Mr. Dilemani, showing you a document
11  that's been marked as Defendant's Deposition
12  Exhibit 1.  This is a copy of part of a page of a
13  Nation's Restaurant News edition of May 22, 2000.
14           There's an ad in the top right
15  corner for Buca Restaurant; do you see that?
16      A.   Yes.
17      Q.   Is this the ad that you answered?
18      A.   Yes.
19      Q.   Do you remember how you answered it?
20  It says, "please send or fax your resume to:;"
21  is that what you did?
22      A.   Yes.
23      Q.   So you faxed your resume to that fax
24  number that's listed in the ad?
25      A.   I don't remember the fax number, but
```

**54**

```
          BEY DILEMANI
1
2   I faxed it.
3       MR. GERHAN: Let's mark this one as
4   2.
5       (Whereupon, Defendant's Exhibit No.
6   2 was received and marked for Identification and
7   is appended to the transcript.)
8   Q.  Mr. Dilemani, the court reporter has
9   given you a document marked as Defendant's
10  Deposition Exhibit 2. Is this the copy of the
11  resume that you sent to Buca?
12  A.  Yes.
13  Q.  And the address that's listed there
14  is the address at which you were living in
15  Scottsdale, Arizona?
16  A.  Yes.
17  Q.  I think we have established in an
18  earlier deposition in this case that the
19  handwriting on there is handwriting by Lori Van
20  Holmes, not you.
21      Is that 6/1/2000 interview, does
22  that jive with when you recall being interviewed
23  by Ms. Van Holmes?
24  A.  I know it was June, but I'm not
25  positive whether that was the day.
```

**55**

```
          BEY DILEMANI
1
2   Q.  Do you remember whether you spoke to
3   her in the morning or the afternoon?
4   A.  It probably was late morning,
5   possibly, very early afternoon.
6   Q.  When you spoke to her, it was by
7   telephone, correct?
8   A.  Correct.
9   Q.  At the top of Defendant's Deposition
10  Exhibit 2, the entry at the top underneath of
11  your name and address, it lists you as Managing
12  Director AZ Spaghetti Western Co.?
13  A.  Correct.
14  Q.  Underneath of that, the next entry
15  Hudson Restaurant Corporation; do you see that
16  entry?
17  A.  Yes.
18  Q.  If I understood your previous
19  testimony, I thought you told me that in that '94
20  to '95 time frame was when you were the owner of
21  Cocconato Restaurant?
22  A.  Correct.
23  Q.  Is Cocconato Restaurant different
24  from Hudson Restaurant Corporation?
25  A.  That was the name of the
```

**56**

```
          BEY DILEMANI
1
2   corporation.
3   Q.  So your corporate name was Hudson
4   Restaurant Corporation?
5   A.  Correct.
6   Q.  And the restaurant that Hudson
7   Restaurant Corporation operated was Cocconato?
8   A.  Correct.
9   Q.  And were you and your wife were the
10  sole shareholders of Hudson Restaurant
11  Corporation, correct?
12  A.  Yes.
13  Q.  Underneath of Hudson Restaurant
14  Corporation, it says "general management of
15  multi-unit fine dining restaurants in the
16  New York tri-state area."
17  A.  Correct.
18  Q.  Is that a correct description of
19  what Hudson Restaurant Corporation was doing?
20  A.  Under Hudson Restaurant Corporation,
21  I was consulting other restaurants, managing
22  other restaurants. Cocconato, I owned. I looked
23  after a couple of other restaurants which
24  somebody else owned.
25  Q.  I thought, as I understood your
```

**57**

