# EXHIBIT C

# CONDENSED TRANSCRIPT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BEY DILEMANI
52 Brinker Drive
Doylestown, PA

     Plaintiff

    V                           Civil Action
                               No. 02-CV-2614

BUCA, INC.
1300 Nicollet Mall
Suite 5003
Minneapolis, MN 55403

     Defendant

       Oral deposition of JAMES M. COWLER, taken at the LAW OFFICES OF MICHAEL J. SALMANSON, P.C., 1515 Locust Street, 10th Floor, Philadelphia, Pennsylvania, beginning at 10:28 a.m., on Thursday, January 9, 2003, before Carmen A. Santone, Court Reporter, pursuant to notice.

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Information and Technology Management
1700 Sansom Street, 5th Floor,
Philadelphia, PA 19103
www.jdreporting.com

215.564.3905
phone

215.751.0581
fax

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

**2**

```
1   APPEARANCES:
2   SCOTT B. GOLDBERG, ESQUIRE
      Law Offices of Michael J.
3     Salmanson, P.C.
      1515 Locust Street, 10th Floor
4     Philadelphia, Pennsylvania 19102
      (215) 772-0150
5     Counsel for the Plaintiff
6   DANIEL C. GERHAN, ESQUIRE
      Faegre & Benson, LLP
7     2200 Wells Fargo Center
      90 South Seventh Street
8     Minneapolis, Minnesota 55402-3901
      (612) 766-7000
9     Counsel for the Defendant
10        EXAMINATION INDEX
11  JAMES M. COWLER
      BY MR. GOLDBERG        3
12
13
14        EXHIBIT INDEX
15              MARKED
16  PLAINTIFFS
      34 One-page document       222
17      entitled Interview
        Evaluation Sheet
18
      35 Eight-page composite with  260
19      5/4/01 letter to PHRC
        from Mr. Gerhan as its
20      cover
21
22
23
24
```

**3**

```
1        (It is agreed by and
2   between counsel that all objections,
3   except as to the form of the
4   question, are reserved until the time
5   of trial.)
6        JAMES M. COWLER, having
7   been duly sworn, was examined and
8   testified as follows:
9            EXAMINATION
10  BY MR. GOLDBERG:
11    Q.  Mr. Cowler, my name is
12  Scott Goldberg. I'm an attorney
13  representing Bey Dilemani, seated to
14  my right, in a lawsuit he has brought
15  against Buca, Inc., based on Buca,
16  Inc.'s decision not to hire him as a
17  paisano partner.
18        Please state your name and
19  address and date of birth for the
20  record?
21    A.  Jim Cowler. Address is 153
22  Pleasant View, McMurray,
23  Pennsylvania, 15317. Date of birth
24  9/21/56.
```

**4**

```
1    Q.  Is Jim your --
2    A.  James M. I'm sorry.
3    Q.  Okay. Have you ever been
4   deposed before?
5    A.  No, I don't believe so.
6    Q.  Good. This way I get to
7   give you instructions without
8   worrying what everyone else has told
9   you.
10    A.  Right.
11    Q.  As you know, everything we
12  say is being recorded by a court
13  reporter, seated to your right. I'm
14  going to be asking you questions and
15  you're required to answer under
16  oath. Do you understand that?
17    A.  Absolutely, yes.
18    Q.  One of the important
19  instructions is that you're going to
20  need to make sure that all of your
21  answers are verbal, because the court
22  reporter cannot record things such as
23  grunts or nods of the head.
24    A.  Okay.
```

**5**

```
1    Q.  If you don't understand a
2   question I'm asking for any reason,
3   please call that to my attention.
4   Okay?
5    A.  Okay.
6    Q.  If you provide an answer to
7   my question, I'm going to move on and
8   assume that you understood my
9   question. Fair enough?
10    A.  Fair enough.
11    Q.  Do you understand that the
12  testimony you're giving here today,
13  although it's not in a courtroom, has
14  the same affect as testimony in a
15  courtroom for purposes of your oath?
16    A.  Yes, I do.
17    Q.  Is there any reason that
18  you cannot give complete and truthful
19  answers to my questions here today?
20    A.  There is no reason why I
21  cannot answer you truthfully.
22    Q.  And completely?
23    A.  Completely.
24    Q.  You're not under the
```

