ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

178

1 candidate for paisano partner, at
2 what point do you actually make a
3 decision on that candidate?
4     A.  After I've interview, are
5 you asking?
6     Q.  Well, let me withdraw it.
7     A.  Okay.
8     Q.  At what point in the
9 process do you make a decision on a
10 particular candidate as to whether to
11 hire?
12     A.  In some cases it's made
13 during my interview process;
14 especially if it's a decline.  In
15 most cases I've got a multiple number
16 of candidates to interview.  And
17 while you're measuring who are the
18 stronger players and who are not
19 going to make it through the
20 interview process, that's when those
21 decisions happen.
22          There are occasions when
23 you have two people that both would
24 work good for you and one might be

179

1 the better-suited player.
2     Q.  In that situation, after
3 reviewing the first good candidate,
4 would you hold off on a decision
5 before reviewing the other
6 candidates?
7     A.  Absolutely.
8     Q.  At Buca, did you receive
9 any specific training on how to
10 interview or recruit candidates?
11     A.  Not with Buca.
12     Q.  Have you ever received any
13 equal employment opportunity training
14 on --
15     A.  With Boston Market and with
16 Chi Chi's.
17     Q.  Buca has not provided any
18 equal employment opportunity training
19 to you?
20     A.  We've got the manuals.
21 We've got -- you know, I mean,
22 there's certain job skills you come
23 with.  I mean, part of my job
24 requirement is knowing how to

180

1 recruit, how to interview.  And
2 protect us; my number one job is to
3 protect the company.
4     Q.  And at all times during
5 your employment with Buca, you had an
6 understanding that age discrimination
7 was against the law?
8     A.  Absolutely.
9     Q.  I want to talk about the
10 recruiting process specifically
11 regarding the paisano partner
12 position in Allentown.
13     A.  Okay.
14     Q.  Tell me about it.
15     A.  Same process as we
16 discussed earlier, where we start
17 recruiting, taking resumes, working
18 the resumes and making decisions.
19     Q.  Was there anything unusual
20 about the process of recruiting for
21 that position in Allentown?
22     A.  Unusual?
23     Q.  Yes.
24     A.  I don't think so.  I think

181

1 the most unusual thing about it would
2 be its location; not being in a major
3 city, relying on the Lehigh Valley
4 connection.
5          The fact that it's halfway
6 between New York City and
7 Philadelphia requires a certain
8 understanding of the community.  It
9 is sort of out in the middle of
10 nowhere, you know, in a manner of
11 speaking.
12          Anytime you get a
13 restaurant that's -- nobody knows
14 their name and, you know, you're
15 opening up in a new city, that can
16 always be a challenge as far as
17 education of what you're trying to do
18 not only with recruiting but with
19 permitting and construction and
20 everything else.
21     Q.  When you mentioned
22 knowledge of the area, are you
23 referring to that portion of
24 Pennsylvania?



ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

186

1  interviewed somebody else in addition
2  to Mr. Dilemani, Mr. Stenger, Mr.
3  O'Neil and possibly Mr. Pongonis?
4      A.  I don't know.  I mean,
5  those names that you read to me sound
6  familiar except for Joe Fryday and
7  Mike --
8      Q.  Bleckman?
9      A.  Yeah, Bleckman.  The other
10  guys, I can tell you they sound
11  pretty -- well, I know Owens.  Was it
12  Owens?
13      Q.  O'Neil.
14      A.  O'Neil, I know I
15  interviewed him.  But the other guy,
16  Pargonis (phonetic), sounds familiar.
17      Q.  Okay.  Who was the first
18  person you interviewed for the
19  Allentown position of paisano
20  partner?
21      A.  No idea.
22      Q.  Do you recall whether you
23  interviewed anyone in particular
24  before Mr. Dilemani for that

188

1  west side of the United States, I
2  know we tried to get him hooked up
3  with Joe Tellerico, one of our DVPs
4  out there, and for some reason we
5  couldn't get that accomplished.
6      And so I believe I did a
7  phone screen, a phone interview with
8  Bey.  I couldn't speak to how long
9  that was.  I would say, you know,
10  based on averages and estimates, 15
11  minutes is about -- that's a pretty
12  long time on the phone.  It's
13  probably about 15 to 20 minutes,
14  going over background and my needs.
15      Then I was contacted by
16  Lori, that Bey was going to be in the
17  Pittsburgh market.  And I said,
18  Great, let's meet, because that's
19  great, that's great that he's going
20  to be in the same city I am.
21      And he came in to meet me
22  at our Station Square restaurant.
23  Can't tell you the date, I'm sorry
24  about that.  We met at our Station

187

1  position?
2      A.  No, I don't recall.
3      Q.  Well, this is a good a
4  place to start as any.
5      A.  Let's go.
6      Q.  Please describe your role
7  in the process of recruiting for the
8  paisano partner position with regard
9  to Mr. Dilemani.
10      A.  My role was doing the
11  face-to-face interview.  My
12  understanding was that he was
13  interviewed by Lucy Lea, I believe.
14  I know he was interviewed by Lori Van
15  Holmes, in which she set him up with
16  an interview with, I believe, Rich
17  Perelli, I believe, which he did.
18  I'm not sure what the interview
19  process -- what happened in that
20  restaurant as far as interviewing
21  process, but I do believe that they
22  met and worked in the restaurant
23  together.
24      Because Bey lived on the

