# EXHIBIT D

# CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF PENNSYLVANIA

BEY DILEMANI,

    Plaintiff,

vs.                             Civil Action No. 02-CV-2614

BUCA, INC.,

    Defendant.

---

DEPOSITION OF LORI A. VAN HOLMES
Taken on behalf of the Plaintiff
December 23, 2002

- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of LORI A. VAN HOLMES was taken before Tia B. Reidt, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on December 23, 2002, commencing at the hour of 10:50 a.m., the proceedings being reported at 601 Union Square, Seattle, Washington.

**NAEGELI REPORTING CORPORATION**

Portland, OR  
(503) 227-1544

Spokane, WA  
(509) 838-6000

National: (800) 528-3335

www.naegelireporting.com

Seattle, WA  
(206) 622-3376

Coeur d'Alene, ID  
(208) 667-1163

Fax: (503) 227-7123

Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

**Page 29**

1  Q. Did you meet with anyone else employed by Buca
2  during that conference in 1998?
3  A. No.
4  Q. Do you recall what the substance of your
5  conversation with Dan Durenberger was during that
6  conversation?
7  A. We both had recruiting tables because it's a
8  college -- it was a conference at a college that has a
9  hospitality program.
10  Q. Okay.
11  A. And he mentioned to me that they were looking
12  for a recruiter, and I said that maybe I could help him
13  find someone because I know people in Minnesota.
14  Q. Mm-hm. When you began employment with Buca in
15  April or May of 1998, was that in the position of
16  recruiter?
17  A. Correct.
18  Q. How did Buca first come to learn that you were
19  interested in a position as recruiter at Buca?
20  A. Well, Dan told me that he was looking for a
21  recruiter, so I called him just to check in. I had given
22  him a couple of names.
23      Then he kept talking to me -- and then
24  he said "Well, the person doesn't have to live in
25  Minnesota." They could live in any of their large

**Page 30**

1  markets, so he said Los Angeles, San Francisco, Seattle.
2  Q. Mm-hm. Was this conversation also at that
3  conference we were talking about?
4  A. No.
5  Q. When did this conversation take place?
6  A. This was on the phone between the conference --
7  after the conference.
8  Q. Do you remember when the conference was so I
9  don't have to keep calling it "the conference"?
10  A. I think it was in -- I don't know for a fact,
11  but I think it was in February -- February or March.
12  Q. How long after the February or March, 1998
13  conference, did you speak on the phone with Dan
14  Durenberger?
15  A. Well, I don't know exactly, Scott, but I would
16  say anywhere between two weeks and a month.
17  Q. Okay. What else do you recall about that
18  conversation?
19  A. I think that was pretty much it of that --
20  during that conversation.
21  Q. What was Dan Durenberger's position at Buca?
22  A. Director of training.
23  Q. Did you have subsequent conversations with Dan?
24  A. Yes. We -- we talked, and I told him that I
25  might be interested in the position, and then we basically

**Page 31**

1  had an interview.
2  Q. A telephone interview?
3  A. Correct.
4  Q. Did you meet with anyone else at Buca prior to
5  receiving an offer from Buca?
6  A. Yes, I did.
7  Q. Who?
8  A. I had a phone interview with Joe Kohaut.
9  Q. Okay.
10  A. I had a phone and a face-to-face interview with
11  Joe Talarico. I had a face to face interview with a --
12  one of our Paisano Partners.
13  Q. Do you recall who?
14  A. Carron Harris.
15  Q. Anyone else?
16  A. And then I met with Joe Micatrotto in person.
17  Q. Mm-hm.
18  A. I interviewed with Dan in person; they flew me
19  to Minnesota. I also interviewed with Stephanie March,
20  who was in the training department with Dan. Also while I
21  was in Minnesota, I met Joe Kohaut briefly, in person.
22  Q. When did you actually receive an offer from Buca
23  for employment?
24  A. In -- I think it was in April.
25  Q. And who made the offer to you?

