## Page 65

1  Q. In the year 2000, approximately how many
2  divisional vice presidents were there at Buca?
3  A. I'm going to give you a range because I
4  wouldn't -- I don't know exactly. I would say between
5  three and five.
6  Q. How is it determined which divisional vice
7  president a candidate meets with?
8  A. Almost always it's going to be the divisional
9  vice president in the area you where you're interviewing
10 for.
11         If you were interviewing for a Seattle
12 position, you would be meeting with the divisional vice
13 president who is in charge of the Seattle market.
14 Q. Okay. Does anything happen in between the phone
15 call to set up the meeting with the divisional vice
16 president and the actual meeting?
17 A. We would be working processing the paperwork,
18 the recruiting coordinator.
19 Q. Would you be running a background check at that
20 point?
21 A. They would be doing that and reference checks.
22 Q. Is this when you would be reviewing the results
23 of the personality test?
24 A. Profile. It's not a test. It's a profile.
25 Q. Okay.

## Page 66

1  A. Yep, you would be reviewing that.
2  Q. To make sure that I'm clear, the personality
3  profile is based on a -- you said a 20-minute test?
4  A. There's a 20-minute timed portion that's done in
5  the restaurant, and that's -- that's verbal and math.
6         Then there's a part that you take home
7  that takes anywhere from two to three hours, depending on
8  the person, and that's on opinions -- personality.
9  Q. Okay. Does anything happen in connection with
10 the meeting with the divisional vice president such as
11 meeting with other employees at Buca or touring the
12 facility or anything like that?
13 A. Well, when they do the on-the-job interview,
14 they should have the tour of the facility.
15 Q. Does anything happen in connection with the
16 meeting with the divisional vice president, other than the
17 meeting itself?
18 A. Are you talking about if they interview with the
19 divisional vice president?
20 Q. Let me clarify by explaining where I'm coming
21 from.
22 A. Okay.
23 Q. And I know that the interview with the Paisano
24 Partner was not just about the interview itself; it was
25 also about a personality profile. I want to make sure

## Page 67

1  that when I ask about the meeting with the divisional vice
2  president, I'm not missing a step.
3  A. Okay.
4  Q. Am I missing a step, is my question.
5  A. I'm -- I'm not sure what you mean by "missing a
6  step." I'm sorry, Scott. I'm not trying to be difficult.
7  I'm not sure what you're asking.
8  Q. That's okay. I'm not trying to be difficult
9  either. I'm sorry if my questions aren't that clear.
10        After the recruiter calls the
11 candidate to set up the meeting with the divisional vice
12 president, what is the next step in the process?
13 A. You're making sure that you've got all of the
14 paperwork that you're supposed to have to administer the
15 background check and do the reference check.
16 Q. What happens after you do that?
17 A. You would let the -- well, the divisional vice
18 president know, for example, if someone had a criminal
19 record --
20 Q. Mm-hm.
21 A. -- and that they lied about it on their
22 application. Then we probably wouldn't -- we wouldn't go
23 forward with the divisional vice president interview.
24        It just depends on how much lag time
25 there is between the interview and the on-the-job

## Page 68

1  interview and with the divisional vice president.
2         A lot of times, the person is in the
3  area like when I gave the Seattle scenario.
4  Q. Mm-hm.
5  A. Then you -- I mean you could do the on-the-job
6  interview on Wednesday and meet with the Paisano
7  Partner -- or the divisional vice president on Saturday,
8  and all of that stuff might not have been done yet. Does
9  that make sense?
10 Q. I think so.
11        What is the purpose of the meeting
12 with the divisional vice president, particularly?
13 A. They are the -- they are the -- almost the final
14 say if the person is going to get hired or not. They
15 report to the divisional vice president.
16        The divisional vice president needs to
17 make sure that they're comfortable with this person
18 running a profit center in their division, so they're
19 the -- they are definitely the -- almost the last buck.
20        When I say "almost the last buck" --
21 the DVP signs off on the person, and then the senior vice
22 president or the president would meet with them for the
23 final say.
24        So no one could ever -- you have to
25 meet with the divisional vice president.

**NAEGELI REPORTING CORPORATION**

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335   www.naegelireporting.com   Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Page 69

1  Q. At this point in time, have we discussed all of
2  the steps in the recruiting process for Paisano Partners
3  that were in effect in the year 2000?
4  A. Well, if we want to go -- I guess we might want
5  to look at why someone might meet with more than one DVP.
6  Q. Does that happen from time to time?
7  A. It happens from time to time if the candidate,
8  as I described earlier, didn't live in the area where they
9  might be going to a divisional vice president.
10 Q. What happens then?
11 A. A DVP in the area -- in the market would meet
12 with them just to get a feel for the person because if
13 we're -- if they had a -- if they didn't feel like it
14 could be a fit, you wouldn't want to fly somebody out to
15 go meet with a DVP.
16 Q. Mm-hm. Aside from that, is there anything else
17 that's part of the recruiting process for Paisano Partners
18 as they were in effect in the year 2000 that we haven't
19 discussed so far in this deposition?
20 A. I don't know if we've really gone through what
21 happens after the DVP meets the person, if they go on to
22 the next step or not.
23 Q. Okay. Please walk me through that then.
24 A. Okay. So if you were -- this is only for
25 Paisano Partners.