```
          BEY DILEMANI
1
2   previous testimony, you told me that, in addition
3   to owning Cocconato, you were also the general
4   manager of Cocconato; is that right?
5   A.  Correct.
6   Q.  And so your testimony is that, in
7   addition to being general manager of that
8   restaurant, there were other restaurants that you
9   consulted on?
10  A.  Yes.
11  Q.  How many other restaurants?
12  A.  At the time, we're talking about
13  right now, based on this resume, it was one more.
14  Q.  What was the name of the other
15  restaurant that you consulted?
16  A.  Paradise Barcelona.
17  Q.  How do you spell that?
18  A.  Paradise Barcelona, the name of the
19  city in Spain.
20  Q.  So the restaurant was located in
21  Spain?
22  A.  No, in New York.
23  Q.  Who was the owner of it?
24  A.  The owner was Armando Behjar,
25  B-E-H-J-A-R.
```

**62**

BEY DILEMANI

2  A. Yes.
3  Q. And what I'm trying to make sure of
4  is that that 10 to 12 months scattered around all
5  occurred during the 36 months that you were
6  owning and operating Cocconato?
7  A. No.
8  Q. What other time periods did that
9  10 to 12 months cover?
10  A. To the best of my knowledge, it
11  covered between '94 and '96.
12  Q. Going back to the process of seeking
13  work with Buca, we had gotten to the point where
14  you've sent a resume in, and you had a telephone
15  conversation with Lori Van Holmes, correct?
16  A. Correct.
17  Q. Do you remember how long your
18  telephone conversation with Ms. Van Holmes
19  lasted?
20  MR. GOLDBERG: Objection. Vague.
21  The question does not specify which conversation
22  you're talking about.
23  Q. You may answer the question.
24  A. Well, exactly, because I don't
25  remember which conversations I had. I had a few

**63**

BEY DILEMANI

2  conversations with her. I don't know which one.
3  Q. You told me, I want to focus on the
4  first conversation that you had with her after
5  you sent your resume in, which you thought
6  occurred around June 1st, but you're not sure of
7  the exact date; is that right?
8  A. Yes.
9  Q. And I want to know how long that
10  first conversation with her lasted.
11  A. Well, actually, I received a first
12  phone call from somebody else than
13  Ms. Van Holmes.
14  Q. Do you remember who you received it
15  from?
16  A. Yes Lea, I believe it's spelled
17  L-E-A.
18  Q. Lucy Lea?
19  A. Correct.
20  Q. And in that conversation, what did
21  Ms. Lea tell you and what did you tell her, to
22  the best of your recollection?
23  A. To the best of my recollection, she
24  mentioned that she has received my resume, and if
25  I'm still interested to work for Buca, and if

**64**

BEY DILEMANI

2  that's the case, she's going to pass it on to
3  Ms. Van Holmes and she is going to give me the
4  phone interview.
5  Q. And what did you say?
6  A. I said that's fine.
7  Q. How long after that conversation
8  that you just testified about with Lucy Lea did
9  Ms. Van Holmes first call you?
10  A. To the best of my knowledge, between
11  five to seven days.
12  Q. And in that first occasion that
13  Ms. Van Holmes called you, how long did the
14  telephone conversation last?
15  A. To the best of my knowledge, again,
16  maybe ten minutes.
17  Q. What do you recall Ms. Van Holmes
18  saying in that ten-minute conversation and what
19  did you say?
20  A. I just want to make this clear,
21  I received a few phone calls from Ms. Van Holmes,
22  I just don't want to mix them up.
23  Q. I understand.
24  A. In that conversation from
25  Ms. Van Holmes, she said that, yes, she got my

**65**

BEY DILEMANI

2  resume, it looks very interesting. And she asked
3  me some questions regarding the job, How do you
4  operate the restaurant and on and on. And they
5  were all very brief.
6  And I don't remember if it was that
7  phone call, the first phone call, or the second
8  phone call, she mentioned, after asking me what
9  my technique is, how I manage a restaurant, how
10  do I treat people, what do I do with customers
11  complaining, that type of questions, and at that
12  point, she said that she has some openings, there
13  are other places opening up.
14  And if I'm not mistaken, probably,
15  it was the first phone call or second phone call,
16  I'm not positive, she said that they're opening
17  one in Pennsylvania and one in Ohio; and are you
18  interesting in any one of those positions?
19  And I said to her, Yes, I would be
20  interested in Pennsylvania.
21  Q. Mr. Dilemani, you were present
22  by telephone when your attorney took
23  Ms. Van Holmes's deposition, correct?
24  A. Yes.
25  Q. Do you remember her testimony when

66

```
 1              BEY DILEMANI
 2   she testified about a telephone conversation with
 3   you in which she asked you a series of questions
 4   about how would you handle this situation or that
 5   situation in a restaurant; do you recall that
 6   testimony?
 7       A.   Yes.
 8       Q.   Do you recall whether those
 9   questions and the answers you gave her occurred
10   in the first conversation that you had with
11   Ms. Van Holmes or was it a later conversation?
12           MR. GOLDBERG: Objection.
13           Are you waiting for grounds?
14   Objection to the characterization of Van Holmes'
15   testimony. This witness has not testified in
16   that regard.
17       Q.   You may answer the question.
18       A.   I'm not sure if it was the first
19   conversation or second phone call.
20       Q.   Sitting here today, can you recall
21   how many days or how much time elapsed between
22   the first phone call you had with Ms. Van Holmes
23   and the second phone call?
24       A.   A few days.
25       Q.   At some point, Mr. Dilemani, in a
```

67

```
 1              BEY DILEMANI
 2   phone call with Ms. Van Holmes, did she ask you
 3   to go to the Phoenix Buca location to meet with
 4   the general manager at that restaurant?
 5       A.   Yes.
 6       Q.   Do you remember whether that request
 7   occurred in the first conversation with
 8   Ms. Van Holmes or the second conversation?
 9       A.   I'm not sure.
10       Q.   And did you, in fact, go and meet
11   with the general manager at the Phoenix Buca
12   restaurant?
13       A.   Yes.
14       Q.   And that meeting was in person?
15       A.   Yes.
16       Q.   Did you have more than one meeting
17   with him?
18       A.   Yes.
19       Q.   Do you remember his name?
20       A.   Rich Perelli.
21       Q.   Tell me what you remember about the
22   first meeting that you had with Mr. Perelli.
23       A.   He was very a hospitable and
24   well-mannered individual, and it was very
25   pleasant meeting him.
```

68

```
 1              BEY DILEMANI
 2       Q.   Was the meeting, from your
 3   perspective, in the nature of an interview?
 4       A.   Absolutely.
 5       Q.   So he was asking you questions that
 6   you felt gave you a chance to tell him about your
 7   qualifications to run the restaurant, that sort
 8   of thing?
 9       A.   In some way.
10       Q.   Did Mr. Perelli show you around the
11   restaurant?
12       A.   No.
13       Q.   When you met with Mr. Perelli, was
14   it while the restaurant was open for business?
15       A.   No.
16       Q.   So it was during pre-business hours?
17       A.   Well, they don't serve lunch. It
18   was lunchtime.
19       Q.   Did you meet with Mr. Perelli more
20   than one time?
21       A.   Yes.
22       Q.   The first time that you met with
23   Mr. Perelli, did you meet anyone at the
24   restaurant, other than him?
25       A.   No.
```

69