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management
215.564.3905   1700 Sansom Street, 5th Floor  Philadelphia, PA 19103   FAX 215.751.0581
www.JDReporting.com

31 (Pages 118 to 121)

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

118

1  partner. Buffalo, Cleveland,
2  Columbus, Pittsburgh -- I'm trying to
3  think back. I don't know -- I
4  think -- I don't know.
5      There might be a couple
6  others, you know, that I might have
7  hired like three years ago, no longer
8  with us, that kind of stuff. Like
9  David Ortiz would be a good example;
10  he was only with us for like two
11  months, three months.
12     Q. Okay. If during the course
13  of this deposition you recall the
14  names of any other paisano partner
15  that you played a role in hiring,
16  would you call that to my attention?
17     A. Absolutely.
18     Q. Why did you hire James
19  Morris?
20     A. Jim Morris?
21     Q. Yes.
22     A. Owned his own restaurant
23  for 15 years. Outstanding image from
24  a respectability point of view, from

119

1  a presentation point of view.
2  Outstanding communication skills.
3  Unbelievable understanding of the
4  market. Community involvement in the
5  chamber of commerce, the New York
6  Restaurant Association. The various
7  Boys Club, Girls Clubs, sports,
8  swimming. A very involved man.
9      Q. Were there any other
10  applicants for the paisano partner
11  position for which James Morris was
12  hired?
13     A. I'm sure there were. I'm
14  sure I interviewed five, six, seven
15  people.
16     Q. You personally considered
17  five or six people in the interview
18  process?
19     A. Considered?
20     Q. Yes.
21     A. I only considered one.
22  That was Jim Morris.
23     Q. You interviewed people
24  without considering them for the

120

1  position?
2      A. They were either ruled in
3  or out during the interview process.
4      Q. By you?
5      A. By me.
6      Q. Would you schedule an
7  interview for someone without any
8  basis for believing they may be a
9  good candidate for the position?
10     A. Could you restate that just
11  so I can give you a yes or no.
12     Q. For each of the people you
13  interviewed, did you review a resume?
14     A. I get copied on a resume,
15  yes. I guess to answer your
16  question, I would not interview
17  somebody for the sake of interviewing
18  somebody.
19     Q. And as a corollary, if
20  during the course of an interview it
21  became clear in your mind that, for
22  example, one of the other people
23  vying for the Albany position was not
24  a good candidate, would you terminate

121

1  the interview?
2      A. I believe in a certain
3  amount of courtesy extended to
4  somebody. I also believe you have to
5  discount a lot of times the first ten
6  minutes of an interview, because some
7  people are nervous, they've never
8  interviewed before.
9      I think you have to make
10  that decision in the first ten
11  minutes of the comfort zone of what
12  an -- so many people don't know how
13  to interview and they get all freaked
14  out and they don't know -- they just
15  don't -- you've got to relax them.
16     Some people come in with an
17  agenda. You have to take people one
18  step at a time in an interview
19  process. I've had interviews go
20  three hours, I've had interviews go
21  20, 30 minutes.
22     Q. What's typical?
23     A. Typical? Average? My
24  average paisano interview is probably

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905            1700 Sansom Street, 5th Floor            FAX 215.751.0581
                        Philadelphia, PA 19103
                        www.JDReporting.com

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

122

1  between an hour and an hour and a
2  half, closer to an hour and a half.
3      Q.  What would lead an
4  interview to last closer to three
5  hours?
6      A.  My liking what I hear and
7  who I'm talking to from a -- fitting
8  the qualifications of what I'm
9  looking for.  More in-depth.  It's
10 the more in-depth.  It's the
11 secondary, the deeper questions, and
12 the revisiting of other questions.
13     Q.  What would lead an
14 interview to last for only 20 or 30
15 minutes for a paisano partner?
16     A.  Misrepresentation,
17 arrogance, lack of humility, an
18 aggressiveness that I don't think
19 fits with our company.  Maybe a skill
20 set that wasn't -- that is clearly
21 not there.
22     Q.  In those situations, how
23 would you keep the interview to 20 or
24 30 minutes?