189

1  Square restaurant and I believe we
2  interviewed for, I'd say, 30 minutes,
3  that's an estimate again, and that
4  was the end of the interview.
5      Q.  And then?
6      A.  And then I continued the
7  search.  I called Lori and told her
8  that I was not interested in Bey.
9      Q.  Did you tell her that
10  before or after interviewing all of
11  the candidates for the position?
12      A.  I don't know what -- where
13  the other people were in.  What I did
14  know was that Bey was not going to
15  fit what I was looking for.
16      Q.  Assuming that you
17  interviewed potential candidates
18  after your interview with Bey, do you
19  recall whether you told Lori Van
20  Holmes you were not interested in Bey
21  Dilemani before interviewing the
22  other candidates?
23      A.  I told Lori within 30
24  minutes of the interview that I was

**JDR**

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          FAX 215.751.0581
                      Philadelphia, PA 19103
                      www.JDReporting.com

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

190

1    not interested in hiring Bey.
2        Q.   Before speaking to anyone
3    about Bey Dilemani, did you receive
4    any documents concerning him, such as
5    a resume or an application or a
6    background check, et cetera?
7        A.   I received a resume.
8        Q.   Did you receive the
9    application?
10       A.   No, I did not.  That's the
11   one they fill out; is that which one
12   you're talking about?
13       Q.   Yes.
14       A.   No.
15       Q.   In addition to the resume,
16   did you receive any other documents?
17       A.   Only the resume.
18       Q.   Did you ever speak with
19   Lucy Lea concerning Mr. Dilemani?
20       A.   I don't recall.
21       Q.   Do you recall speaking with
22   Ms. Van Holmes concerning Mr.
23   Dilemani?
24       A.   Frequently in the interview

191

1    process, when she would give me an
2    update not only on Bey in Allentown
3    but everything she was recruiting on.
4            When we talk to recruiters,
5    we don't talk single issues.  We talk
6    exactly what you're doing, what are
7    we working on, where are we hiring,
8    and there's -- there could be ten
9    people we're talking about, 15
10   people, at any given time because
11   we're talking about half a country.
12       Q.   At what point in the
13   process do you recall first speaking
14   with Ms. Van Holmes about Mr.
15   Dilemani?
16       A.   I have no idea how to
17   pinpoint that.
18       Q.   Let me try to break it
19   down.  It was before you actually met
20   with Mr. Dilemani?
21       A.   Oh, yeah.  Yeah.
22       Q.   Was it before you received
23   his resume?
24       A.   Most likely.  Most --

192

1    because most likely they didn't
2    submit a resume until it was time to
3    get an interview going, until I --
4    most likely I did not get the resume
5    until prior to doing the phone
6    interview.
7        Q.   Meaning, you got the resume
8    and then did the phone interview?
9        A.   Correct.
10       Q.   Do you believe you received
11   Mr. Dilemani's resume after Mr.
12   Dilemani met with Rich Perelli in
13   Arizona?
14       A.   I have no idea.  I don't
15   know if that was all happening at the
16   same time or what.
17       Q.   What do you recall about
18   your first conversation with Ms. Van
19   Holmes about Mr. Dilemani?
20       A.   I don't really recall the
21   conversation, to tell you the truth.
22   Obviously she must have said
23   something positive in nature as far
24   as his qualifications, his job

193

1    skills, his desire to move back east,
2    because otherwise I wouldn't have
3    done the phone screen.
4            So there are certain
5    assumptions you have to be made, that
6    she felt that he was a candidate we
7    needed to talk to.
8        Q.   Let's talk collectively
9    about all of the phone or in-person
10   conversations you had with Ms. Van
11   Holmes prior to receiving Mr.
12   Dilemani's resume.  What can you
13   recall about them?
14       A.   Well, "collectively,"
15   meaning as we recruit for
16   Allentown --
17       Q.   Yes.
18       A.   -- as we recruit for the
19   east coast of the United States?  I
20   mean, what do you want to know about?
21       Q.   It's my assumption from
22   your previous answer that you cannot
23   recall specifically what you
24   discussed with Ms. Van Holmes at any

JDR
**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          FAX 215.751.0581
                      Philadelphia, PA 19103
                      www.JDReporting.com

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

202

1  recollection of why you formed those
2  impressions of Mr. Dilemani?
3      A.  Well, I mean, his resume
4  shows that he's worked in the
5  restaurant industry and he was a
6  partner -- I don't know ex- -- I
7  can't remember exactly what it was he
8  was working for, but I believe it was
9  an Italian concept of some sort or --
10  and he was in some sort of
11  partnership out there.  And we always
12  like guys and gals that understand
13  the difference in a partnership.
14      And I'm sure that's
15  probably what we talked about more
16  than anything else; why he was
17  leaving that -- why he was leaving
18  that concept.
19      Q.  Do you have any belief, one
20  way or the other, as to whether you
21  told Mr. Dilemani during your
22  telephone conversation that you were
23  happy to have a person with New York
24  experience?