**Page 32**

1  A. Dan Durenberger.
2  Q. Do you know if Joe Talarico had any involvement
3  in deciding whether to extend an offer to you?
4  A. I -- anyone who interviews somebody would
5  probably have an opinion. In my interview --
6  Q. Do you know if he was involved or not?
7  A. I don't know. All I know is that I
8  interviewed --
9  Q. Okay.
10  A. -- with him twice.
11  Q. Okay. What was the title of your position upon
12  your hire at Buca?
13  A. Recruiting manager.
14  Q. Are you still employed at Buca?
15  A. Yes.
16  Q. Is that still your title?
17  A. No.
18  Q. Can you walk me through the changes until your
19  current title, please?
20  A. Sure. I became senior family resource manager,
21  and last year in October I was promoted to director of
22  family resources for the West Coast.
23  Q. Throughout your employment at Buca, have you
24  always been stationed in Seattle?
25  A. Yes.

**NAEGELI REPORTING CORPORATION**

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

**Page 33**

1  Q. When you became senior family resource manager,
2  was that a promotion?
3  A. Yes.
4  Q. When did that take place?
5  A. I don't know, Scott. I don't know off the top
6  of my head. I mean it was probably a year and a half to
7  two years after I started there --
8  Q. Okay.
9  A. -- but I wouldn't be able to give you an exact
10 date.
11 Q. Do you know if it was before or after Buca
12 placed an ad for Paisano Partners in May of 2000?
13 A. I don't know. I honestly don't know. I mean we
14 can find out, I think, if we looked at my personnel file.
15 Q. Do you have that with you?
16 A. No.
17 Q. Okay. We may or may not need to, so let's move
18 on and see if I have to come back to that.
19        As a recruiting manager, who did you
20 report to?
21 A. I started out reporting to Dan Durenberger.
22 Q. Is Dan the only person you reported directly to
23 as a recruiting manager?
24 A. When I first started.
25 Q. Did you report to anyone else besides Dan while

**Page 34**

1  you were the recruiting manager for Buca?
2  A. Yeah.
3  Q. Who was that?
4  A. Well, Dan was my direct supervisor, and then Dan
5  got promoted.
6  Q. Mm-hm.
7  A. And for a while, I was reporting straight to Joe
8  Micatrotto.
9  Q. Okay.
10 A. But as a recruiting manager, you sort of report
11 to the DVPs. I mean they're not doing your review or
12 anything like that, but they're definitely telling you
13 what to do. You're taking directions from them.
14 Q. What does "DVP" stand for?
15 A. Divisional vice president.
16 Q. Okay. After Dan got promoted and you began
17 reporting to Joe Micatrotto, did you report to anyone
18 else --
19 A. Yes.
20 Q. -- as a recruiting manager at Buca?
21 A. Yes.
22 Q. Who is that?
23 A. Jennifer Percival.
24 Q. Anyone else?
25 A. No.

**Page 35**

1  Q. Did anyone report to you in your role as
2  recruiting manager at Buca?
3  A. No.
4  Q. When you became a senior family resource
5  manager, who did you report to?
6  A. Jennifer Percival.
7  Q. Did your job duties change in any way --
8  A. Yes.
9  Q. -- with this promotion?
10 A. Yes. I took on training classes.
11 Q. You don't have to -- at the moment -- I'm not
12 sure if you were finished with the answer, but you don't
13 have to describe the differences because I'm going to ask
14 you what you did in these positions.
15 A. Okay.
16 Q. But thank you for that.
17        Did you report to anyone else besides
18 Jennifer Percival during the time you were senior family
19 resource manager at Buca?
20 A. No.
21 Q. Who did you report to when you became the
22 director of family resources for the West Coast?
23 A. Jennifer Percival.
24 Q. Do you still report to Jennifer Percival?
25 A. No.

**Page 36**

1  Q. Who did you report to after Jennifer Percival?
2  A. Joe Kohaut.
3  Q. Okay. Do you still report to Joe?
4  A. No.
5  Q. Who next?
6  A. Wes Garnett.
7  Q. And then?
8  A. That's the current person.
9  Q. Have you now told me everyone you've reported to
10 during your employment at Buca?
11 A. Yes.
12 Q. As the director of family resource manager, did
13 you have anyone reporting to you?
14 A. Yes.
15 Q. How many people?
16 A. Well, directly two -- the two salary positions
17 were a market trainer and the recruiter. Then also I
18 function as a new restaurant opening manager, so all of
19 the trainers at a new restaurant opening would report to
20 me.
21 Q. Was that the reporting structure that remained
22 in effect during the time you were senior family resource
23 manager?
24 A. I don't -- I'm not sure I understand what you're
25 asking, Scott.