Page 70

1  Q. Correct.
2  A. If a Paisano Partner met with a DVP, and they
3  mutually thought it went well, then they would meet with
4  the president or the senior vice president for the final
5  interview.
6  Q. And what happens next?
7  A. Then after that, we would discuss a job offer,
8  and a job offer would be made in -- on the phone and in
9  writing.
10 Q. By who?
11 A. The divisional vice president would discuss it
12 with the recruiter, and the recruiter would do that. That
13 is also a change. Now, the DVPs do their own offers,
14 just --
15 Q. Okay.
16 A. That wasn't the case in 2000.
17 Q. Okay. Thank you for pointing that out.
18 A. So the recruiter would make the job offer. When
19 they make a job offer, they are very specific about
20 salary, benefits, where the person would be training, how
21 long the training would be, and any travel arrangements if
22 they would need to be made.
23 Q. Mm-hm. Is that the final step in the process?
24 A. Nope. Then the final step would be if the
25 person accepts or not.

Page 71

1  Q. That's a good point. So I guess the person has
2  to then decide whether to accept the job offer?
3  A. Correct.
4  Q. And is that decision the final step in the
5  recruiting process? I guess it would have to be, right?
6  A. Yep.
7  Q. Okay. So then the question I really want to ask
8  is -- now, have we reached a point where we've discussed
9  all of the steps for recruiting a Paisano Partner position
10 as they existed in the year 2000?
11 A. We talked about the interview steps.
12 Q. Are there other steps aside from the interview
13 steps?
14 A. Well, for instance, if you were -- if you placed
15 an ad -- which you would be placing an ad -- that could be
16 a step or not.
17 Q. What other steps could there be?
18 A. Besides that?
19 Q. Mm-hm.
20 A. I think that would be it, Scott.
21 Q. Okay.
22 A. Well, one thing you --
23 Q. Yes? I couldn't hear you, I'm sorry.
24 A. I was -- I was going to say that you're talking
25 to your divisional vice president.

Page 72

1       I mean after every step of the
2  process, you're talking. After someone meets for the
3  on-the-job, I talk with the Paisano Partner, et cetera,
4  which I think you got in the gist of the conversation, but
5  I just wanted to make sure.
6  Q. Okay.
7  A. A recruiter can't make any decisions without the
8  opinions of other people. They don't have that latitude
9  whatsoever.
10 Q. Except when it comes to the initial screening,
11 right?
12 A. Correct.
13 Q. And when it comes to screening after the
14 telephone conversation, right?
15 A. The screening after the telephone conversation,
16 yes.
17 Q. Okay.
18     MR. GOLDBERG: At this point I would
19 like to ask Ms. Reidt to show you a document that I have
20 marked as "P-11."
21     Before showing it to you, I want to
22 make sure that we give Mr. Gerhanan opportunity to review
23 it so he knows the document you're looking at.
24     Are we doing that now?
25     THE REPORTER: Yes, Scott.



NAEGELI REPORTING CORPORATION

Portland, OR           Seattle, WA
(503) 227-1544         (206) 622-3376

Spokane, WA            Coeur d'Alene, ID
(509) 838-6000         (208) 667-1163

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Page 73

1    MR. GOLDBERG: Okay. Thank you.
2        (Whereupon, a 3-page Paisano Partner
3    Job Description was marked Exhibit-P-11 for
4    identification.)
5        THE REPORTER: Okay.
6    MR. GERHAN: I've looked at it, Scott.
7    BY MR. GOLDBERG:
8    Q. Okay. Do you have before you, Ms. Van Holmes, a
9    3-page document that in the bottom right-hand corner
10   has -- lawyers call these intent numbers -- "D 01 04 64"
11   through "D 01 04 66"?
12   A. (Witness peruses document.)
13      Yes.
14   Q. And what is that document?
15   A. It's the Paisano Partner job description.
16   Q. Is that the job description that was in effect
17   in the year 2000?
18   A. Well, it looks like it was -- it says here
19   "Last updated 11/2000" on this document.
20   Q. Was that document in effect -- it was updated
21   11/2000?
22   A. That's what it says on this, in the left-hand
23   corner.
24   Q. I'm going to ask you to please review that
25   document and then tell me whether the job duties of the