```
 1              BEY DILEMANI
 2       Q.   And how long did you spend with
 3   Mr. Perelli the first time that you met him?
 4       A.   To the best of my knowledge,
 5   anywhere from 30 to 40 minutes.
 6       Q.   Did you, at the time that you went
 7   to the restaurant to meet with Mr. Perelli the
 8   first time, do anything there, other than talk to
 9   Mr. Perelli?
10       A.   Yes.
11       Q.   What else did you do?
12       A.   He gave me some paper to take a
13   test.
14       Q.   Did you take all the test at the
15   restaurant or was some of it a take-home test?
16       A.   The first time I took the test in
17   the restaurant. The second time I went there, he
18   gave me stuff to take home.
19       Q.   And by "the second time," you're
20   referring to the second time that you went to the
21   restaurant to meet with Mr. Perelli?
22       A.   Yes.
23       Q.   How much time elapsed between your
24   first visit with Mr. Perelli and your second?
25       A.   Approximately, to the best I can
```

Page 70

```
 1          BEY DILEMANI
 2  remember, one week.
 3      Q.  Do you remember when or in what
 4  month you visited the Phoenix restaurant to speak
 5  with Mr. Perelli?
 6      A.  I believe it was the month of June.
 7      Q.  Both visits?
 8      A.  Yes.
 9      Q.  Do you, sitting here today, know
10  what the dates of the visits were?
11      A.  No.
12      Q.  Do you know whether they were in the
13  beginning of the month, middle of the month, end
14  of the month?
15      A.  I don't remember that.
16      Q.  Do you maintain any sort of a
17  personal calendar, Mr. Dilemani?
18      A.  No, I don't.
19      Q.  Do you have any records that might
20  show when you had your meetings with Mr. Perelli?
21      A.  No.
22      Q.  I take it by the time that you had
23  had your meetings with Mr. Perelli, you had
24  already given notice to your two partners that
25  you were leaving?
```

Page 71

```
 1          BEY DILEMANI
 2      A.  Yes.
 3      Q.  On your resume you have your address
 4  listed as 10763 E. Palm Ridge Drive, Scottsdale?
 5      A.  Yes.
 6      Q.  Is that a house?
 7      A.  Yes.
 8      Q.  Had you already listed your house
 9  for sale --
10      A.  Yes.
11      Q.  -- at the time that you met with
12  Mr. Perelli?
13      A.  Yes.
14      Q.  How about the first time that you
15  spoke to Ms. Van Holmes, had you listed your
16  house for sale?
17      A.  No.
18      Q.  So it was between your first
19  conversation with Ms. Van Holmes and when you
20  first met with Mr. Perelli --
21      A.  Somewhere in that area, yes.
22      Q.  -- that you decided to sell your
23  house; is that right?
24      A.  Yes.
25      Q.  You said that you completed one test
```

Page 72

```
 1          BEY DILEMANI
 2  while you were at the restaurant visiting
 3  Mr. Perelli and another test at home; is that
 4  right?
 5      A.  Yes.
 6      Q.  What did you do with the test that
 7  you completed at the restaurant?
 8      A.  I left it with Mr. Perelli.
 9      Q.  And what did you do with the test
10  that you finished at home?
11      A.  That was mailed to Ms. Van Holmes.
12      Q.  In the conversation that you had
13  with Ms. Van Holmes where she talked about your
14  qualifications and experience and so forth, did
15  you tell her that you were the owner of Spaghetti
16  Western?
17      A.  No.
18      Q.  Did you tell Mr. Perelli that?
19      A.  No.
20      Q.  Did you ever tell anyone whom you
21  interviewed with at Buca that you were the part
22  owner of Spaghetti Western?
23      A.  No.
24      Q.  Why did you decide not to tell them
25  that?
```

Page 73