123

1      A.  Well, it's like anything
2  else.  You manage the situation.  You
3  cut it close.  You don't -- you see
4  if they've got any open-ended
5  questions about the concept, about
6  the position.
7      I basically stop asking
8  questions and see if they have
9  questions for the interview, and I
10 answer all those questions and I
11 shake their hand and thank them for
12 their time.
13     Q.  Do you ever tell someone
14 during an interview, I'm sorry, it's
15 not going to work out?
16     A.  I've only done that -- not
17 necessarily done that with a paisano
18 partner, but somebody who might be
19 interviewing for a paisano partner
20 who is clearly an assistant level or
21 an entry level person, where I want
22 to give them advice from, you know,
23 You should probably do this first,
24 then come back and see us.  But very

124

1  rarely do I say, I'm sorry, this is
2  not going to work out.
3      Q.  Why did you hire Vincent
4  Vesci?
5      A.  I'm laughing because you'd
6  have to know Vince.  Vince probably
7  understands our concept more than
8  most.  Based on his life experience
9  and background; Sons of Italy,
10 president of the bowling league,
11 owned his own business, raised in
12 Norristown, member of the church.  He
13 is embedded in the community.
14     He understands what it's
15 like to be an owner.  He was a
16 general manager of a high-volume,
17 fast-paced restaurant company called
18 Houlihan's, and I appreciated his
19 ownership skills, I appreciated his
20 general manager skills.
21     He was -- you could cut
22 butter with his shirt sleeve.  I
23 mean, he's a guy that takes personal
24 pride in everything he does, and you

125

1  could see that in interview and you
2  could see it in his restaurant.  I'm
3  a firm believer that if you -- that
4  the paisano partner reflects the
5  restaurant.
6      Q.  Were there other applicants
7  for the East Norriton position for
8  which Vince Vesci was hired as a
9  paisano partner?
10     A.  Yes, yes.
11     Q.  Do you recall how many?
12     A.  No.
13     Q.  Do you recall how many
14 people you interviewed for that
15 position?
16     A.  No.  I -- you know, on an
17 average, I would say we interviewed
18 between -- I interview -- not through
19 recruiters, but I interview between
20 five and seven.
21     Q.  When you use the term
22 "interview" in that sense, are you
23 referring to an in-person interview,
24 a telephone --



**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          FAX 215.751.0581
                      Philadelphia, PA 19103
                      www.JDReporting.com

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

146

1  and above?
2      A.  Any more?  We got Cheryl.
3  If I think of any, I'll let you know.
4  That's what I can think of right now.
5      Q.  Okay.  Please provide your
6  best estimate for Alison Hoffman's
7  age.
8      A.  38, 39.
9      Q.  Amy Bonner?
10     A.  Early 30s.
11     Q.  Tony Avasakdi?
12     A.  I'd say Tony's 38, 39.
13     Q.  John Little?
14     A.  37, 38, right in that area.
15     Q.  Cheryl...
16     A.  Dometrovec.
17     Q.  Dometrovec.
18     A.  What is Cheryl?  Cheryl
19  would probably be in her late 30s.
20  And Jeanie just turned 40, I believe.
21     Q.  Please tell me your
22  understanding of the recruiting
23  process for paisano partners during
24  the year 2000?