203

1      A.  I'm sure I did, because
2  that's what we were looking for, that
3  New York/Philly experience, somebody
4  who understood that market.  You
5  can't take a midwest guy and put him
6  in Philadelphia.  You can, but you'll
7  fail.
8      Q.  Do you recall any
9  conversations with Ms. Van Holmes
10  prior to your actual in-person
11  interview with Mr. Dilemani, other
12  than the ones we've discussed?
13      A.  Other than the ones we've
14  discussed?  No.
15      (A discussion was held off
16  the record.)
17  BY MR. GOLDBERG:
18      Q.  What do you recall about
19  your in-person interview with Mr.
20  Dilemani?
21      A.  I recall, again,
22  probably -- well, I guess not --
23  probably's not the right word you
24  want to hear.  But I recall going

204

1  through the resume again, just sort
2  of sitting across from each other and
3  talking about the role, the concept,
4  what we're looking for, doing a new
5  store opening.  That's what I recall
6  as far as the nuts and bolt of the
7  interview process.
8      Q.  Do you recall approximately
9  when the interview occurred?  I know
10  you can't give me a precise date, but
11  are we talking --
12      A.  I don't think we -- we
13  weren't -- I don't believe we were
14  open for business yet, so -- being a
15  dinner concept.  I would assume that
16  it was in the early afternoon.
17  That's usually when we do our
18  interviews.
19      Q.  I was actually referring to
20  what time of year.
21      A.  I'm sorry.  Oh, okay.  You
22  know, it wasn't snowing.  So based on
23  a time line for -- I don't know.
24  Yeah, I don't know.

205

1      Q.  Is it possible it was the
2  summer of 2000?
3      A.  The summer of 2000?  I
4  think that would probably be close.
5  I mean, I don't believe it was, you
6  know, winter in Pittsburgh at the
7  time.  So summer, spring or fall,
8  yeah.  I would -- I hate to narrow it
9  down to such a degree.  I don't have
10  his file in front of me.  So I don't
11  know.
12      Q.  Can you recall anything
13  specifically that occurred during
14  your in-person interview of Mr.
15  Dilemani?
16      A.  Specifically?
17      Q.  Yes.
18      A.  What would you like to
19  know?
20      Q.  Everything you remember.
21      A.  The biggest thing I
22  remember is that the interview went
23  30 minute, maybe 20, 25, 30 minutes.
24  I found Bey very arrogant and felt he



**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          FAX 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

### 206

1  lacked humility, and did a 30-minute
2  interview.
3      Q.  Do you recall what led you
4  to the conclusion that he was
5  arrogant?
6      A.  It must have been his
7  actions, his verbiage, what he said
8  and how he said it.  My perception
9  was he was very arrogant.
10      Q.  Did he dress appropriately?
11      A.  He dressed very sharply.  I
12  believe the blue blazer he wore and
13  tan pants.  Very smartly dressed.
14      Q.  He appeared to have good
15  hygiene?
16      A.  I -- from my vantage point,
17  he had very good hygiene.
18      Q.  Did he have a good
19  handshake?
20      A.  I believe he did.
21      Q.  Was he respectful to you
22  during the interview?
23      A.  I don't feel he showed any
24  personal disrespect, no.  I think he

### 207

1  was very cordial.
2      Q.  Well-mannered?
3      A.  Except for the arro-- I
4  mean, it depends on what you define
5  as manners.  I think that -- I mean,
6  did he swear?  No.  Did he not pay
7  attention?  Did he not listen?  Did
8  he not say please, thank you?  He was
9  fine.  He had all those manners
10  covered.
11      Q.  Did he come in and put his
12  feet on your desk?
13      A.  We sat at a table.  So no,
14  he did not.
15      Q.  Did he put his feet on the
16  table?
17      A.  No.  He sat properly.
18      Q.  The reason that I'm asking
19  all of these questions is because I'm
20  trying to see if I can jog your
21  memory as to what led you to the
22  conclusion that he was arrogant.
23      A.  It must be in the way he
24  presented himself, like I said

### 208

1  previously, in his verbiage, in the
2  way he talked about what he could do,
3  what he was capable of done, what had
4  happened to him in the past.
5      It is very tough to define
6  while -- you can pull something out
7  of Webster's version of what
8  arrogance is and what the lack of
9  humility is.  There was a pompousness
10  about him that he portrayed.  And as
11  an interviewer, it's not something
12  I'm looking for in Buca diBeppo.
13      Q.  When you say "lack of
14  humility," are you using that to mean
15  something different than arrogant in
16  the context of Mr. Dilemani?
17      A.  I think there is a slight
18  difference in it.
19      Q.  Okay.  Then please tell me
20  everything you can remember that led
21  you to the conclusion that Mr.
22  Dilemani lacked humility.
23      A.  I can't give you item by
24  item.  There's no way I can do that.

### 209

1      Q.  Was it in his manner of
2  speaking?
3      A.  Not -- maybe not the manner
4  of speaking, but how he spoke about
5  the people he'd worked with, how he
6  presented his resume, how he
7  presented himself.
8      It's a very tough thing to
9  say He said this, therefore I form
10  this opinion.  It was not that easy
11  to come up with the ABCs, especially
12  something that I have long forgotten
13  about and moved forward on.
14      What I can tell you is
15  that, you know, between -- in that
16  first 15 minutes or so, as we settled
17  in together, that I quickly saw that
18  this was not an individual that
19  would, in my mind, fit our
20  organization.
21      Q.  So please tell me in detail
22  all of the reasons that led you to
23  the decision not to hire Mr.
24  Dilemani.