**NAEGELI REPORTING CORPORATION**

Portland, OR (503) 227-1544    Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000    Coeur d'Alene, ID (208) 667-1163

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Page 37

1  Q. Fair enough. You did the right thing. It's my
2  job to ask good questions, so make sure you tell me if you
3  don't understand my question.
4       At any point during the time that you
5  were senior family resource manager at Buca, did you have
6  any direct reports other than the marketing trainer, a
7  recruiter, and at times trainers at individual
8  restaurants?
9  A. When you -- you asked me what I did as a
10 director, which is what you just described. That is not
11 the case for the senior family resource manager.
12 Q. Oh. Who reported to you as a senior family
13 resource manager?
14 A. We had a recruiting coordinator.
15 Q. Okay. Anyone else?
16 A. No.
17 Q. Throughout the time you were senior family
18 resource manager, did you ever have anyone reporting to
19 you other than a recruiting coordinator?
20 A. No.
21 Q. Okay. Now, I understand from what you said
22 before that as the director of family resources for the
23 West Coast, you had a market trainer, a recruiter and at
24 times trainers at restaurants that reported directly to
25 you, right?

Page 38

1  A. Correct.
2  Q. Did anyone else ever report to you other than
3  those people while you were director of family resources
4  for the West Coast?
5       MR. GERHAN: Scott, this is Dan. Can
6  we put a timeframe on some of this stuff?
7       The reason I'm asking is -- you know,
8  I know that Mr. Dilemani's interviews occurred in the
9  summer of 2000, and I want to make sure that your -- that
10 the deposition is focused on that timeframe. I don't know
11 when all of these positions started to change.
12      MR. GOLDBERG: Well, I don't either.
13 I don't think that Ms. Van Holmes is certain exactly when
14 the promotions took place, and I don't need to go on very
15 long about it. I just want to know if anyone else ever
16 reported to her in her role as director of family
17 resources for the West Coast.
18      THE WITNESS: I had a -- in the
19 interim -- I had some people report to me in an interim
20 situation.
21 BY MR. GOLDBERG:
22 Q. Okay. What kind of function?
23 A. That the people did?
24 Q. Yes.
25 A. One is an admin assistant --

Page 39

1  Q. Okay.
2  A. -- manager of management training, and new
3  restaurant opening coordinator.
4  Q. Okay. Now, we're at the point where I'm going
5  to ask you to please tell me your job duties in the
6  position of recruiting manager at Buca.
7  A. Okay.
8  Q. Go ahead, please.
9  A. Okay. Placing ads, receiving resumes,
10 responding back to resumes, interviews, coordinating
11 subsequent interviews, coordinating reference checks,
12 background checks, working with the divisional vice
13 presidents throughout the process, creating the offer
14 letter, coordinating the training of the candidate,
15 follow-up with the candidate after they started training,
16 travel for the candidate before and after training -- or
17 before and after they were hired.
18 Q. Have you finished your answer?
19 A. I think so.
20 Q. Okay. If during the course of your deposition
21 you recall any of your job duties, will you please call it
22 to my attention?
23 A. Sure.
24 Q. What were your job duties as the senior family
25 resource manager?

Page 40

1  A. All of those I just described --
2  Q. Mm-hm.
3  A. -- as well as teaching classes at our Buca
4  University.
5  Q. Okay.
6  A. New restaurant openings.
7  Q. Mm-hm.
8  A. Our internship program.
9  Q. Is that everything?
10 A. And I worked with our consultant on feedback on
11 our training manuals.
12 Q. Is that everything?
13 A. Miscellaneous projects that my -- that Jennifer
14 would ask me to do.
15 Q. What types of classes do you teach or did you
16 teach at Buca University?
17 A. Interview and selection.
18 Q. Is that it?
19 A. No. A class on how to do a preshift.
20 Q. How to what? I didn't hear you.
21 A. Oh, I'm sorry. A preshift is a meeting that you
22 do before the restaurant openings with the hourly family
23 members.
24 Q. Okay.
25 A. Sexual harassment, time management, coaching and

NAEGELI REPORTING CORPORATION

Portland, OR (503) 227-1544     Seattle, WA (206) 622-3376
Spokane, WA (509) 838-6000     Coeur d'Alene, ID (208) 667-1163



Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Page 41

1  counseling.
2  Q. Is that all you can think of?
3  A. Yeah.
4  Q. When you mentioned your training classes on
5  sexual harassment, does that more generally cover other
6  types of employment discrimination?
7  A. We also discuss the ADA consistent
8  documentation.
9  Q. Is that the Americans with Disabilities Act?
10 A. Correct.
11 Q. Okay. And your job duties as the director of
12 family resources for the West Coast --
13 A. Are -- the recruiter reports to me, so I work
14 with her.
15 Q. Mm-hm.
16 A. New restaurant openings, the training manuals,
17 advertising for recruitment, advertising, Buca U classes
18 still. I help investigate any -- we call them "CRL
19 claims."
20 Q. What is a "CRL claim"?
21 A. If a call was called into the chief
22 responsibility officer, then I would go investigate it.
23 Q. What kinds of positions did you recruit for
24 throughout your tenure at Buca?
25 A. Primarily the management positions that we -- in

Page 42

1  the restaurant, but I've also helped with marketing
2  positions, construction.
3  Q. "Paisano Partner" is a management position at a
4  restaurant?
5  A. Correct.
6  Q. Are there other management positions at the
7  restaurant?
8  A. Yes.
9  Q. What are they?
10 A. Kitchen manager, assistant general manager, and
11 assistant kitchen manager.
12 Q. Do all of those positions report to the Paisano
13 Partner?
14 A. Correct.
15 Q. And who does the Paisano Partner report to?
16 A. The divisional vice president.
17 Q. Who reports to whom?
18 A. The president.
19 Q. I take it that the president just reports to the
20 board?
21 A. Right. And Scott, there has been a change now.
22 The COO -- we just had a COO, so now the DVPs report --
23 will be reporting to that person.
24 Q. How long ago did that change take place?
25 A. That's starting in January.

Page 43

1  Q. Okay. Now, aside from that change, did the
2  reporting structure you just described apply throughout
3  your employment at Buca?
4  A. At -- the COO -- the soon-to-be COO --
5  Q. Mm-hm.
6  A. -- was a divisional vice president, and then he
7  became the senior divisional vice president, and had DVPs
8  reporting to him --
9  Q. Okay.
10 A. -- along with Joe -- with the president.
11 Q. Okay. I think I've got it.
12 A. Okay.
13        MR. GOLDBERG: I guess this is
14 probably a good time to break for purposes of asking how
15 this is working on the speakerphone?
16        THE REPORTER: I can hear you just
17 fine, Scott.
18        MR. GERHAN: Yeah, I think it's fine.
19        MR. GOLDBERG: Okay. Do I need to
20 change my pace or anything like that? I'm asking, I
21 guess, particularly Ms. Reidt.
22        THE REPORTER: No. I can hear you
23 just fine. Everything is great. Believe me, I'll
24 interrupt if I don't hear. I promise.
25        MR. GOLDBERG: That's all I ask.

Page 44

1        Just a second. Okay. Does anyone on
2  that end need a break?
3        THE WITNESS: No, I'm fine.
4        MR. GERHAN: No, I think we're fine.
5        MR. GOLDBERG: Okay. Anytime you need
6  a break, of course, just let me know, Ms. Reidt. I know
7  you know that, Dan.
8        MR. GERHAN: Yeah.
9        THE REPORTER: Thank you.
10 BY MR. GOLDBERG:
11 Q. I want to discuss Buca's recruiting process for
12 Paisano Partners. Before I get into the specifics, I want
13 to ask you whether the recruiting process has changed
14 during your tenure at Buca.
15 A. It's -- when Joe Kohaut -- is that a question?
16 Q. Yes.
17 A. Okay. Do you want me to go through the process
18 first?
19 Q. Well, this is what I'm after: I want to
20 understand the process at any given point in time, so if
21 it's easier for you to first highlight changes to the
22 process, that's fine.
23        If you would rather -- if there are no
24 changes, we can go right into the process.
25        MR. GERHAN: I'm going to register an

NAEGELI REPORTING CORPORATION

Portland, OR                        Seattle, WA
(503) 227-1544                                          (206) 622-3376

Spokane, WA                                             Coeur d'Alene, ID
(509) 838-6000                                          (208) 667-1163