Page 74

1    Paisano Partner during the earlier portion of 2000
2    differed in any respect, to your knowledge. Okay?
3    A. (Pauses.)
4    Q. Do you understand what I'm asking you to do?
5    A. Yeah.
6    Q. Okay. So please tell me when you're done
7    reviewing the document?
8        THE WITNESS: Scott, could I take a
9    restroom break?
10       MR. GOLDBERG: Of course.
11       THE WITNESS: Thanks.
12       MR. GOLDBERG: The only thing I ask is
13   that -- well, normally I would ask you to answer whatever
14   question is pending --
15       THE WITNESS: Okay.
16       MR. GOLDBERG: -- but this is a long
17   document.
18       THE WITNESS: Right. That's why I'm
19   asking --
20       MR. GOLDBERG: So why don't we do
21   that. In the future -- I would generally wait until a
22   question that is not pending, fair enough?
23       THE WITNESS: Fair enough.
24       MR. GOLDBERG: Okay. How should we do
25   this? Should we just wait on the line, Ms. Reidt?

Page 75

1    THE REPORTER: That's fine, if you
2    would like to hold.
3    MR. GERHAN: That's fine.
4    MR. GOLDBERG: Okay. I'll let you
5    know when we're back. We're going to do the same.
6        (Pause in the proceedings.)
7    BY MR. GOLDBERG:
8    Q. Do you remember what my question was,
9    Ms. Van Holmes?
10   A. You wanted me to review the job descriptions.
11   Q. Yes.
12       MR. GOLDBERG: Ms. Reidt, are you
13   ready?
14       THE REPORTER: I'm ready.
15   BY MR. GOLDBERG:
16   Q. I'm sorry. Yeah, please because I'm going ask
17   you to about that job description as dated November 2000,
18   whether the nature of the job duties earlier than 2000
19   were different in any respect.
20   A. For the Paisano Partner?
21   Q. Yes.
22   A. (Witness peruses document.)
23      No.
24   Q. To make sure that that's clear on the record,
25   you're saying that the job duties were not different; is

Page 76

1    that correct?
2    A. Correct.
3    Q. Okay. So I think we're ready to talk about Bey.
4    A. Okay.
5    Q. Can you please tell me the recruiting process
6    with respect to Bey Dilemani, starting at the beginning?
7    A. Well, he sent in a resume to the recruiting
8    coordinator, Lucy Lea.
9    Q. What was the reporting relationship between you
10   and Lucy Lea?
11   A. She reported to myself and to the other senior
12   family resource manager.
13   Q. Okay. And then what happened?
14   A. I -- Lucy set up with an interview with me to do
15   an interview with Bey -- or set up a time for me to
16   interview Bey.
17   Q. Did you in fact do a telephone interview with
18   Bey?
19   A. Correct.
20   Q. Do you know when that was?
21   A. I don't know. I couldn't tell you the exact
22   date off the top of my head.
23   Q. Before your telephone interview with Bey, did
24   you discuss with Lucy anything about Bey?
25   A. No.

NAEGELI REPORTING CORPORATION

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335       www.naegelireporting.com       Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Page 77

1  Q. Did Lucy Lea provide you any materials regarding
2  Bey?
3  A. His resume.
4  Q. Anything else?
5  A. No.
6     MR. GOLDBERG: I'm going to ask you,
7  Ms. Reidt, to please show the witness a document that I
8  have marked for identification as "P-13."
9     (Whereupon, a 1-page resume of Bey Dilemani was
10 marked Exhibit-P-13 for identification.)
11    THE REPORTER: Okay.
12    MR. GOLDBERG: Did you see a copy,
13 Dan?
14    THE WITNESS: Yes.
15    MR. GERHAN: Yeah, I got it.
16 BY MR. GOLDBERG:
17 Q. Do you have it in front of you, Ms. Van Holmes?
18 A. Yes, I do.
19 Q. A single-page document, and at bottom right
20 saying "D 01 02 16"?
21 A. (Witness peruses document.)
22    Right. I got it.
23 Q. Is that the resume you were referring to?
24 A. Correct.
25 Q. Whose handwritten notes appear on this?

Page 78

1  A. (Witness peruses document.)
2     Well, it looks like two different
3  handwritten notes. One is mine and one is Lucy's. The
4  one that says "interview 6/1/2000, 10 a.m." would be
5  Lucy's handwriting.
6  Q. Okay. What is the mark appearing before that?
7  It looks like it says "Received"?
8  A. Yeah, it was -- when a resume comes in, we mark
9  the date it is received.
10 Q. I take it, you can't read that date?
11 A. I can't.
12    MR. GOLDBERG: I'm going ask Ms. Reidt
13 to show you a document that I have marked as "P-12," which
14 is a single-page document with a big stamp No.
15 "D 01 02 02."
16    (Whereupon, a 1-page resume of
17 Bey Dilemani was marked Exhibit-P-12 for identification.)
18    THE REPORTER: Okay.
19    THE WITNESS: Okay. All right.
20 BY MR. GOLDBERG:
21 Q. Do you have that document in front of you?
22 A. Yes.
23    MR. GOLDBERG: Dan, did you see it?
24    MR. GERHAN: Yes.
25    THE WITNESS: Mm-hm. (Witness answers