```
 1          BEY DILEMANI
 2          MR. GOLDBERG:  Objection.  Assumes a
 3  fact not in evidence.
 4      Q.  You may answer it.
 5      A.  I didn't really think it was
 6  important to say it.
 7      Q.  In between the first time and the
 8  second time that you met with Mr. Perelli, did
 9  you have any conversations with Lori Van Holmes?
10      A.  Yes.
11      Q.  Do you remember how many?
12      A.  No.
13      Q.  Do you remember what was said in
14  the one or more conversations that you had with
15  Ms. Van Holmes?
16      A.  In the first time and second time
17  meeting with Mr. Perelli, Ms. Van Holmes
18  mentioned that you have to go back to pick up
19  more tests, so either Mr. Perelli forgot to give
20  it to me or she forgot to mention it to him,
21  I don't know.
22      Q.  So to sum up, basically, the reason
23  that you had a second meeting with Mr. Perelli
24  was because Ms. Van Holmes called after the first
25  meeting?
```

74

BEY DILEMANI

1
2      MR. GOLDBERG: Objection.
3  Speculation.
4      A.   Yes.
5      Q.   Is your answer yes?
6      MR. GOLDBERG: Same objection.
7      Q.   You may answer the question.
8      A.   Yes.
9      Q.   After you went back to the Phoenix
10 restaurant, picked up the tests, took them home,
11 completed them, sent them off to Ms. Van Holmes,
12 when was the next time that you spoke with
13 somebody from Buca?
14     MR. GOLDBERG: Objection. That's a
15 mischaracterization of his testimony, and,
16 therefore, the question is misleading.
17     MR. GERHAN: Why do you think it's
18 mischaracterizing his testimony?
19     MR. GOLDBERG: Because he only took
20 one test home. Your question was phrased in a
21 way that both tests were taken back to someone at
22 Buca.
23     MR. GERHAN: We can argue about how
24 the question was phrased, but I'll reask the
25 question because I don't want it to be unclear.

75

BEY DILEMANI

1
2      A.   Sure.
3      Q.   You went to the restaurant a second
4  time to pick up a test, took it home, completed
5  it and mailed it off to Ms. Van Holmes, correct?
6      A.   Correct -- excuse me. I'm not sure
7  if it was mailed to Ms. Van Holmes or to Lucy
8  Lea.
9      Q.   To whoever it was mailed?
10     A.   Yes.
11     Q.   After you did that, when was the
12 next time you had a conversation with anyone at
13 Buca?
14     A.   A few days later.
15     Q.   And who was the person from Buca
16 that you spoke to that next time?
17     A.   The only one I was talking to at the
18 time in Buca was Lori Van Holmes.
19     Q.   And what do you remember of that
20 next conversation with Ms. Van Holmes; what did
21 she say, what did you say?
22     A.   In one of those conversations,
23 Ms. Van Holmes mentioned, Are you positive you
24 want to go to Allentown?
25     And I said, Yes.

76

BEY DILEMANI

1
2      And the next step was to meet JT,
3  the senior vice president, area vice president.
4      And I said, Fine.
5      And, actually, if I can go back,
6  the second time I went to Mr. Perelli, he
7  mentioned JT is here, and he explained to me who
8  he is and what is his position, and, of course,
9  he has to see you, on and on, Do you have time to
10 see him?
11     I said, Absolutely.
12     He came back, he said, He's tied up
13 right now, he's not at work.
14     I said, If you want me to wait, I'll
15 wait. Obviously, it was busy and I understood
16 that.
17     In that conversation, going back to
18 Ms. Van Holmes, she said she's going to make the
19 arrangement for me to get to see JT, and then
20 she's going to let me know when it's going to
21 take place.
22     Q.   Okay. At some point, did you have
23 another conversation with Ms. Van Holmes where
24 she gave you the information about when you would
25 see JT?

77

BEY DILEMANI

1
2      A.   Yes.
3      Q.   And do you recall when that
4  conversation was?
5      A.   To the best of my knowledge, it was
6  in the end of June, sometime in the end of June.
7      Q.   And what did she tell you about
8  seeing JT?
9      A.   She mentioned that, Can you see him
10 at the Phoenix restaurant on July 5th?
11     I said, Yes.
12     Q.   Was there anything else that you
13 said or she said in that conversation, that you
14 recall?
15     A.   No, that was pretty much it. The
16 appointment was set for July 5th.
17     Q.   So on July 5th, did you go to the
18 Phoenix restaurant?
19     A.   She also mentioned that she's going
20 to call me to confirm the time. I did not hear
21 from her, and I called her.
22     Q.   Do you remember what day you called
23 her?
24     A.   To the best of my knowledge, I would
25 probably say it was July 3rd, and I said, The



**Page 78**

1  BEY DILEMANI
2  reason I'm calling is, what time should I go
3  there on July 5th?
4      She said, By the way, JT went on
5  vacation. And that was it.
6    Q.  Was that conversation, the
7  conversation where she told you that JT went on
8  vacation, a conversation where she talked about
9  your need to complete an employment application
10  or was that a different conversation?
11    A.  No, it wasn't during that
12  conversation. It was later.
13    Q.  When did you talk to Ms. Van Holmes
14  about -- when did you have a conversation with
15  Ms. Van Holmes that concerned your need to fill
16  out an employment application?
17    A.  At one of the phone calls I received
18  from Ms. Van Holmes, which was toward the end,
19  and she was aware of it, my house was put up on
20  the market for sale and I'm packing my bags for
21  Pennsylvania, she was aware of it totally, and
22  during one of those conversations I had with her,
23  she mentioned that, it seems like you never fill
24  out an application, and I said I never got it.
25      So she mentioned that she's going to

**Page 79**

1  BEY DILEMANI
2  Federal Express the application, and as soon as I
3  get it, to fill it out and Federal Express it
4  back, which came in a return Federal Express
5  envelope. And I did that.
6    MR. GERHAN: I'm going to note an
7  objection to that part of the answer that relates
8  to Mr. Dilemani's testimony about what
9  Ms. Van Holmes may or may not have been aware of
10  as not responsive to my question.
11      Let's mark this as 3.
12      (Whereupon, Defendant's Exhibit No.
13  3 was received and marked for Identification and
14  is appended to the transcript.)
15      (Recess.)
16    Q.  I'm showing you the document that's
17  been marked as Defendant's Deposition Exhibit 3,
18  Mr. Dilemani. This is a copy of the application
19  for employment that you completed; is that right?
20    A.  Yes.
21    Q.  And that's your signature at the
22  bottom of the second page?
23    A.  Yes.
24    Q.  And it appears that you completed
25  the application on July 12th of 2000?

**Page 80**

1  BEY DILEMANI
2    A.  Right.
3    Q.  And you faxed this application back
4  to somebody at Buca; is that right?
5    A.  No. I believe this was Federal
6  Expressed the next day.
7    Q.  Did you receive it Federal Express
8  or did you send it Federal Express?
9    A.  I received it Federal Express and it
10  was sent Federal Express, to the best of my
11  knowledge. If it was faxed also, I don't
12  remember.
13    MR. GERHAN: Let's mark this as 4.
14      (Whereupon, Defendant's Exhibit No.
15  4 was received and marked for Identification and
16  is appended to the transcript.)
17    Q.  Mr. Dilemani, showing you
18  Defendant's Deposition Exhibit 4, this is a
19  Disclosure and Release Statement that you filled
20  out; is that correct?
21    A.  Yes.
22    Q.  And did you fill this out at the
23  same time or at least on the same date that you
24  were filling out the Application for Employment?
25    A.  Yes.

**Page 81**

1  BEY DILEMANI
2    Q.  And you sent this off either by fax
3  or Federal Express?
4    A.  Yes.
5    Q.  At the same time that you sent the
6  application?
7    A.  Yes.
8    Q.  And both Deposition Exhibit 3 and 4
9  you sent to Lucy Lea; is that right?
10    A.  Correct.
11    Q.  After completing Deposition Exhibits
12  3 and 4 on July 12, when was the next time that
13  you spoke to somebody from Buca?
14    A.  I'm sorry, could you repeat that
15  question again, please?
16    Q.  After you completed Deposition
17  Exhibits 3 and 4 on July 12th, when was the next
18  time that you spoke to somebody from Buca?
19    A.  I would say a few days later, with
20  Ms. Van Holmes.
21    Q.  And what can you recall of that next
22  conversation with Ms. Van Holmes, the one that
23  occurred shortly after you completed Deposition
24  Exhibits 3 and 4?
25    A.  She mentioned that she's going to

**Page 82**