147

1      A.  My understanding of how the
2  process works?
3      Q.  Yes, from start to finish.
4      A.  Start to finish.  We
5  determine a time line of hiring, when
6  we're going to need to hire people,
7  source and hire people.
8      Q.  And who makes that
9  decision?
10     A.  Usually the recruiters come
11  up with those time lines once we've
12  established the opening date for the
13  restaurant.  That's for a brand new
14  restaurant.
15         For an existing restaurant,
16  you know, obviously when the -- if
17  there is an opening due to a
18  promotion, you know, a lateral move
19  to another market or a loss of a
20  partner, that process, as far as
21  sourcing and hiring, starts
22  immediately.
23     Q.  Okay.
24     A.  So we have a sourcing and

148

1  hiring -- or, sourcing period in
2  which -- and the people involved back
3  then, I believe, were Lucy Lea, who
4  basically took in all resumes; so all
5  resumes would be forwarded to her.
6         Depending on who wrote the
7  ad and what our needs were, some of
8  our resumes would go to Lori Van
9  Holmes, who was our west coast
10  recruiter, some would go to Stephanie
11  Comeaux.
12     Q.  Who is Stephanie Comeaux?
13     A.  She is based out of
14  Florida.  They were both recruiters
15  back in 2000; now they're directors
16  of Family Resources.
17         So those resumes then would
18  be reviewed and screened by folks
19  like Lucy, Stephanie, and Lori, where
20  they would call the candidate and ask
21  various questions about those
22  candidates and interview them.
23         The next process would
24  be -- and it all depends on

149

1  geography, as far as, you know, where
2  everybody is at the time, because we
3  are sort of a fluid company -- would
4  be getting a partner into a
5  restaurant so they can see what the
6  restaurant's like.
7      Q.  When you say a partner into
8  the restaurant --
9      A.  A future partner.  A
10  partner candidate.
11     Q.  Oh.  "Partner" means
12  paisano partner?
13     A.  Yeah.  I'm sorry.
14     Q.  Okay.  Please continue.
15     A.  Getting a paisano partner
16  candidate in a restaurant with a
17  current paisano partner just to get a
18  feel for the restaurant, see how that
19  partner interacts with the team,
20  making sure that potential partner
21  has an understanding of what we're
22  trying to accomplish.  Basically
23  seeing if it's a fit, seeing if
24  there's a comfort zone.



**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          FAX 215.751.0581
                      Philadelphia, PA 19103
                      www.JDReporting.com

39 (Pages 150 to 153)

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

150

1        In that, Lori will ask the
2   paisano partner to test the candidate
3   with Batrus/Thurstone testing, which
4   is basically a personality profile,
5   and it's also -- it measures not raw
6   intellect but more the ability to
7   learn new things.
8        They will do an
9   application. They will do a -- fill
10  out some paperwork to request a
11  background check as far as DMV,
12  credit and things of that nature.
13  That interview is then processed.
14       The paisano partner
15  basically reports back to Lori or
16  Stephanie and says, You know what,
17  here's where we want to go. We want
18  to have this person set up for
19  another interview. And then that
20  person is put in front of a
21  divisional vice president for a
22  personal interview.
23      Q.  And then?
24      A.  That's the process. The

151

1   interview is done by the divisional
2   vice president. Depending if there's
3   mult- -- I mean, multiple candidates
4   or what process it's in. It might be
5   the first candidate of ten. You
6   know, we interview everybody
7   available and make decisions as they
8   go.
9        And what you try to do is
10  you try to hire the best candidate
11  for the site and for Buca diBeppo.
12      Q.  How long before a new
13  opening is scheduled does Buca begin
14  the interviewing process?
15      A.  Again, that's going to
16  depend on the market. There are
17  certain markets that are very tough
18  to staff. An example, like
19  Philadelphia and Washington D.C. take
20  us a little longer to staff then,
21  let's say, a market like Pittsburgh,
22  where I have resumes for job openings
23  I don't have; California, where we
24  have resumes for job openings we

152

1   don't have.
2        It's just the nature of
3   employment base and the nature
4   basically of how well-known we are in
5   the community. So that's one
6   determination of how long it's going
7   to take us to source a good pool of
8   candidates to hire from.
9        The other thing that we
10  have to consider is also the
11  holidays, because most people do not
12  like to change jobs in the end of
13  November, December because it
14  requires training, which is also, you
15  know, something you have to consider
16  if you're -- you got a family. We're
17  going to say, Hey, we need to, you
18  know, fly you to so and so and you
19  can come back the day before
20  Christmas. It's just pretty tough on
21  people.
22       And most people do not
23  change jobs in November, December.
24  Most people change right after