**JDR**
**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management
215.564.3905          1700 Sansom Street, 5th Floor          FAX 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

210

1    A.  I just gave them to you.
2  There's not a whole lot of detail.
3  There's some things that are in this
4  world black and white, and that's one
5  of them.  And he was very arrogant in
6  the way he handled the interview.
7  That's the detail that I can give
8  you.  And that was very evident,
9  quickly.
10    Q.  Do you recall whether you
11  took into account Ms. Van Holmes'
12  feedback concerning Mr. Dilemani at
13  all in deciding not to hire him?
14    A.  No, because I don't believe
15  she called me and said, I'm not -- I
16  don't think we should hire this guy.
17  That's not -- that was never a
18  conversation.  She set me up for the
19  interview.  So obviously if there was
20  a negative spin to it, that would
21  have been a mistake to set me up for
22  the interview.
23    Q.  Who made the decision not
24  to hire Mr. Dilemani?

211

1    A.  I did.
2    Q.  Did anybody else play a
3  role in that decision?
4    A.  To not hire him?
5    Q.  Yes.
6    A.  No.
7    Q.  Tell me all of the
8  documents that you considered when
9  deciding whether to hire Mr.
10  Dilemani.
11    A.  I consider all documents
12  when we determine to hire somebody.
13  When we determine to not hire
14  somebody, it can stop real quick.
15  Just like the recruiter can screen
16  out somebody on a phone in five
17  minutes because they don't have the
18  qualifications, documents that I had
19  in my possession were the resume.
20  And my skill as an interviewer said
21  this is not a guy that I want working
22  for me, bottom line.
23    Q.  Aside from your review of
24  Mr. Dilemani's resume and the

212

1  conversation that took place during
2  your interview of Mr. Dilemani, did
3  you consider any other information at
4  all in deciding not to hire him?
5    A.  No.  There's no other
6  information to consider.
7    Q.  Was there anything about
8  the resume that led you to decide not
9  to hire Mr. Dilemani?
10    A.  No, otherwise it wouldn't
11  have gotten to that point.  For
12  example, if it would have said I
13  worked at Macy's department store,
14  while he might be a great manager for
15  Macy's, the resume would have said
16  this is an exercise in futility.  We
17  wanted somebody in restaurants, in
18  ownership.  So no, the answer is no.
19    Q.  During the interview, did
20  you form an opinion as to whether you
21  liked Mr. Dilemani personally?
22    A.  Now, that's a tough
23  question.  I would have to say that
24  the answer is I did form an opinion

213

1  about him.
2    Q.  What was that opinion?
3    A.  That he is an arrogant
4  person and, by nature, I am not
5  attracted to arrogant people.  You
6  would have to draw your own
7  conclusion whether that means did I
8  like him.  I wasn't looking for a
9  friend, I was looking for a partner;
10  two different people.
11    Q.  In looking for a partner,
12  presumably you look for someone you
13  feel that you can work with.
14    A.  Correct.
15    Q.  Do you look for somebody
16  that you like personally as well?
17    A.  I think that is a factor.
18  It would be dishonest to say it's not
19  a factor.  But I can tell you right
20  now that I don't -- my buddies don't
21  work for me.  People that get the job
22  done work for me.  I don't have to
23  like somebody a lot to have them work
24  for me.  I have to respect them and

**JDR**
**James DeCrescenzo Reporting**
Pennsylvania's Leader In Technology and Information Management

215.564.3905        1700 Sansom Street, 5th Floor        FAX 215.751.0581
                    Philadelphia, PA 19103
                    www.JDReporting.com

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

214

1  have to believe in the basic core of
2  who they are.
3      Q.  What I'm trying to figure
4  out is that, if you found Mr.
5  Dilemani to be arrogant, how did you
6  feel that would affect his
7  suitability for a paisano partner?
8      A.  It would not.
9      Q.  How specifically?
10      A.  It's a guest-oriented
11  business.
12      Q.  Meaning?
13      A.  Meaning we work with
14  people.  Our job is to work with
15  people, both developing management,
16  hourly and guests to drive the
17  business.  We have interpersonal
18  meetings with recruiters, with
19  marketing people, with vendors.  I
20  didn't want him working for us.
21      Q.  Are you saying that you
22  formed an opinion that Mr. Dilemani
23  would not work well with people who
24  reported to him?