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

**Page 49**

1  Q.  What are the factors that the recruiter uses to
2  decide whether to schedule an interview or instead reject
3  the applicant upon receiving the resume?
4  A.  You could look at tenure -- tenure on the
5  resume.
6  Q.  Mm-hm.
7  A.  Where they worked, what kinds of places they
8  worked at.  Do they have any restaurant experience or
9  management experience?
10 Q.  Anything else?
11 A.  If they're currently working.
12 Q.  Are there any other factors you can think of?
13 A.  For the initial screening?
14 Q.  Yes.
15 A.  Possibly education.  If they just -- if they
16 didn't have that much experience, where did they go to
17 school?
18 Q.  Is that everything?
19 A.  Yes.
20 Q.  Are these factors memorialized in (inaudible.)
21 A.  Pardon?
22 Q.  Is there a memo or employment manual that states
23 that these are the factors that should be used in deciding
24 whether to reject versus scheduling an interview for an
25 applicant?

**Page 50**

1  A.  No.
2  Q.  Any other document that states that these are
3  the factors, to your knowledge?
4  A.  For looking at a resume?
5  Q.  Yes.
6  A.  I don't think so.
7  Q.  Okay.  So let's continue with the process.  If
8  the person gets past the screening performed by the
9  recruiter, what happens next?
10 A.  They would call and set up an interview and
11 interview the candidate.
12 Q.  In person or on the phone?
13 A.  It's almost always on the phone.
14 Q.  Okay.  That's performed by the recruiter?
15 A.  Correct.
16 Q.  What things are discussed during that interview?
17 A.  Past job history.
18 Q.  Mm-hm.
19 A.  How they manage people.
20 Q.  Okay.
21 A.  Costs -- how they manage costs.
22 Q.  Yes.
23 A.  What they like about the restaurant industry,
24 what they don't like about the restaurant industry.
25 Q.  Anything else?

**Page 51**

1  A.  Salary expectations.
2  Q.  Mm-hm.
3  A.  When we're talking -- going back to the tenure,
4  just -- you know, they may have great tenure, but what is
5  their sales volume?  Is it like -- is it high volume or
6  low volume?
7  Q.  Okay.  Keep going.
8  A.  Examples of how they've developed people
9  throughout their history of work like who they brought up
10 through the ranks.
11 Q.  Is that everything?
12 A.  Yeah, pretty much.
13 Q.  If you think of something else during the course
14 of this deposition, will you bring it to my attention?
15 A.  Sure.
16 Q.  How long does that initial telephone interview
17 by the recruiter normally take?
18 A.  Depending on who you're talking to and if they
19 know Buca, it can take anywhere from 30 minutes to an hour
20 and 15 minutes.
21 Q.  Okay.  What's the next step?
22 A.  Then the recruiter would -- I guess this is
23 where there could be a change in what we did.  It just
24 depends on how -- I can't remember the timing of how it
25 worked, but originally the recruiter would set up a

**Page 52**

1  subsequent interview, calling the Paisano Partner in the
2  area and setting it up for person.
3           It became that we were interviewing
4  so many people, and at times the Paisano wasn't there, and
5  there were a lot of phone calls back and forth, and it
6  took too long, so we put the oweness on the candidate to
7  go call the Paisano Partner to set up the interview.
8  Q.  Do you recall how it worked in Bey's case?
9  A.  I'm pretty sure that the oweness was on him to
10 set up the interview -- the second interview.
11 Q.  Now, before setting up this interview or putting
12 on oweness on the candidate to set up the interview, did
13 the recruiter make another screening decision based on the
14 telephone interview?
15 A.  I'm not sure I understand the question.
16 Q.  After the 30-minute to an hour and 15 minute
17 telephone interview by the recruiter --
18 A.  Mm-hm.  (Witness answers affirmatively.)
19 Q.  -- would the recruiter automatically go to the
20 next step or would the recruiter first make a decision
21 whether to reject an applicant as a result of that
22 telephone interview?
23 A.  Oh, they may reject right then.
24 Q.  What factors would go into the recruiter's
25 decision to reject following the telephone interview?