Page 79

1  affirmatively.)
2  BY MR. GOLDBERG:
3  Q. Can you read -- well, withdrawn.
4     Is the document P-12 the same as
5  document P-13 aside from the handwritten notes and the
6  lines indicating the facsimile transmission?
7  A. (Witness peruses document.)
8     The facsimile dates are different.
9  Q. Aside from the line indicating facsimile date
10 and transmission?
11 A. Yep, it looks the same.
12 Q. Can you read when this document was received?
13 A. I still can't see that. I think it might say
14 May 31, but I can't tell.
15 Q. Can you tell that it says at least "31"?
16 A. Yes.
17 Q. And do you believe that from your knowledge of
18 and recollection of dealings with Bey that the "31" is
19 May?
20 A. I think that seems right.
21 Q. Okay. Let's look at P-13.
22 A. Okay.
23 Q. Would you please tell me which of -- withdrawn.
24    At the time you first saw this
25 document, did it have Lucy Lea's handwritten notes on it?

Page 80

1  A. (Witness peruses document.)
2     Lucy only wrote the "Interview
3  6/1/2000..." The other handwriting is mine.
4  Q. Right. And I understand that. And what I'm
5  trying to ask you is -- at the time you first received it,
6  your handwriting obviously wasn't on it yet?
7  A. Correct.
8  Q. Was Lucy Lea's handwriting on it?
9  A. Yes. She -- this would be just a copy that she
10 faxed over so I would have it with the time on it.
11 Q. Did you work in the same location Lucy Lea?
12 A. We did not.
13 Q. Have you ever met face to face?
14 A. Lucy?
15 Q. Yes.
16 A. Yes.
17 Q. Did you ever discuss Bey Dilemani with her face
18 to face?
19    MR. GERHAN: Can you be more specific
20 as to the timeframe, Scott?
21 BY MR. GOLDBERG:
22 Q. I mean ever. At any time following May 1st,
23 2000, have you ever spoken to Lucy Lea concerning Bey
24 Dilemani?
25 A. In person?

NAEGELI REPORTING CORPORATION

Portland, OR
(503) 227-1544



Seattle, WA
(206) 622-3376

Spokane, WA
(509) 838-6000

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Lori A. Van Holmes                                                              December 23, 2002

Page 81

1  Q. Yes.
2  A. I don't think so.
3  Q. How about over the phone?
4  A. On the phone? We would have talked about
5  interview times, et cetera, "Did you receive the
6  information," but anything else, no.
7  Q. Am I understanding your testimony then that you
8  have never discussed anything substantive regarding Bey's
9  application for the Paisano Partner position?
10 A. I'm not sure what you mean by "substantive."
11 Q. I mean aside from setting times and dates of
12 interviews, am I understanding that you've never discussed
13 Bey Dilemani with Lucy Lea?
14 A. Or -- did we receive the paperwork? I'm not
15 sure that I understand the question.
16 Q. All right. I think you're doing just fine.
17        Aside from ever asking whether you
18 received the paperwork, and aside from discussing times
19 and dates of interviews, have you ever discussed Bey
20 Dilemani with Lucy Lea?
21 A. I don't know. I don't -- I mean we talked. You
22 talk to people. I don't know.
23 Q. You don't have any recollection of any such
24 conversations?
25 A. That's correct.

Page 82

1  Q. Okay. When did you make your handwritten notes
2  on P-13?
3  A. (Witness peruses document.)
4        I would say I did that on 6/1 at the
5  time of the interview.
6  Q. Mm-hm. Did you make any other notes on June 1st
7  regarding Bey Dilemani aside from the words that are shown
8  on this piece of paper, P-13?
9  A. Yeah. Usually I make a note -- a couple notes
10 on the resume, but there should be an interview form that
11 I filled out.
12 Q. Okay. When you spoke with Bey on June 1st,
13 2000, did you call him?
14 A. Yes.
15 Q. Was anyone else on the phone aside from you and
16 Bey?
17 A. Not to my knowledge.
18 Q. Tell me what you remember about that telephone
19 conversation.
20 A. Well, I would say that most of the interviews
21 all go the same way. The first thing I usually ask is,
22 you know, "How is the weather where you are?"
23 Q. Okay.
24 A. "How did you get the idea to apply with Buca?"
25 Then I'll go into the questions that I described to you