```
                    BEY DILEMANI
 2   make the arrangement for me to have a telephone
 3   call with Mr. Cowler. I believe it's spelled
 4   C-O-W-L-E-R.
 5        Q.   And did she say when she was going
 6   to set that telephone call up for you?
 7        A.   Actually, to the best of my
 8   knowledge, she also gave me his number.
 9        Q.   Did she ask you to call him or were
10   you supposed to wait for him to call you?
11        A.   I don't remember, really, her saying
12   it either way.
13        Q.   What did you do after the telephone
14   call? Did you call Mr. Cowler?
15        A.   Yes.
16        Q.   And do you recall when you called
17   him?
18        A.   It was definitely in July. The
19   first time when I called, I believe that he had a
20   message machine. I left a message for him.
21   The actual conversation, I don't remember whether
22   I called him back again or he called me, that,
23   I don't remember.
24        Q.   In the occasion when you finally
25   reached Mr. Cowler, was that when you made an
```

**Page 83**

```
                    BEY DILEMANI
 2   arrangement to meet him in person or was this
 3   just a telephone interview?
 4        A.   A combination.
 5        Q.   Maybe the better way to get at it,
 6   then, is to ask you, what do you remember of that
 7   phone conversation, that first phone conversation
 8   that you had with Mr. Cowler?
 9        A.   He asked me if I have seen the vice
10   president, meaning JT.
11             I explained to him that he's on
12   vacation. Your name and number was given to me
13   by Lori Van Holmes to call you, and I believe he
14   mentioned first, you can come here first to
15   Pittsburgh, and then you can fly back to
16   Minnesota to meet the president.
17        Q.   At the time that you're having this
18   conversation with Mr. Cowler that you've just
19   testified about, where are you living?
20        A.   I was in Arizona.
21        Q.   How long after the telephone
22   conversation that you had with Mr. Cowler did you
23   actually meet with him in person?
24        A.   I believe I met Mr. Cowler on
25   July 22nd, sometime in the end of July. I'm not
```

**Page 84**

```
                    BEY DILEMANI
 2   positive of the date.
 3        Q.   At the time that you met with
 4   Mr. Cowler, had you already moved from Arizona?
 5        A.   Yes.
 6        Q.   At the time that you had moved, had
 7   you sold your house in Arizona?
 8        A.   It was on the market, it was not
 9   sold.
10        Q.   At the time that you met with
11   Mr. Cowler, had you rented the house in --
12        A.   Chalfont.
13        Q.   -- in Chalfont?
14        A.   Yes.
15        Q.   When you went to Pittsburgh to
16   interview with Mr. Cowler, was it a one-day trip
17   for you?
18        A.   Yes.
19        Q.   Let me back up for a minute.
20   Where did you meet with Mr. Cowler?
21        A.   At the restaurant.
22        Q.   At the Buca Restaurant in
23   Pittsburgh?
24        A.   Yes.
25        Q.   What time of day did you meet with
```

**Page 85**