153

1   January. So we determine -- I mean,
2   that's how we determine when we're
3   going to hire.
4        But there are drop-dead
5   dates we have to establish on store
6   openings. We do time lines on that,
7   yeah.
8       Q.  Is there a typical time
9   line for the hiring process for a
10  paisano partner?
11      A.  Yeah. We take the date and
12  we work backwards. So we take an
13  opening date. We work backwards two
14  weeks for training the crew and doing
15  the grand opening, four weeks back
16  from that to do the hiring of the
17  crew, a minimum of seven weeks behind
18  that to train the paisano partner and
19  get them out just in time to do the
20  hiring, and then we take back a
21  30-day period and a 90-day period for
22  sourcing and hiring.
23      Q.  And all together, that
24  comes to about what?

**JDR**

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          FAX 215.751.0581
                      Philadelphia, PA 19103
                      www.JDReporting.com

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

154

1    A.  It comes to about five
2   months, where we have to really start
3   looking.
4    Q.  Does that depend on the
5   factors you were discussing before?
6    A.  Those are a part of the
7   factors.  Some of the other factors
8   is in some restaurants you've got
9   promotable people in the market.
10       Some factors, you've got
11  people that want to move to new
12  markets.  An example would be
13  Charlotte, North Carolina, which
14  we're opening in April.  Our guy in
15  Pittsburgh is from there and is going
16  to move there.  So you have wins like
17  that, where you've got a seasoned
18  individual who wants to go to a new
19  market, and that helps out in the
20  recruiting immensely.
21    Q.  I want to make sure I
22  understand what each stage is in the
23  recruiting process, where a decision
24  is made whether to screen an

155

1   applicant out.
2    A.  Okay.
3    Q.  Do you understand what I'm
4   asking?
5    A.  Absolutely.
6    Q.  What is the first stage at
7   which an applicant would be
8   potentially screened out?
9    A.  At the screening stage,
10  when a resume is received at the
11  office.
12    Q.  This is prior to any --
13    A.  The actual screening could
14  be not even a response; meaning, a
15  guy who wants to be a restaurant
16  manager who is currently doing
17  something completely out of the
18  industry who says, I'm going to send
19  you resume.  It would be completely
20  screened out; a letter that says, you
21  know, We're not looking for those
22  qualities.  And you get that when --
23  when the economy, too, is you get
24  people that are looking to do

156

1   anything.
2    Q.  Who makes the decision
3   whether to screen out an applicant at
4   that stage?
5    A.  The person who is actually
6   doing the screening.  So it would be
7   the screener, the recruiter, the
8   paisano partner or myself.
9    Q.  And --
10    A.  And then there's one
11  level -- back in 2000 there was one
12  level above that, in that if a DVP
13  said, on a paisano partner, This is
14  my candidate of choice, we would
15  meet -- they would meet with the COO,
16  and that's -- that would be the final
17  determination.
18    Q.  To your knowledge, when the
19  process involved that final step, was
20  there ever an instance where the COO
21  rejected the divisional vice
22  president's candidate of choice?
23    A.  I couldn't say for sure.
24  My belief is yes, the COO -- not the

157

1   CEO but the COO.  I believe it
2   happened.  I do not know for fact but
3   I believe it did based on --
4    Q.  Is it fair to say that it
5   was rare?
6    A.  It was fair to say that if
7   you were a divisional vice president
8   and put a bad candidate in front of
9   the COO, your decision-making skills
10  would definitely be at task.
11    Q.  Is it fair to say that a
12  divisional vice president who
13  recommends a candidate can reasonably
14  expect that candidate to be approved
15  by the COO?
16    A.  Absolutely; otherwise,
17  you'd have to question yourself.
18    Q.  So as I understand it, the
19  first step at which a decision is
20  made to screen out an applicant is by
21  somebody other than yourself --
22    A.  Absolutely.
23    Q.  -- who's in the --
24  reviewing the resume.