215

1      A.  I formed the opinion based
2  on the person he presented to me in
3  an interview, which was he was not
4  going to work for me and Buca
5  diBeppo.
6      Q.  Did you form an opinion
7  during the interview as to whether he
8  wanted your job?
9      A.  I don't know.  I'm not
10  afraid of somebody taking my job.  I
11  just hired a girl to take my job.  So
12  I'm not afraid to have somebody take
13  my job.  You need people like that.
14      I believe he did make it
15  clear that he would like to grow with
16  the company, but I won't say that
17  that was something singular to Bey.
18  I very rarely interview people that
19  say, I don't want to grow and I don't
20  want opportunity.  I think I would
21  hire them on the spot, because they'd
22  probably be the most honest person
23  I've met.
24      I very rarely meet somebody

216

1  who doesn't like growth and
2  opportunity; otherwise, why would you
3  come with a new company.
4      Q.  In Bey's case, was it a
5  factor in your decision not to hire
6  him --
7      A.  No.
8      Q.  And I want to make sure I
9  finish the question.
10      A.  Oh, I'm sorry.  I thought
11  you were going to follow.
12      Q.  When you answered, it
13  pretty much was a question.  You had
14  no way of knowing I was going to
15  continue.  So that's fine.
16      A.  Go like this (indicating).
17      Q.  Did you form an opinion as
18  to whether Bey was seeking a position
19  at a higher level than paisano
20  partner?
21      A.  I think he presented
22  himself that he wanted to be in a
23  regional spot, if I recall.
24      Q.  Did that have any bearing

217

1  on your decision not to hire him?
2      A.  No.  No.  I mean, it's not
3  abnormal to seek -- to interview
4  people that want more.
5      Q.  During your personal
6  interview with Mr. Dilemani, did you
7  ask him if he was willing to go to
8  Buffalo for training?
9      A.  I don't recall that as --
10  Buffalo has never been a training
11  store.  But I don't recall that.
12  I --
13      Q.  It's possible?
14      A.  It's possible.  Now, he
15  might have -- we might have said, Do
16  you want to go up there and work with
17  Sal, who had been around with the
18  company for a while, to, you know,
19  feel the restaurant out for a -- but
20  not -- I don't believe we were -- we
21  weren't doing any training there.  So
22  I don't recall that.
23      Q.  Do you recall --
24      A.  I'm not ruling it out.  I

**JDR**

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905        1700 Sansom Street, 5th Floor        FAX 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

226

1  out and faxed it to me once in a
2  while.
3      Q.  Is there a form that
4  divisional vice presidents are
5  provided to use for purposes of
6  evaluating a candidate after an
7  interview?
8      A.  Not that I'm aware of.  Do
9  you mean something we send back and
10  say yes, we're going to pursue or no,
11  we're not going to?
12     Q.  Something that evaluates
13  the candidate on various qualities?
14     A.  Not that I'm aware of.
15  That the DVP fills out?
16     Q.  Yes.
17     A.  Not that I'm aware of.
18     Q.  Okay.  I'm done with that
19  document.  When I say "is," did you
20  understand my question to mean, or
21  has ever been a form like that?
22     A.  And again, my awareness?
23  I'm not --
24     Q.  Yes.

227

1      A.  I'm not saying no, because
2  I don't know.  I've never used a form
3  like that, that I know of, and I have
4  not had anybody, I don't believe, ask
5  me for a form like that.
6      Q.  Okay.
7      A.  Now, I know we've used
8  forms like that in the earlier days,
9  but to what extent I don't know as a
10  company.  I believe -- I'm unsure if
11  they use the arrows still today.
12     Q.  Okay.  If you don't know,
13  you don't know.
14     A.  I don't know.  I just want
15  to make sure that we are clear on
16  that.
17     Q.  Thank you.  You ultimately
18  hired Tim Stenger for the position of
19  paisano partner in Allentown,
20  Pennsylvania; right?
21     A.  Correct.
22     Q.  And that's the position you
23  understood Mr. Dilemani was applying
24  for?

228

1      A.  Correct.
2      Q.  What do you recall about
3  the recruiting process as it applied
4  to Mr. Stenger?
5      A.  Tim's resume came to us --
6  it came to our COO, Len Ghalani.  Tim
7  had been a director of operations
8  with Schuler's restaurant, and
9  Schuler's is sort of an old icon, one
10  of the famous old restaurateurs, very
11  respected in the north.
12         And he had done a lot of
13  good things with them, including
14  being a member of the National
15  Restaurant Association, menu
16  development, very instrumental and
17  key in the restaurant industry.
18         I got a call from Len
19  Ghalani saying, I've got a great
20  guy's resume and I know you're
21  looking for somebody in Allentown.
22         I believe Tim went to
23  either college or high school in the
24  Lehigh Valley.  His parents lived

229

1  there while his dad did something, I
2  don't know what it was.  And Tim
3  wanted to relocate back east, where I
4  believe his grandmother lives.
5         And so we started the
6  interview process just like we do
7  normally.  I do not know if Lori did
8  the interview or not.  I think, but I
9  don't know.  But it was either her or
10  Stephanie.
11     Q.  What is Stephanie's last
12  name?
13     A.  Comeaux, Comeaux.  I don't
14  remember where I interviewed Tim.
15     Q.  Before we get to the
16  interview.
17     A.  Okay.
18     Q.  Do you recall any
19  conversations with anyone, other than
20  what you have just described,
21  concerning Mr. Stenger that took
22  place before your interview?
23     A.  Yeah.  The biggest
24  conversation I remember would be with



242

1  THE WITNESS: Mr.
2  Dilemani --
3  MR. GERHAN: -- and
4  foundation.
5  THE WITNESS: -- his
6  experience in the restaurant business
7  had nothing to do with him losing the
8  job. He didn't get the job because
9  of the way he interviewed. He was
10  arrogant and somebody I did not want
11  to work in our company.
12  It had nothing to do with
13  his experience. It had nothing to do
14  with the way he dressed. He had
15  manners, he was cordial, he shook my
16  hand firmly. He was arrogant, and I
17  won't have anybody working for me
18  that is like that, bottom line, I
19  don't care how much experience they
20  have.
21  BY MR. GOLDBERG:
22  Q. Have you ever considered
23  Mr. Dilemani for any position other
24  than paisano partner in Allentown?