**NAEGELI REPORTING CORPORATION**

Portland, OR                          Seattle, WA
(503) 227-1544                                           (206) 622-3376

Spokane, WA                                              Coeur d'Alene, ID
(509) 838-6000                                           (208) 667-1163

Phone: (800) 528-3335   www.naegelireporting.com   Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

**Page 53**

1  A.  If they didn't understand cost, if their
2  management style wasn't in sync with the way we treat
3  people.
4  Q.  Mm-hm.
5  A.  If they -- if their resume -- sometimes people
6  will put things on their resume that don't jive when
7  you're in the phone conversation.
8  Q.  Okay.
9  A.  Personality.
10  Q.  Okay.  Anything else?
11  A.  Why we would reject someone?
12  Q.  (No response.)
13  A.  Is that it, Scott?  Anything else on why we
14  would reject someone?
15  Q.  Yes.
16  A.  I think that's pretty much it.
17  Q.  Okay.
18  A.  You know what?  There would be something else
19  for a rejection.
20  Q.  Yes?
21  A.  If you were interviewing someone like -- for
22  instance, if I was interviewing you, and you had the TV
23  blaring in the background, and it just seemed like -- it
24  didn't seem like you were in tune with what we were doing
25  on the interview, that would be another reason we would

**Page 54**

1  reject someone.
2  Q.  Okay.
3  A.  Actually, one other reason.  Sorry.  Actually
4  two.
5       One, if salary expectations weren't in
6  line -- we have very strict salary guidelines, so if
7  somebody was making a lot of money, and we are only paying
8  so much, that might be a reason to knock them out because
9  if -- you know, if you're making a $100,000 a year, how is
10  your lifestyle going to fit into making $50,000 a year?
11  Q.  Mm-hm.
12  A.  Or -- what was I going to say?  Salary -- oh, if
13  you're interviewing for a position, and you want to stay
14  in a certain location that we don't have an opening for,
15  that would be another -- could be another knock out.  For
16  instance, if you were wanting to be in Seattle and I
17  didn't have any openings in Seattle.
18  Q.  Is it fair to say that at the stage following
19  the telephone interview, if the recruiter found whatever,
20  in the recruiter's opinion, was a good reason, a recruiter
21  could decide to screen the applicant out at that stage?
22  A.  I would say if the recruiter is not sure because
23  it is on the phone, they would pass them on to the next
24  interview because they don't want to rule someone out if
25  they weren't sure.

**Page 55**

1       I mean the hundred percent sures --
2  pretty much what I told you that we went through, that
3  would be a knockout.  If I wasn't sure on someone -- if I
4  wasn't quite sure, I wouldn't knock them out just because
5  I wasn't quite sure.  I would let them go on to another
6  interview so someone else could give another opinion.
7  Q.  Was there any formal list of factors that a
8  recruiter was expected to base the recruiter's decision
9  on?
10  A.  You mean like an evaluation form?
11  Q.  If there was one, yes.
12  A.  Yeah, we had an evaluation form.
13  Q.  Was there any other formal list of factors that
14  a recruiter was expected to use in deciding whether to
15  screen someone out following the telephone interview?
16  A.  I'm not sure what you mean "following the
17  telephone interview."
18  Q.  Subsequent to the telephone interview.
19  A.  I'm still not sure what you mean, Scott.
20  Q.  Okay.  When describing the process for
21  recruiting Paisano Partners, I believe that we had said
22  that there's sometimes an ad but usually not.
23       The process usually begins with the
24  receipt of the resume.  The recruiter then screens
25  resumes.  The person passes that screening, and then the

**Page 56**

1  recruiter sets up a telephone interview.
2       After that telephone interview, the
3  recruiter decides whether to set up an interview with a
4  Paisano Partner in an area or puts them on the phone with
5  the applicant, or alternatively the recruiter decides to
6  screen out the applicant at that stage.  Am I right so
7  far?
8  A.  That would all be on the same phone call.
9  Q.  Okay.  At the conclusion of that phone call -- I
10  believe you were giving me a list of factors that a
11  recruiter could use to decide to screen out an applicant
12  including:  The applicant had problems with management
13  styles, the resume was inaccurate in instances,
14  personality issues, salary expectations that apply, et
15  cetera?
16  A.  Correct.
17  Q.  We were talking about where those factors may be
18  written down, and I believe you said that the evaluation
19  form is one place, right?
20  A.  Right.
21  Q.  Is there any other place?
22  A.  I don't -- I don't think so.
23  Q.  Okay.
24  A.  But there might be.
25  Q.  If you think of one later, will you call it to