Page 83

1  earlier.
2  Q. Do you recall what you asked Bey in particular?
3  A. Pardon?
4  Q. Do you recall what you asked Bey in particular?
5  A. Oh, I ask everyone the same exact questions. I
6  can go through that, if you want.
7  Q. Well, let's put it this way: Do you recall any
8  of Bey's answers to your questions?
9  A. (Witness peruses document.)
10       Well, from looking at this resume, the
11 notes, I found out some information about what Spaghetti
12 Western was. It says "Modern Chinese with pasta,
13 burgers." It was a full-service restaurant with a full
14 bar, 38 to 43 employees, one manager. They're open for
15 lunch and dinner. It's one manager per location.
16       And then under the director of
17 operations, it looks like I wrote that he was in charge of
18 purchasing, hiring, training, advertising and banquettes.
19       At the top, in the left hand corner,
20 there's written "Allentown," "Mayfield Heights, Ohio," and
21 "cost-of-living checks," which would tell me that he's
22 probably checking out those places to see what the
23 cost-of-living would have been.
24 Q. Do you have any recollection as to why he was
25 checking out Allentown and Mayfield Heights, Ohio to see

Page 84

1  what the cost-of-living might have been?
2  A. Probably because I -- when we were talking, he
3  was in Arizona. I didn't have anything available in
4  Arizona. He may have said "Well, I'm available to go to
5  other places."
6  Q. Meaning that you told him there was an opening
7  in Allentown and in Mayfield Heights, Ohio?
8  A. Or I could have said, you know, coming down the
9  pike at some point, we could be looking at these
10 locations.
11 Q. Do you recall now what it is that you said
12 regarding those locations?
13 A. I don't recall now.
14 Q. Do you recall anything else at all about your
15 initial telephone conversation with Bey as you sit here
16 now?
17 A. In what regard?
18 Q. Anything. Any regard. Do you recall anything
19 that was said by either you or Bey?
20 A. Specifically to his interview? I do remember
21 that he -- that he -- we were talking and he was talking
22 about what he -- you know, his goals and what he wanted to
23 do. And --
24 Q. What did he say his goals were?
25 A. He said that eventually he wanted to be a

**NAEGELI REPORTING CORPORATION**

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Page 85

1  divisional vice president. I remember that because I
2  wasn't quite sure what to do with that because a lot of
3  times -- we get a lot of people who want that and that's
4  not -- we need people who want to be Paisano Partners.
5  Q. Did you tell that to Bey?
6  A. I don't know. I wouldn't be able to tell you
7  that off the top -- I don't know if I told him that or
8  not.
9  Q. Do you recall anything else that either you or
10 Bey said during your conversation on June 1st, 2000?
11 A. No.
12 Q. Do you recall any general impressions of Bey
13 that you formed as a result of that conversation?
14 A. General impressions?
15 Q. Yes.
16 A. I do recall that he seemed pretty matter of
17 fact, not like the, you know, cheerleading manager.
18 Q. Anything else?
19 A. No.
20 Q. Do you recall how long your conversation with
21 him lasted?
22 A. I would say it lasted anywhere from 30 minutes
23 to an hour and 15 minutes.
24 Q. Do you recall forming any impressions as to
25 whether, in your mind, Bey would make a good Paisano

Page 86

1  Partner as a result of your conversation with him on June
2  1st, 2000?
3  A. I recall thinking that it would probably be
4  worth the time to go on and do the next step.
5  Q. Did you form a positive impression of Bey based
6  on your telephone conversation with him on June 1st?
7  A. I think I would say that I formed a neutral
8  opinion of him.
9  Q. Mm-hm. Let's look still at P-13. Okay?
10 A. Mm-hm. (Witness answers affirmatively.)
11 Q. Do you have that in front of you?
12 A. Yes, I do.
13 Q. Now, are you the person that made the decision
14 not to screen Bey based on his resume?
15 A. I don't understand the question.
16 Q. In the process for Paisano Partner applicants
17 that you described earlier in this deposition, I believe
18 you said that after receiving a candidate's resume, a
19 decision is made as to whether that candidate should be
20 screened out of consideration, right?
21 A. Upon receiving the resume?
22 Q. Yes.
23 A. Yes. I didn't receive this, Lucy did.
24 Q. You received it at some point before your
25 interview with Bey, right?