```
                    BEY DILEMANI
 2   him?
 3        A.   I believe it was early afternoon.
 4        Q.   How long did you meet with
 5   Mr. Cowler?
 6        A.   To the best of my knowledge,
 7   anywhere between 30 to 40 minutes.
 8        Q.   Was anyone else present for the
 9   interview?
10        A.   No.
11        Q.   Did either you or Mr. Cowler take
12   notes?
13        A.   No.
14        Q.   Did you complete any paperwork while
15   you were with Mr. Cowler or was it just a
16   face-to-face meeting?
17        A.   Face-to-face.
18        Q.   At the conclusion of the interview,
19   did Mr. Cowler tell you what the next step in
20   your job application process was going to be?
21   Did he say wait for me to call you, wait for
22   somebody else to call you, anything like that?
23        A.   He mentioned that the training
24   program is going to take place in Buffalo for two
25   weeks, and then after that, someplace in
```

**Page 86**

1      BEY DILEMANI
2  Pennsylvania to learn the opening of a
3  restaurant.
4      Q.   During the interview with
5  Mr. Cowler, did you learn when the Allentown,
6  Pennsylvania restaurant was going to open?
7      A.   At that time, he mentioned
8  approximately five to six months.
9      Q.   Was that the first time that you had
10 learned that the restaurant would not be open for
11 that period of time?
12     A.   No.
13     Q.   So you already knew that
14 information?
15     A.   Yes.
16     Q.   During the interview itself, did you
17 feel that you got along well with Mr. Cowler?
18     A.   Definitely.
19     Q.   Did you feel that Mr. Cowler was
20 somebody that you could work for?
21     A.   Yes.
22     Q.   Did you understand that if you
23 became the general manager of the Allentown
24 restaurant, that Mr. Cowler would be your
25 immediate supervisor?

**Page 87**

1      BEY DILEMANI
2      A.   Yes.
3      Q.   Did Mr. Cowler ask you any questions
4  about your experience at Spaghetti Western
5  Restaurant?
6      A.   I don't recall Mr. Cowler asking me
7  too many questions regarding how to operate a
8  restaurant. I don't remember that.
9      Q.   What type of questions do you
10 remember Mr. Cowler asking you, if any?
11     A.   Not too much.
12     Q.   Do you remember discussing with
13 Mr. Cowler any other job opportunities at Buca,
14 other than being the general manager of the
15 Allentown restaurant?
16     A.   He actually asked me, A guy with
17 your background, you might get bored running one
18 restaurant, something of that shape. I'm not
19 saying this is the exact words.
20          And I mentioned to him, after a few
21 years, you get promoted, which that is pretty
22 much the standard in a lot of companies. And
23 that was about it.
24     Q.   Did you feel that running a single
25 restaurant for a period of several years might

**Page 88**

1      BEY DILEMANI
2  get boring?
3      A.   Absolutely not.
4      Q.   After you met with Mr. Cowler in
5  person, when was the next time that you spoke to
6  somebody with Buca?
7      A.   A few days later, I did receive a
8  phone call from Ms. Van Holmes.
9      Q.   What did she say in that phone call
10 and what did you say?
11     A.   That was very brief, actually.
12          How was your trip to Pennsylvania?
13          I said, It was fine.
14          In the same tone of voice, Well,
15 Mr. Cowler decided on somebody else, I'm very
16 sorry.
17     Q.   What did you say after she said
18 something to the effect of Mr. Cowler --
19     A.   I was very, very shocked, and very
20 surprised.
21     Q.   My question, though, was, what did
22 you say after Ms. Van Holmes said something to
23 the effect of, Mr. Cowler has decided on someone
24 else, I'm very sorry?
25     A.   I probably -- to the best of my

**Page 89**

1      BEY DILEMANI
2  knowledge, I said, After two and a half months
3  interviewing back and forth, you're just telling
4  me this now after I moved to Pennsylvania.
5          And she just kept saying that she's
6  sorry.
7      Q.   Did you raise your tone of voice
8  during the conversation?
9      A.   I don't remember raising my voice.
10 Especially when I talk to a lady, I usually don't
11 do that.
12     Q.   Do you recall whether you used any
13 curse words in your conversation?
14     A.   Absolutely not.
15     Q.   Approximately how long did this
16 conversation last with Ms. Van Holmes?
17     A.   Anywhere between three to five
18 minutes, maybe.
19     Q.   In this conversation that you were
20 having with Ms. Van Holmes, did you complain to
21 her about having to pay the cost of the airplane
22 tickets?
23     A.   Yes. She mentioned I should take
24 a -- for a one-day trip from here to go to
25 Pittsburgh to go by car. And, actually, she

90

```
 1              BEY DILEMANI
 2   asked me, How come you didn't drive. Imagine
 3   that, 600 miles. And so I took the plane, and
 4   this is what it came to.
 5        Q.   Did she tell you in that
 6   conversation that she would take care of the
 7   airplane tickets?
 8        A.   She said, Send me the receipts and
 9   I'll see what I can do.
10        Q.   Did she subsequently send you
11   reimbursement for your expenses for that trip to
12   Pittsburgh?
13        A.   Yes.
14             MR. GERHAN: Let's mark this as
15   Exhibit 5.
16             (Whereupon, Defendant's Exhibit No.
17   5 was received and marked for Identification and
18   is appended to the transcript.)
19        Q.   Mr. Dilemani, I'm showing you a
20   document that's been marked as Deposition Exhibit
21   5. Is this a copy of the letter that you sent to
22   Ms. Van Holmes requesting reimbursement for your
23   expenses on the trip to Pittsburgh?
24        A.   Yes.
25        Q.   At the top of Deposition Exhibit 5,
```

91