**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905        1700 Sansom Street, 5th Floor        FAX 215.751.0581
                    Philadelphia, PA 19103
                    www.JDReporting.com

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

158

1    A.  Absolutely.
2        MR. GERHAN: Objection.
3    Asked and answered.
4    BY MR. GOLDBERG:
5    Q.  What is the next step?
6    A.  After the screener?
7    Q.  Yes.
8    A.  It would go to a recruiter.
9    Q.  Okay.  And what would
10   happen --
11   A.  A more in-depth phone
12   interview.  Or if it was at a job
13   fair, a personal interview.  But the
14   norm is a phone interview.
15   Q.  And as a result of the
16   phone interview, another decision
17   would be made whether to screen out
18   an applicant?
19   A.  Absolutely.
20   Q.  Who would make that
21   decision?
22   A.  The recruiter would either
23   screen out or go forward.
24   Q.  Would you have any role in

159

1    that decision?
2    A.  No.
3    Q.  To your knowledge, what are
4    the criteria used by a recruiter,
5    whether to screen out an applicant at
6    that stage?
7    A.  Job history is a major part
8    of it.  Understanding full service is
9    a major part of it.  Where you live
10   is a part of it.  Like we said, we
11   like people involved in the community
12   or that know the market that they're
13   going to.
14       A lot of what we call
15   nuts-and-bolts questions as far as
16   how to run P&Ls, how they hire, what
17   they look for, how would they
18   describe themselves.  There's a lot
19   of atypical questions in that thing
20   to be consistent.  We call them
21   recruiter interviews; they ask a lot
22   of the same questions to every single
23   candidate from a consistency point of
24   view.

160

1    Q.  Prior to your interviewing
2    a candidate for a paisano partner, do
3    you have any role in the recruiting
4    process?
5    A.  Well, my role as a
6    networker of restaurant people is
7    there.  I'm doing -- I do job fairs.
8    So there would be a role there.  If
9    we have a job fair, I try to make
10   myself available to be there, to
11   help, you know, resource.
12       But if you mean do I do
13   first interviews, second interviews.
14   Very rarely.  But if we are behind,
15   then I will absolutely pick up the
16   phone and call somebody.
17       I think another example
18   was, I got a resume for a paisano
19   partner from a vendor who said, This
20   is a great, great individual that you
21   need to talk to.  And so I happened
22   to be in that city that day and I was
23   flying out the next morning, and it
24   didn't make a lot of sense to say,

161

1    Well, I'm going to take this resume
2    and send to it a screener to send to
3    a recruiter for somebody I could
4    speak to in an hour.
5        So, you know, if you're
6    looking for something in stone, I
7    think what we have in stone is to
8    move the applicant through the
9    process as quickly as possible with
10   the utmost respect as possible.
11   Q.  So far, when I have been
12   asking you questions and asking if
13   you would play a role, do you
14   understand that my questions have
15   been focusing on your role as the
16   director of -- I mean, the DVP as
17   opposed to the --
18   A.  If you mean, do I direct
19   the process?  I tell the recruiter,
20   This is what I need.
21   Q.  What I mean is that I want
22   to make sure my questions have not
23   been confusing.  And I know that a
24   couple of weeks ago you assumed a new

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

162

1   position.
2      A.   Mm-hmm.
3      Q.   And I want to make sure
4   that you understood that, even though
5   I was using the present tense, I was
6   talking about your DVP job function
7   and not whatever your current job
8   function is.
9      A.   My position and
10   responsibility has not changed in
11   that role.
12      Q.   Okay.
13      A.   As a DVP, I had the
14   ability, because of my reputation and
15   seniority with and tenure with the
16   people that are running our company,
17   to make the final decision on paisano
18   partners. I did not need to go to a
19   COO or anybody else.
20         As a senior vice president,
21   the only thing that's changed is, now
22   any partner that is hired on the east
23   coast of the United States has to go
24   through me first.