243

1  A. No.
2  Q. Have you had any paisano
3  partner openings subsequent to the
4  one filled for Allentown?
5  A. In Philadelphia?
6  Q. In your region.
7  A. In Philadelphia?
8  Q. Yeah.
9  A. Yeah. Reading,
10  Pennsylvania. Exton, Pennsylvania.
11  We filled the Jenkintown position,
12  the downtown Philly position, and
13  we're currently looking for a partner
14  for Cherry Hill.
15  Q. Did you consider Mr.
16  Dilemani for any of those positions?
17  A. No.
18  Q. Why not?
19  A. For reasons stated prior.
20  Q. Please explain them.
21  A. He's arrogant.
22  MR. GERHAN: Objection.
23  Asked and answered.
24  THE WITNESS: He doesn't

244

1  know how to interview, apparently.
2  He is somebody I don't want working
3  for our company.
4  BY MR. GOLDBERG:
5  Q. Have you finished telling
6  me about all of the conversations you
7  had with anybody concerning your
8  decision to hire Mr. Stenger?
9  A. Well, I mean, I covered the
10  conversation with Len Ghalani. I
11  don't recall but I believe Lori Van
12  Holmes or Stephanie, whatever,
13  interviewed him and done references
14  on him; which I believe the Schuler
15  family was his references.
16  Additional people? I don't
17  know. I think he worked in Chicago,
18  as far as the on-the-job interview.
19  And I don't -- I can't say this a
20  hundred percent, but I think it was
21  Aric Spiczka who he worked with, one
22  of our paisano partners in Chicago,
23  for the on-the-job interview like Bey
24  had with Mr. Perelli.

245

1  Q. During the entire course of
2  your career at any of your past
3  employers, can you recall hiring a
4  person who at the time was at least
5  50 years old?
6  A. Yes.
7  Q. How many people can you
8  recall hiring during --
9  A. I don't know. I mean, the
10  first one that comes to mind is
11  Dennis up in Allentown, who's 54.
12  Q. At the time he was hired?
13  A. The restaurant's been
14  opened two and a half years. So he
15  must have been 52.
16  Q. Dennis who?
17  A. Sifiles, S-i-f-i-l-e-s.
18  Q. And the position was for
19  what?
20  A. Assistant general manager.
21  Q. Can you recall anybody
22  else?
23  A. Well, I'm not sure how old
24  Vinnie was when I hired him, because



ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

246

1   I'm guessing at his age. So I
2   don't -- I really don't know. I'm
3   thinking Buca. So Buca, I don't
4   know.
5        Boston Market, I can think
6   of a couple folks in the hourly
7   ranks.
8        Q. Any in the management
9   ranks?
10      A. I'm not sure how old Susan
11  Baux was, I have no idea. She's
12  working for US Air now. I don't
13  recall. Yeah, I'm sorry. I don't
14  recall.
15      Q. Do you have an estimate as
16  to how many people over 50 years old
17  you have hired in the course of your
18  career?
19      MR. GERHAN: Objection.
20  Asked and answered.
21      THE WITNESS: You know,
22  based on this moment right now --
23  BY MR. GOLDBERG:
24      Q. Yes.

247

1       A. -- ten or less in the
2   management ranks. But again, I don't
3   know.
4       Q. To your knowledge, is there
5   something about a recruiting process
6   at Buca as it existed in the year
7   2000 that would not attract
8   applicants who are 50 years old or
9   more?
10      A. Would not attract?
11      Q. Yes.
12      A. I don't know what we would
13  have. I don't know of anything that
14  would say, Stay away if you're over
15  50.
16      Q. Let me ask you this way.
17  While at Buca, did you receive
18  applications from qualified people
19  who were over 50 years old for a
20  paisano partner?
21      A. I have no idea. We don't
22  ask the age on the -- people don't
23  put their age on resumes, you know.
24  I have no idea.