**NAEGELI REPORTING CORPORATION**

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Page 57

1  my attention?
2  A. Sure.
3  Q. So let's say at that stage where a recruiter
4  decides not to screen the applicant. You were beginning
5  to say that at some point during your tenure there was a
6  change where it used to be that the recruiter would set up
7  an interview with a Paisano Partner in the area and now --
8  A. Mm-hm. (Witness answers affirmatively.)
9  Q. -- you're putting the oweness on the candidate,
10 right?
11 A. Correct.
12 Q. Regardless of which path was taken, what was the
13 next step, the interview itself?
14 A. Right. It's called an "on-the-job interview."
15 Q. How does that work?
16 A. The candidate meets -- first of all, we would
17 call the Paisano Partner and set up a time to meet.
18 Q. Mm-hm.
19 A. They are supposed to come in and meet with the
20 Paisano Partner. It gives them an opportunity to ask
21 questions and the Paisano Partner to ask them questions.
22      They would also do the Batrus Hollweg
23 personality profile, the 20-minute timed portion. They --
24 it's an interview that takes two to three hours or longer.
25 The person can stay as long as they want.

Page 58

1       They would also stay for family meal.
2  Every day, in all of our restaurants, we feed everybody
3  who works there for free.
4       Then they follow the Paisano Partner
5  around and essentially see what kind of job functions they
6  are doing so they can get an idea of what the job would be
7  like.
8  Q. At this point in the process, aside from sending
9  in a resume, is there a formal written application that a
10 candidate is expected to fill out?
11 A. After the phone interview they should be sent an
12 application that they would fill out and a disclosure
13 statement for the background check.
14 Q. Okay. Is that application supposed to be
15 completed prior to the interview with the Paisano Partner
16 in the area?
17 A. No. It hardly ever is because all of this is
18 happening over the phone and mail.
19 Q. Mm-hm. Whose decision is it to administer a
20 personality test to candidates at the stage where -- a
21 candidate at a job interview?
22 A. Whose decision?
23 Q. Yes.
24 A. That's part of the interview process. I mean we
25 always do it. There might be a time when a person came in

Page 59

1  to interview and things were too busy or you know, maybe
2  the water main broke and all of a sudden things are crazy,
3  and you might have to come in to do it at a different
4  time, but that's part of the interview process.
5  Q. Why is it part of the interview process?
6  A. Why?
7  Q. Yes.
8  A. We -- Batrus Hollweg personality profiles -- we
9  try and -- you know, when you're interviewing people, you
10 don't have a crystal ball. We try to find people that are
11 going to fit within the framework of how Buca is running
12 things. We have a benchmark with our successful Paisano
13 Partners and managers, and then they measure against that.
14 Q. Is it fair to say that the purpose of the
15 personality test is to obtain objective information on the
16 personality traits of the candidate?
17 A. I think that would be probably fair to say.
18 Q. Who reviews the personality test upon its
19 completion?
20 A. The recruiter and the divisional vice president.
21 Q. The divisional vice president and the recruiter,
22 you said?
23 A. Correct.
24 Q. What is the next step following the on-the-job
25 interview with the Paisano Partner?

Page 60

1  A. Well, it depends on how it went.
2  Q. When you say "how it went," are you referring to
3  the interview, the personality test, or both?
4  A. The interview.
5  Q. Okay. What are the options at that point?
6  A. They -- the Paisano Partner could think that
7  that person is not a fit, or the person could have not
8  liked the on-the-job interview and doesn't want to pursue
9  the interview process, or the Paisano Partner thinks they
10 may or may not be a fit, and it would be time to meet with
11 a divisional vice president.
12 Q. Does the Paisano Partner have the authority to
13 screen out an applicant following the on-the-job
14 interview?
15 A. To "screen out"?
16 Q. Yes.
17 A. Yes, but if they are unclear -- if they're
18 unsure, they would probably pass it on because they -- if
19 they weren't sure, they would probably pass them on to the
20 divisional vice president.
21 Q. Do the Paisano Partners get into any standards
22 for deciding whether to screen out an applicant following
23 the on-the-job interview?
24 A. They have an interview form with questions and
25 evaluations, and then they work with their divisional vice

**NAEGELI REPORTING CORPORATION**

Portland, OR (503) 227-1544        Seattle, WA (206) 622-3376

Spokane, WA (509) 838-6000         Coeur d'Alene, ID (208) 667-1163

Phone: (800) 528-3335   www.naegelireporting.com   Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204