Page 87

1  A. Correct.
2  Q. Did you make a decision before your telephone
3  interview as to whether you should screen out Bey based on
4  his resume?
5  A. You wouldn't do that. If the recruiting
6  coordinator sent it on -- I wouldn't, based on reading the
7  resume, screen someone out or in, either way.
8  Q. Okay. As a result of your telephone interview
9  with Bey on June 1st, 2000, did you make a decision as to
10 whether you should screen out Bey, based on that telephone
11 interview?
12 A. I made a decision that I couldn't -- I wouldn't
13 definitively say to screen him out and go on to the next
14 interview.
15 Q. What was your decision specifically with regard
16 to Bey at that stage?
17 A. That based on my talk with him -- as I said
18 earlier, I was neutral. I wouldn't, based on that talk,
19 be able to screen him out or screen him in.
20 Q. Am I'm understanding correctly that at that
21 point in the process, a decision had to be made whether to
22 either screen him out or send him to the next stage in the
23 recruiting process, right?
24 A. Well, as I said earlier, sometimes if you're not
25 sure -- if you -- if you're not sure, you send them on

Page 88

1  because you want to get a second opinion. You want to
2  make sure that you're getting a second opinion.
3  Q. Well, am I right, though, that at that stage, a
4  decision had to be made, whether to screen him out or to
5  send him on to the next step?
6     MR. GERHAN: Objection; asked and
7  answered.
8  BY MR. GOLDBERG:
9  Q. You can answer.
10 A. Well, yeah. I interviewed him. I wasn't sure,
11 so I sent him on to the next interview.
12 Q. Did you make the decision alone?
13 A. To send him on to the next interview?
14 Q. Yes.
15 A. Yes.
16 Q. Have you told me in full, the basis for sending
17 Bey on to the next step in the process?
18 A. Pardon?
19 Q. Have you now told me all of your reasons for
20 deciding to send Bey to the next step in the recruiting
21 process for an interview?
22 A. (Pauses.)
23 Q. Do you understand what I'm asking?
24 A. Not really.
25 Q. Okay. Why did you decide following your June

NAEGELI REPORTING CORPORATION

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335   www.naegelireporting.com   Fax: (503) 227-7123

Page 89

1  1st, 2000 interview with Bey to schedule an interview for
2  Bey?
3  A. He had some qualifications that could be a fit
4  for a Paisano Partner.
5  Q. What qualifications in particular?
6  A. Well, as we talked about earlier, he had tenure
7  in positions. He had restaurant experience.
8  Q. Anything else?
9  A. Of why he would go on?
10 Q. I want to make sure that I understand all of
11 your reasons --
12 A. Why I sent him on or why I wasn't sure to send
13 him on?
14 Q. Well, you did send him on, right?
15 A. Right.
16 Q. I want to make sure that I know all of the
17 reasons why you sent him on.
18 A. That was it.
19 Q. Bear with me one second.
20 A. Sure.
21 Q. Do you agree that based on Bey's resume that you
22 reviewed and based on your telephone interview with Bey
23 that he had the qualifications for a Paisano Partner?
24 A. No.
25 Q. What qualifications did you determine he lacked

Page 90

1  based on his resume and your initial conversation over the
2  telephone with him on June 1st?
3  A. Well, he -- he lacked the salary expectation
4  qualifier that we spoke about, the management style
5  personality that we spoke about.
6  Q. What else?
7  A. Developing your people.
8  Q. Developing what?
9  A. The "Developing your people" question that I
10 spoke about.
11 Q. Right.
12 A. Wanting to just be a Paisano Partner.
13 Q. Anything else?
14 A. Why I was questioning whether or not to send him
15 on?
16 Q. My question is: In what respect do you
17 believe -- based on Bey's resume and your telephone
18 interview with him on June 1st, do you believe that Bey
19 did not have the qualifications for a Paisano Partner?
20 A. What other things -- did I think he didn't have
21 qualifications to be a Paisano Partner?
22 Q. Yes?
23 A. I didn't know if he had the personality to be in
24 Buca. It's an irreverent, fun -- I couldn't ascertain
25 that from a phone interview.

Page 91

1  Q. I'm not sure I heard the word you said. Did you
2  say "irreverence"?
3  A. Yeah, our concept. Have you ever been to a Buca
4  di Beppo?
5  Q. I have, but I get to ask the questions. Sorry.
6       What about Bey's personality that you
7  were able to determine from your review of his resume and
8  your telephone interview of him on June 1st --
9  A. He was a bit stiff. He has a lot of fine dining
10 experience, which sometimes doesn't translate working at
11 Buca.
12 Q. Anything else about his personality?
13 A. I would say he seemed focused on getting to the
14 next level.
15 Q. Anything else about his personality?
16 A. Besides being stiff?
17 Q. Besides what you just mentioned.
18 A. Well, I do remember that when I asked about the
19 developing -- developing your person, he didn't give me a
20 recent example. It was someone from way back when. When
21 I look for a developer of people -- you look for
22 somebody -- you know, like let's hear a recent example.
23       Most people, if they're constantly
24 developing their people -- this is in general -- would
25 talk about a very recent example.