```
 1              BEY DILEMANI
 2   there's what I'll call a fax transmission.
 3        A.   Yes.
 4        Q.   An indication that has the word Jake
 5   Dilemani?
 6        A.   That's my son.
 7        Q.   Is it his fax machine that you used?
 8        A.   No.
 9        Q.   Do you know why it prints out that
10   way?
11        A.   Actually, even if you look at the
12   number on top of the fax machine, it's 914 area
13   code. This number was in the machine. It was
14   programmed in the machine when we were living in
15   New York. He programmed the number in the
16   machine under his own name, that's why. Finally,
17   he changed it about a year ago to my name.
18        Q.   After the telephone conversation
19   with Ms. Van Holmes where she told you the news
20   about your application at Buca, did you ever have
21   any other telephone conversations with anyone
22   from Buca?
23        A.   No.
24             MR. GERHAN: Let's mark this one as
25   Exhibit 6.
```

92

```
 1              BEY DILEMANI
 2             (Whereupon, Defendant's Exhibit No.
 3   6 was received and marked for Identification and
 4   is appended to the transcript.)
 5        Q.   Mr. Dilemani, I'm showing you a
 6   document that's been marked as Deposition Exhibit
 7   6. This is a copy of a letter that you sent to
 8   Mr. Micatrotto; is that correct?
 9        A.   Correct.
10        Q.   Did you send this letter before or
11   after receiving the reimbursement for the
12   Pittsburgh trip expenses, if you recall?
13        A.   That, I don't remember.
14        Q.   If you look at the next to last page
15   and the last page of Deposition Exhibit 6, the
16   last sentence before your signature -- or
17   actually, I'm sorry, the next to last sentence
18   before your signature says, "Enclosed you will
19   find papers that I think will be of interest to
20   you."
21             Do you see that sentence?
22             MR. GOLDBERG: May I point out to
23   the witness the sentence?
24             MR. GERHAN: Sure.
25        A.   Yes.
```

93

```
 1              BEY DILEMANI
 2        Q.   Do you remember what papers you
 3   enclosed with this letter?
 4        A.   All the paperwork had to do with my
 5   moving expenses, yes, from Arizona to Chalfont.
 6        Q.   So things like the bill from the
 7   moving company, would that have been one of the
 8   enclosures?
 9        A.   Yes, the trucking company, the
10   plane. I don't remember all of them, really.
11        Q.   But they all related to expenses
12   that you had incurred in moving from Arizona to
13   Pennsylvania?
14        A.   Correct.
15        Q.   At the time that you were going
16   through the interview and application process at
17   Buca, were you seeking employment with any other
18   employer?
19        A.   I don't remember if it was the same
20   time or before or after, that, I don't remember.
21        Q.   What other employer would you have
22   been seeking employment with at or about that
23   same time?
24        A.   During the time I was negotiating
25   with Buca, practically nobody, because I was --
```

### 94

```
 1         BEY DILEMANI
 2  based on what I heard from Ms. Van Holmes and
 3  Mr. Cowler, in part, I was pretty much sure the
 4  job -- I have the job, and based on that, I did
 5  not bother to do anything else, and, therefore,
 6  that was my mistake.
 7      Q.   How about before you first contacted
 8  Buca, but while you were still in Arizona, was
 9  there any other employer that you sought
10  employment with?
11      A.   Where, in Arizona?
12      Q.   Yes.
13      A.   No.
14      Q.   Or anywhere, but while you were
15  living in Arizona.
16      A.   I might have sent an application and
17  my resume, based on what I've seen in the paper,
18  but there was nothing really I did follow up on.
19      Q.   And if you assume for a minute that
20  you did send your resume to somebody during that
21  time that you were operating Spaghetti Western,
22  nobody contacted you as a follow-up, other than
23  the Buca stuff?
24      A.   Yes, probably.  I mean, to the best
25  of my knowledge, if I can remember everything,
```

### 95

```
 1         BEY DILEMANI
 2  they did send me some type of letter, you know,
 3  we have your information in the file or fill out
 4  an application, send it back, that sort of thing.
 5      Q.   Do you remember what company it was?
 6      A.   Not really, I don't.
 7      Q.   Was it a company that was based in
 8  Arizona or was it based elsewhere?
 9      A.   They were pretty much national.
10      Q.   So it was some sort of national
11  restaurant company that you sent your resume to?
12      A.   Probably.
13      Q.   So I take it, then, that at some
14  point before you sent your resume to Buca, you
15  had already decided that Spaghetti Western was
16  not going to be the final job for you, if you
17  will, you were looking elsewhere?
18      A.   I was looking for a little more
19  responsibility.
20      Q.   When do you recall making that
21  decision?
22      A.   I'm sorry, what decision?
23      Q.   The decision that you wanted to look
24  for a job with a little more responsibility.
25         MR. GOLDBERG:  Objection.  Asked and
```

### 96