163

1      Q.   In the recruiting process,
2   once you get to the stage where a
3   recruiter determines it's appropriate
4   for you as the DVP to interview a
5   candidate for a paisano partner, at
6   that point is it your understanding
7   as the DVP that the recruiter has
8   determined the candidate appears to
9   have the basic minimum qualifications
10   for the position?
11      A.   Yes.
12      Q.   And is it your
13   understanding that the recruiter has
14   at that point reviewed the
15   personality profile you mentioned?
16      A.   That is doubtful, because
17   generally speaking the personality
18   profile is not done until the
19   candidate goes in for a, what we
20   call, on-the-job interview, and
21   that's when they generally administer
22   the test.
23      Q.   The on-the-job interview
24   refers to the interview with the

164

1   paisano partner; right?
2      A.   Right. Generally speaking,
3   they go into the restaurant, and, for
4   lack of a better word, hang out and
5   work with the paisano partner just to
6   see what his or her role is, what
7   they do.
8         What we don't want to do is
9   have any candidate be surprised;
10   like, This is your job function, This
11   is what you're going to be expected
12   to do, It is a dinner business, We
13   sell big plates of food, We sell lots
14   of wine. So it gives them a chance
15   to really see the concept.
16         Because as you can imagine,
17   in new markets, many people have
18   never seen a Buca diBeppo much less
19   heard of it and so we've got to get
20   them in the concept so they
21   understood it.
22      Q.   It's my understanding that
23   during the process prior to the
24   interview with the divisional vice

165

1   president, including that portion of
2   the process with the on-the-job
3   interview, the recruiter is the
4   primary contact between the candidate
5   and Buca.
6      A.   Yes.
7      Q.   And it's my understanding
8   that the recruiter is the one who,
9   after the on-the-job interview with
10   the paisano partner, would contact
11   the divisional vice president to
12   schedule an interview.
13      A.   Correct.
14      Q.   And it's at that point that
15   you would go right into the interview
16   of the divisional vice president
17   without any intervening steps?
18      A.   You might want to clarify
19   that.
20      Q.   I want to make sure I'm not
21   missing a step.
22      A.   You're not missing a step.
23   I just want to make sure there's not
24   something being read into it. It's

JDR
James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          FAX 215.751.0581
                      Philadelphia, PA 19103
                      www.JDReporting.com

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

166

1   real, real simple.
2       Q.   Okay.
3       A.   The recruiter does all the
4   leg work as far as screen, testing,
5   background, references, in the
6   restaurant, calls the DVP -- and
7   sometimes that's happening while
8   we're setting up that interview --
9   and says, you know, When are you
10  going to be in the area or when can
11  we get you two together, and, Here's
12  the -- you know, you hope, here's
13  five guys and gals that you want to
14  talk to over a two-day period; two,
15  four, six, whatever it may be.
16      Q.   To the best of your
17  understanding, why are personality
18  profiles done on candidates for
19  paisano partner positions?
20      A.   We do them on all managers,
21  number one.
22      Q.   Okay.
23      A.   Number two, they are an
24  incredible tool that absolutely

167

1   shows -- and they're not my studies,
2   they're others, and not the company's
3   either -- that they will reduce your
4   management turnover by up to as much
5   as 40 percent.
6       They're also a very good
7   validation tool; meaning, when you
8   spend an hour and a half with
9   somebody, two hours with somebody,
10  these can validate key points you
11  have seen in somebody.
12      Q.   As a divisional vice
13  president --
14      A.   Can I finish something on
15  that, too?
16      Q.   Please.
17      A.   The profile is rated, too,
18  based on our performers and how they
19  tested.  So that the testing -- the
20  scoring is not rated against an
21  arbitrary number against the law.
22      If you're going for a
23  paisano partner, the benchmark is
24  based on our best paisano partners,

168

1   what they've done on the score.  So
2   the whole idea is to say, Is this
3   individual similar in thinking and
4   skill set to our best people.
5       Q.   When making a decision
6   whether to hire a candidate for a
7   paisano partner, do you review the
8   personality profile results?
9       A.   Generally speaking, I do,
10  yes.
11      Q.   At what point do you review
12  it?
13      A.   Usually after I've been to
14  an interview.
15      Q.   Is it fair to say that the
16  purpose of the personality profile is
17  to obtain an objective measure of
18  personality traits concerning an
19  applicant?
20      A.   I think it is not fair to
21  say that.  I think it's fair to say
22  that it is a standard baseline
23  measurement that you have to -- you
24  have to analyze like anything else.