248

1       Q. How old did you think Bey
2   was when you interviewed him?
3       A. You know, I didn't -- I
4   don't even consider it. That's
5   probably the disgrace of being here
6   for me, is that it's not something I
7   consider.
8        I take it as an extreme
9   insult, for the record, that I'm
10  here. Extreme. Call me anything,
11  but don't call me discriminatory, you
12  know, put me in a corner.
13       So I was shocked, to say
14  the least, that I was being called
15  here to talk about -- at the
16  fact-finding session, that it was
17  age. I was shocked and insulted.
18  And probably that's the canned
19  version that most people would tell
20  you, as an attorney or as a referee
21  or as a court, but I don't care about
22  that.
23       What I care about is
24  results, respect, people who can do

249

1   the job. And again, that's probably
2   canned and what most people are
3   supposed to say.
4       Q. When did you first found
5   out that Mr. Dilemani had asserted
6   allegations of age discrimination?
7       A. When I got called by
8   Jennifer Percival to fly to
9   Philadelphia with Dan and herself
10  to --
11      Q. Referring to Dan Gerhan,
12  your attorney?
13      A. Yes, yes. I think that was
14  the first time I heard about -- she
15  might have called me a month before
16  or two months before, and I just
17  thought, Wow, where did that come
18  from. Because nothing clicked. You
19  know what I'm saying? Nothing
20  clicked, like -- I mean, I just -- I
21  couldn't -- I just -- it didn't, it
22  didn't click. Nothing clicked. I
23  was like, Wow, for what.
24       As a matter of fact, when I

**JDR**

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905        1700 Sansom Street, 5th Floor        FAX 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

250

1 came to court I didn't know it was
2 age discrimination. I just heard
3 discrimination. I'm like, Well, what
4 could that possibly be for. So it
5 took me by surprise, sure.
6       Q.  Were you aware that Buca
7 had submitted materials to the
8 Pennsylvania Human Relations
9 Commission in Buca's defense in
10 relation to the claims of age
11 discrimination that Mr. Dilemani had
12 asserted?
13       A.  I was probably notified
14 that somebody had filed. But when
15 you're in a company that's across the
16 country, you're going to have
17 unemployment, you're going to have
18 disability, you're going to have -- I
19 mean, that's what the people in human
20 resources do, they handle these
21 things and get the documentations
22 that were requested by various
23 agencies.
24       I don't think I was

251

1 really -- I don't recall really being
2 brought in, to my attention.
3       Q.  Have you ever reviewed any
4 of the materials that Buca submitted
5 to the Pennsylvania Human Relations
6 Commission?
7       A.  I have never seen any --
8 I've not been copied on any materials
9 that were sent, that I know of. I
10 mean, I don't -- I don't recall
11 seeing any documentation.
12       Q.  Did you play any role in
13 the drafting of any of those
14 materials?
15       MR. GERHAN: Objection.
16       THE WITNESS: Not that --
17       MR. GERHAN: Calls for
18 speculation.
19       THE WITNESS: I don't
20 recall. I mean, if somebody took a
21 verbal statement from me at the time
22 I was notified that we were going to
23 see the -- the inquiry that we went
24 to the first time.

252

1       But I don't reme- -- I
2 never wrote a written statement or
3 anything like that. Somebody might
4 have asked, Hey, do you have any
5 notes or anything, but, you know, I
6 don't take notes when I do
7 interviews.
8 BY MR. GOLDBERG:
9       Q.  Do you recall talking to
10 anybody after Mr. Dilemani had
11 asserted his claims of age
12 discrimination regarding the reasons
13 you decided not to hire him?
14       A.  I would --
15       MR. GERHAN: I'm going to
16 object and make sure that you don't
17 reference any conversations with
18 counsel.
19       THE WITNESS: Okay.
20 BY MR. GOLDBERG:
21       Q.  I'm not asking you -- let
22 me withdraw and start again. I'm not
23 asking you at this point for the
24 substance of any conversations.

253

1       A.  Okay.
2       Q.  I just want to know whether
3 you did have any conversations.
4       A.  After I was notified?
5       Q.  That Mr. Dilemani had
6 asserted claims of age
7 discrimination --
8       A.  Right.
9       Q.  -- in which you were asked
10 your reasons as to why you did not
11 hire him.
12       MR. GERHAN: And same
13 objection as to conversations with
14 counsel. Conversations with other
15 people you can testify to.
16       THE WITNESS: Okay. Yeah,
17 I'm sure I did. Lori Van Holmes knew
18 why I turned down Bey, because I let
19 her know.
20       As a reference point,
21 Jennifer Percival may have asked, you
22 know, This is what, you know, Lori
23 said. But to my failing, I didn't
24 think it was a serious thing, and not

**JDR**

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          FAX 215.751.0581
                      Philadelphia, PA 19103
                      www.JDReporting.com

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

266

1 don't remember his resume. So
2 nothing with Mark do I remember.
3 Beckman -- of course, I
4 haven't seen the release or the
5 application on these people. I don't
6 get copies of that. I don't recall
7 Michael -- Bleeman, I'm sorry,
8 Bleeman's, which is surprising.
9 Rick O'Neil, obviously I
10 recall his resume. I've not seen the
11 pre-screen, to the best of my
12 knowledge. I mean, I remember
13 Richard O'Neil from his resume
14 obviously because he worked for the
15 Back Bay Group, which is a guy that I
16 had worked with in Rain Forest, and
17 we had already talked about knowing
18 him.
19 And Joseph Fryday. I don't
20 remember meeting him, and I do work
21 with National Hospitality a lot;
22 they're the recruiters that I use a
23 lot of times.
24 I don't know if I answered