Page 92

1  Q. Okay. Have you now told me all of the
2  personality characteristics you felt led you to believe
3  that Bey lacked qualifications for a Paisano Partner based
4  on your June 1st interview and review of his resume?
5  A. That I can remember.
6  Q. What is it that you were able to determine
7  regarding Bey's management style from your June 1st
8  telephone interview with him and your review of his resume
9  that led you to believe that he lacked qualifications for
10 Paisano Partner?
11 A. Well, on his -- in the -- when you interview
12 someone, you're talking to them on the phone, and you're
13 finding out where they worked in their past.
14       I ask how they develop their people.
15 "Tell me about someone you've developed." "Tell me about
16 your management style," and he would tell you that.
17 Q. Mm-hm. So what I'm asking you now is: What is
18 it about his management style --
19 A. As I said earlier, he seemed stiff on the phone.
20 He has a lot of fine dining experience, which in fine
21 dining, you do things a certain way. It's very
22 regimented, and it doesn't translate well with Buca.
23 Q. What was it about these salary expectations that
24 led you to believe from your telephone interview with Bey
25 on June 1st and your review of his resume that he lacked

NAEGELI REPORTING CORPORATION

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335   www.naegelireporting.com   Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Page 93

1  qualifications for a Paisano Partner?
2  A. It's not lacking qualifications, it would be a
3  knock out.
4      Again, as the example I gave you
5  earlier, if somebody is making a lot more than we pay,
6  then how is -- you know, how is that going to work? You
7  become accustomed to a certain style of living.
8      I recall him saying that he made more
9  than what our salary base was, and then it even -- on my
10 notes here on this resume -- on the P-13 document, I wrote
11 down that he had to go look at a cost-of-living check.
12     MR. GOLDBERG: I'm going to ask
13 Ms. Reidt to please show you a document that I've marked
14 as "P-16."
15     Do you have that, Ms. Reidt?
16     THE REPORTER: I do. I'm getting it.
17     MR. GOLDBERG: Okay. Thank you. Just
18 let me know when you've handed it to the witness.
19     THE REPORTER: Handing it to the
20 witness.
21     MR. GOLDBERG: Great.
22     Are you looking at it Dan?
23     MR. GERHAN: Yep.
24     MR. GOLDBERG: Great.
25         (Whereupon, a 2-page

Page 94

1  Management Candidate In-Depth Evaluation form was marked
2  Exhibit-P-16 for identification.)
3  BY MR. GOLDBERG:
4  Q. This is a 2-page document. If you look at the
5  bottom right, the number there is "D 01 02 17," and the
6  second page is "D 01 02 18," is that correct,
7  Ms. Van Holmes?
8  A. (Witness peruses document.)
9      Correct.
10 Q. What is this document?
11 A. (Witness peruses document.)
12     The "D 01 02 17" is our "In-Depth
13 Evaluation" form, and "D 01 02 18" is my notes from the
14 interview.
15 Q. Who completed the first page of P-17 (sic)?
16 A. Me.
17 Q. You said you?
18 A. Yes.
19 Q. Okay. And the second page was all you?
20 A. (Witness peruses document.)
21     Correct.
22 Q. Are there any marks on any part of P-16 that are
23 handwritten marks that you did not write?
24 A. (Witness peruses document.)
25     No.

Page 95

1  Q. When did you fill out the "Candidate In-Depth
2  Evaluation"?
3  A. I almost always do it right after I talk with
4  the person.
5  Q. Do you believe that's what you did in Bey's
6  case?
7  A. I would have to think so.
8  Q. Looking at the second page, are those
9  handwritten notes a continuation of the handwritten notes
10 that appear beneath your signature on the first page?
11 A. (Witness peruses document.)
12     Actually, this wouldn't have been a
13 continuation. The "D 01 01 18" would be done first. That
14 would be done as I'm speaking to the candidate, so I'm
15 doing that as we go.
16 Q. Looking to the bottom of the first page, do you
17 see where it says: Hobbies: Photography..." And it says
18 some other things as well?
19 A. (Witness peruses document.)
20     Yes. That's the very last question I
21 ask. "What do you like to do when you're not working?"
22 Q. Okay.
23 A. It's a part of the formal interview. You can
24 see that I ran out of room on "D 01 02 18" and put it on
25 "17."

Page 96

1  Q. How did you -- withdrawn.
2      You're the person that completed the
3  evaluation section of the "Management Candidate In-Depth
4  Evaluation"?
5  A. Correct.
6  Q. For "Job Fit & Stability," you ranked Bey "Above
7  expectation," right?
8  A. (Witness peruses document.)
9      Right.
10 Q. How did you come to that determination?
11 A. The tenure on the resume.
12 Q. Anything in particular?
13 A. He's just had several jobs that he's been at
14 over two years.
15 Q. You completed this form after your phone
16 interview with Bey, right?
17 A. Both documents, 17 and 18, I'm doing as I go.
18     The bottom evaluation -- or the last
19 question for the last evaluation might be after we hang up
20 the phone. As I'm going, if I -- right from the beginning
21 of the interview, when I mentioned that we first usually
22 talk about the weather, and then we talk about their
23 resume, right after that first part of the conversation I
24 may or may not have circled job instability. We go
25 through the whole resume.