```
 1         BEY DILEMANI
 2  answered.
 3      Q.   You may answer it.
 4         MR. GOLDBERG:  You may answer it.
 5      A.   Probably, starting in April.
 6         MR. GERHAN:  Let's mark this one as
 7  Deposition Exhibit 7.
 8         (Whereupon, Defendant's Exhibit No.
 9  7 was received and marked for identification and
10  is appended to the transcript.)
11      Q.   Mr. Dilemani, I'm showing you a copy
12  of a document that's been marked as Defendant's
13  Deposition Exhibit 7.
14         Is this a copy of your current
15  resume?
16      A.   Yes.
17      Q.   Is there a company other than
18  Spaghetti Western Company that's your most recent
19  place of employment?
20      A.   Yes.
21      Q.   And what is that?
22      A.   At the present time?
23      Q.   Yes.
24      A.   A company called 1900 North Broad,
25  Inc.
```

### 97

```
 1         BEY DILEMANI
 2      Q.   What does 1900 North Broad, Inc. do?
 3      A.   It is a gas station and food mart.
 4      Q.   Who is the owner of 1900 North
 5  Broad, Inc.?
 6      A.   Me.
 7      Q.   Are there any other owners besides
 8  you?
 9      A.   No.
10      Q.   How long have you been the owner of
11  1900 North Broad, Inc.?
12      A.   Since May.
13      Q.   May of 2002?
14      A.   Correct.
15      Q.   What 1900 North Broad, Inc. does is
16  operate a gas station and food mart?
17      A.   Yes.
18      Q.   Is the gas station and food mart
19  that it operates located at 1900 North Broad?
20      A.   North Broad Street.
21      Q.   Does 1900 North Broad, Inc. do
22  anything other than operate that gas station and
23  food mart?
24      A.   No.
25      Q.   Do you perform any services for
```

```
                                         114
 1            BEY DILEMANI
 2   expected it to be when you bought it?
 3       A.   I really don't have any final answer
 4   to that.
 5       Q.   Approximately, how many hours per
 6   week do you work at the gas station/food mart?
 7       A.   Around 40.
 8       Q.   How many other employees work there?
 9       A.   I have quite a few.
10       Q.   How many?
11       A.   Four.
12       Q.   Are any of them family members?
13       A.   No.
14       Q.   I think you told me earlier that
15   your wife works presently?
16       A.   Yes, yes.
17       Q.   Has she worked throughout the time
18   that you've lived -- let me back up.
19            Has your wife worked since you moved
20   back to Pennsylvania in July or August of 2000?
21       A.   Most part of it.
22       Q.   And has she had the same job or
23   different jobs?
24       A.   Different jobs.
25       Q.   What is she doing presently?
```

```
                                         115
 1            BEY DILEMANI
 2       A.   She is an interior designer.
 3       Q.   Is she employed by anyone or is she
 4   self-employed?
 5       A.   Employed by someone right now.
 6       Q.   And how long has she been employed
 7   by that business?
 8       A.   The present job, to the best of my
 9   knowledge, seven months, six, seven months.
10       Q.   Did your wife work when you lived in
11   Arizona?
12       A.   No.
13       Q.   Taking the entire calendar year
14   2001, do you know how much money your wife made?
15       A.   Not really. I don't know offhand.
16       Q.   Do you know how much she made in
17   calendar year 2002?
18       A.   No.
19       Q.   When I was asking you about the
20   damages that you were seeking, in addition to
21   lost pay, you told me that you were looking for,
22   I think the words you used were compensation for
23   being made uncomfortable.
24       A.   Yes.
25       Q.   What did you mean by that?
```

```
                                         116
 1            BEY DILEMANI
 2       A.   Okay. When you have a feeling that
 3   you have a job offer and the job is in the bag,
 4   and then everything changes and changes 360
 5   degrees against you, at one point, I'm blaming
 6   myself, I did not wait for the formal offer
 7   letter, I blame myself for that. And sitting
 8   here in front of you right now, I'm very sorry
 9   I did what I did, extremely sorry.
10            And based on this, it would affect
11   you mentally, it would affect you emotionally,
12   you would lose your confidence and you sort of
13   feel that you can't stand yourself anymore.
14            Again, I blame myself for part of
15   that, which I sort of took these two individuals,
16   especially Ms. Van Holmes's conversation, I took
17   it very serious, because I believe when you're
18   applying for a job, it's serious. And based on
19   all of this stuff and going through the
20   aggravation, mentally, physically, financially,
21   the family, the children, and putting everybody
22   into that package, I can assure you, it was not a
23   pleasant time when we were going through it at
24   all, not for me, not for my wife and also not for
25   my children; which, again, I'm going to repeat
```

```
                                         117
 1            BEY DILEMANI
 2   myself, I'm very sorry I did what I did.
 3       Q.   When you say you're very sorry you
 4   did what you did, to what are you referring?
 5       A.   I'm referring to moving without
 6   having an offer letter in my hand.
 7       Q.   Is there a money figure that you
 8   believe would compensate you for the problems
 9   that you just described in your previous answer?
10       A.   I mean, that is something that is up
11   to the law to make that decision, what's fair is
12   fair.
13       Q.   Have you gone to see a psychiatrist
14   or psychologist with respect to the issues that
15   you were talking about?
16       A.   No.
17       Q.   Have you gone to see any kind of a
18   counselor about those problems?
19       A.   No.
20       Q.   Have you gone to see a doctor about
21   those problems?
22       A.   I have seen doctors, but did not
23   mention the problems.
24       Q.   Do you attribute -- let me back up
25   for a second.
```