169

1   And it is simply a tool, like the
2   interview, like references, like the
3   on-the-job training.  They are tools
4   to make you make the best hire.  Not
5   one thing will either give you a job
6   or take you out of it.
7       Q.   If the personality profile
8   result showed a different conclusion
9   than the one you had reached when
10  interviewing a candidate, what would
11  you do?
12      A.   It's -- definitely would
13  raise your eyes to what you are
14  looking at.  And we have set up
15  second interviews with paisano
16  partners.
17      Q.   Meaning, you've set up
18  second interviews on paisano partners
19  in --
20      A.   Let's get together again,
21  let's talk about some things.
22      Q.   But I want to make sure I
23  understand the situation when that
24  occurs.



ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

170

1      Is it a situation where
2   during an interview you formed one
3   impression of a candidate but the
4   personality profile suggested that
5   that conclusion may not be right and
6   therefore you decide to have a second
7   interview?
8      A.  I have not experienced that
9   personally very strongly.  You know,
10   they're pretty clear and they give
11   you pretty light parameters.  But
12   what's nice is they talk to
13   leadership skills, they talk to
14   interpersonal skills and things of
15   that nature.
16      Q.  I'm not sure that that was
17   exactly what --
18      A.  Meaning --
19      Q.  -- I was asking.  So I'm
20   going to try --
21      A.  Meaning -- okay.
22   Meaning --
23         MR. GERHAN:  Wait for --
24         THE WITNESS:  Okay.  Let

171

1   him finish his questions.
2   BY MR. GOLDBERG:
3      Q.  You can finish your answer.
4      A.  No, no.  Go.
5      Q.  No.  I insist.
6      A.  Okay.  Meaning, if I
7   decided to turn somebody down and I
8   get a this-guy-walks-on-water
9   personality profile, you know, I
10   don't say, Well, I must have been
11   wrong, and hire the guy.  I'm not
12   going to make that kind of decision,
13   because the final decision -- final
14   responsibility falls on my shoulders.
15      Q.  In a situation like that,
16   would you consider scheduling a
17   second interview?
18      A.  It depends on why I decided
19   to decline the candidate.  Again,
20   when I began, I told you some people
21   don't know how to interview.  Some
22   people are very nervous.  Some people
23   do stupid things when they interview.
24   It's the nature of the beast.

172

1      And because I interview an
2   awful lot, I get to see that more
3   often.  And frankly, I interview
4   people live more than any of our
5   recruiters do, because a DVP, I'm the
6   guy in the field.
7      They -- while they've got
8   hours of phone time logged, I'm the
9   one who sits right across from
10   somebody.  And everybody knows who
11   recruits or works with people, that
12   communication is all not spoken.
13   There's many ways to communicate to
14   people.
15      Q.  So if I'm understanding,
16   you wouldn't schedule a second
17   interview based on the personality
18   profile if you determined the person
19   didn't have quality work experience
20   when you interviewed with them;
21   right?
22      A.  Right, right.
23         MR. GERHAN:  Objection.
24   Asked and answered.

173

1         THE WITNESS:  Yeah.  I
2   mean, we're not going to -- we're not
3   going to set somebody up -- we're not
4   going to spend money testing somebody
5   who doesn't qualify.  It costs money
6   to test people.  It costs money to do
7   background checks.
8      So if a recruiter says,
9   We're done, then we're done.  We're
10   not going to spend an extra hundred
11   dollars just to see.  That's what
12   they get paid for; they get paid to
13   recruit and make the best
14   determinations that they can.
15   BY MR. GOLDBERG:
16      Q.  So by the time the company
17   decides to do a personality profile
18   of an applicant, the company has
19   already made a determination that the
20   applicant appears to be qualified for
21   the position?
22      A.  The company has made a
23   determination to go forward in the
24   interviewing process.

**JDR**

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          FAX 215.751.0581
                        Philadelphia, PA 19103
                        www.JDReporting.com