267

1 your question, though. I'm sorry.
2 Q. I think you did, but let me
3 ask again just to make sure. Have
4 you now finished identifying all
5 documents that are part of Exhibit
6 P-21 that played a role in your
7 decision whether to hire any
8 particular applicant?
9 MR. GERHAN: I'm going to
10 object because I think it
11 mischaracterizes what the witness
12 said. You may answer.
13 BY MR. GOLDBERG:
14 Q. Then I'm going to withdraw
15 the question and ask you, have you
16 identified every document that is
17 found in P-21 which played a role in
18 your decision whether to hire an
19 applicant?
20 A. Hire an applicant?
21 Q. Yes.
22 MR. GERHAN: Object to the
23 form of the question.
24 BY MR. GOLDBERG:

268

1 Q. When I say "whether to hire
2 an applicant," it means hire them or
3 not.
4 A. I just told you, the
5 documentation on application and
6 release for background check I don't
7 get.
8 Q. I understand. Let me back
9 up. I understand that you have not
10 seen certain documents that are part
11 of P-21.
12 A. Okay.
13 Q. What I'm asking you now is,
14 which documents did you see that
15 played a role in your decision
16 whether to hire any particular
17 applicant?
18 A. The resumes that I
19 recognize are Bey's and Rick
20 O'Neil's. The resume that sounds
21 familiar is Mark Pargonis (phonetic,)
22 and the other two I do not recall.
23 The only articles in
24 here -- the only sheets in here that

269

1 I recognize as material I have seen
2 before is page two, and I can't tell
3 you why that seems familiar --
4 Q. Right.
5 A. -- and the actual resumes
6 in here.
7 Q. Okay.
8 A. But I don't get the -- as a
9 rule, I do not get the disclosure,
10 there's no need for me to have it.
11 And there's no need for me to have
12 the application.
13 Q. Okay.
14 A. I hope that answered it,
15 because --
16 Q. I think so.
17 A. -- I don't feel like I did.
18 So...
19 Q. If you'd like, you could
20 try again. I feel comfortable --
21 A. No. I don't want to go
22 over it.
23 Q. -- with your answer.
24 A. Okay.



**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905    1700 Sansom Street, 5th Floor    FAX 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

ORAL DEPOSITION OF JAMES M. COWLER, 1/9/03

274

1  seeing there.
2      A.  Okay.  Who put this
3  together?
4          MR. GERHAN:  Let him --
5          THE WITNESS:  Buca.  Okay.
6          MR. GERHAN:  Jim, let him
7  ask --
8          THE WITNESS:  Okay, I'm
9  sorry.
10         MR. GERHAN:  -- the
11  questions.
12  BY MR. GOLDBERG:
13     Q.  Are you familiar with these
14  background check forms generally?
15     A.  Yes.
16     Q.  Am I correct that generally
17  the second page of these background
18  forms include identifying information
19  about the person being checked?
20         MR. GERHAN:  Objection.
21  Lack of foundation.
22         THE WITNESS:  I have no
23  idea.  I have no idea.
24  BY MR. GOLDBERG:

275

1      Q.  How do you know who this
2  background check is for?
3          MR. GERHAN:  Objection.
4  Lack of foundation.
5          THE WITNESS:  Because their
6  name is on top of it.  I'm looking
7  right at it.
8  BY MR. GOLDBERG:
9      Q.  In P-19, I assume you're
10  referring to the top of the document
11  which says, "Dilemani, Bey K."
12     A.  Correct.
13     Q.  From this document, on this
14  first page of the document, can you
15  tell you've got the right Dilemani,
16  Bey K?
17     A.  Can I tell --
18     Q.  Yes.
19     A.  -- based on what you're
20  putting in front of me?
21     Q.  Yes.
22     A.  I assume so, yeah.
23     Q.  In your experience, do
24  these documents contain any more

276

1  identifying information about the
2  person other than their name being
3  listed at the top of the form?
4          MR. GERHAN:  Objection.
5  Lack of foundation.  Assumes facts
6  not in evidence
7          THE WITNESS:  I don't use
8  these documents from getting the
9  document and looking at it page by
10  page.  It's a big document that --
11  the only thing I want to know from
12  our recruiters -- I don't -- I don't
13  take this.  I don't get this at my
14  home.  Once in a while they'll fax
15  them to me or send it to my computer,
16  but I don't want it because it's like
17  20-some pages.
18         I want to know if there's
19  been a major bankruptcy which would
20  enable the person to run our
21  business, and I want to know if there
22  is a DUI that could impede us from
23  getting a liquor license in states
24  like Pennsylvania which, I'm sure

277

1  you're aware of, you investigate the
2  partner to get the liquor license,
3  and that can stop you from getting
4  the liquor license, either achieving
5  it or renewing it.  I don't even go
6  through this.
7  BY MR. GOLDBERG:
8      Q.  I understand that --
9      A.  Okay.
10     Q.  -- you've explained how you
11  use background checks, and I
12  appreciate that testimony.  I'm
13  asking you a question now not based
14  on how you use the document --
15     A.  Okay.
16     Q.  -- but based on your
17  knowledge of the document from having
18  seen background checks.
19     A.  Okay.
20         MR. GERHAN:  You haven't
21  established that he has any knowledge
22  about this particular document.  So I
23  will object to this testimony.
24         MR. GOLDBERG:  Okay.

**JDR**

## James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor
Philadelphia, PA 19103          FAX 215.751.0581
www.JDReporting.com