NAEGELI REPORTING CORPORATION

Portland, OR  (503) 227-1544                           Seattle, WA  (206) 622-3376



Spokane, WA  (509) 838-6000                            Coeur d'Alene, ID  (208) 667-1163

Phone: (800) 528-3335     www.naegelireporting.com     Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

**Page 105**

1  you look on the right-hand corner, the salary base is 80
2  grand, which is what he was making. Our salary base is
3  $50,000, so there's a huge disparity there.
4      My other question -- he was currently
5  doing 30 to 35,000 sales per week, and we try and find
6  people with a higher sales volume.
7      The question under "Late" which would
8  be "How would you talk to someone if they were late?" I
9  want to look for kind of a fostering -- honesty and
10 nurturing environment, and he just said that that would be
11 their last and first notice, so that was abrupt and stiff.
12     The "Developing your people" question,
13 he gave a bus boy that he turned into a matradee at one of
14 his -- the restaurants from way back. Those would be some
15 of the reasons.
16 BY MR. GOLDBERG:
17 Q. What was the purpose of your taking notes during
18 your interview with Bey on June 1st, 2000?
19 A. It's just like your taking notes right now. You
20 can't remember everything.
21     When you interview four to eight
22 people a day, it's impossible -- you wouldn't be able to
23 remember anything if you didn't take notes.
24 Q. So the purpose of your taking notes is to aid
25 your memory of the interview; is that what you're saying?

**Page 106**

1  A. Yeah, it helps me remember the interview. I'm
2  taking them as we're talking, if not after the fact.
3  Q. Are you saying that you're taking notes right
4  now during the deposition?
5  A. I am not. I'm saying that I do in an interview,
6  but I do believe that --
7  Q. Oh, okay.
8  A. -- Tia is taking notes.
9  Q. You were using the present tense, and I got
10 confused.
11     When taking notes during the
12 interview, do you attempt to be as complete as you can?
13 A. I take notes that would make sense to me when
14 I'm -- yeah, I take notes that would make sense to me.
15 Q. Do you take notes because -- withdrawn.
16     In taking notes, do you attempt to be
17 as complete as you can?
18 A. I don't know what you mean by "complete."
19 Q. When taking notes, do you attempt to report
20 everything that occurred during the conversation?
21 A. I would not attempt to record everything that
22 occurs during the conversation.
23 Q. Would you attempt to record those components of
24 the conversation that you believe you would want to make
25 sure to remember later on?

**Page 107**

1  A. Some, yeah. For instance, their salary,
2  absolutely.
3  Q. And would you attempt to make sure that you take
4  notes of those portions of the conversation that you felt
5  were important?
6  A. (Witness peruses document.)
7      Looking at this, Page 18 -- I ask
8  everyone the same questions, and then I'm making my
9  answers on here. You can see -- you can see, based on
10 what's written here, what the questions were that I asked.
11     I didn't write every word verbatim
12 that he said, just some things that I thought were
13 important.
14 Q. When taking notes during the conversation, did
15 you attest to make sure that you took notes of those
16 things that you felt were important?
17     MR. GERHAN: Objection; asked and
18 answered.
19 BY MR. GOLDBERG:
20 Q. You can answer.
21     MR. GERHAN: She already answered it.
22     MR. GOLDBERG: No, she didn't.
23     MR. GERHAN: Yes, she did. She just
24 said that she took notes of stuff that she thought was
25 important.

**Page 108**

1      MR. GOLDBERG: Well, you've noted your
2  objection.
3  BY MR. GOLDBERG:
4  Q. I'm asking you now, Ms. Van Holmes, when taking
5  notes, did you make sure to include everything in your
6  notes that you felt was important to remember?
7      MR. GERHAN: Same objection.
8      You may answer.
9  BY MR. GOLDBERG:
10 Q. You can answer, Ms. Van Holmes.
11 A. I don't write down every single thing that
12 somebody says. I write down things that I think might be
13 important or just to help me remember what somebody said.
14 Q. Did you omit from your notes --
15 A. And also --
16 Q. -- anything that you thought was important for
17 you to remember later on?
18 A. You know -- I don't know.
19 Q. Is it your testimony that when taking notes on
20 P-16 that you may or may not have included everything that
21 you felt was important to remember later on?
22 A. I did not write down every word that Bey said,
23 so I don't know. Now -- I mean I don't know.
24 Q. Okay. On P-16, did you take notes that you felt
25 Bey's personality was stiff?

**NAEGELI REPORTING CORPORATION**

Portland, OR
(503) 227-1544



Seattle, WA
(206) 622-3376

Spokane, WA
(509) 838-6000

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204