**Page 109**

1  A. I'll --
2      MR. GERHAN: Objection. The document
3  speaks for itself.
4  BY MR. GOLDBERG:
5  Q. You can answer.
6  A. Okay. I'll go back to my answer that I said
7  earlier.
8      The "Late" question, "How would you
9  talk to someone if they came in late to work?" He
10 wrote -- he said that that would be their last and first
11 notice. That's abrupt and stiff to me.
12     "Tell me about somebody that you've
13 developed," and you're giving me an example from many,
14 many years ago.
15     In my notes here, it's telling me that
16 you're not doing -- it's not something that you're
17 constantly doing. It's not part of -- it's not a trait
18 that you have. That's -- if that gives you an example.
19     Also he -- I also asked him what he
20 still needs to learn, and he said in his own words that he
21 needs to learn to be more patient. He's anxious to get
22 things done. He gets anxious about it.
23 Q. In your answer just now, is that focusing on why
24 you believe you took notes on why Bey's personality was
25 stiff?

**Page 110**

1      I want to make sure that that's what
2  you're answering.
3  A. Well, what -- your question was why did I think
4  he was stiff?
5  Q. What do you mean by "stiff" when you describe
6  someone's personality as being "stiff"?
7  A. I'm trying to think how to describe this.
8      You say you've been to Buca's, so you
9  know what we're like. Buca is a very fun -- people go
10 there to have a good time. It's fun and lively.
11     For fine dining, people go in there to
12 be -- just have their dining experience and not to be
13 interacting so much with the managers or the staff. It's
14 like you're there, and you want things perfect. You don't
15 want to have to ask for anything.
16     At Buca, people are interacting. It's
17 constant talking and going crazy. It's that irreverence
18 that I was talking to you about.
19     That's what I mean when I say -- if
20 you're stiff, it seems like you wouldn't be that way at
21 Buca. Does that make sense?
22 Q. Actually it doesn't, but I guess if that's the
23 best -- I mean if that's the best explanation -- that's
24 not what the word "stiff" means to me, but you have to
25 answer my questions the best you can. If you feel you've

**Page 111**

1  done that, I'll move on.
2  A. I do. I feel I have.
3  Q. Okay. Was Bey asked to contact the Paisano
4  Partner on his own? Meaning was the oweness put on Bey to
5  contact the Paisano Partner, or did you set up an
6  interview with the Paisano Partner in the area?
7  A. I'm not sure. It could have been either way.
8  I'm not sure about that.
9  Q. Do you know who the Paisano Partner was?
10 A. Rich Perelli.
11 Q. Did you speak with Rich Perelli in advance of
12 his meeting Bey?
13 A. I don't know.
14 Q. Did you speak with him subsequent to his meeting
15 with Bey?
16 A. Yes.
17 Q. Was that right after the meeting?
18 A. I don't know.
19 Q. How long did you talk to Rich Perelli regarding
20 his meeting with Bey?
21 A. I don't know how long I talked to him.
22 Q. What do you recall about the conversation?
23 A. I recall that he didn't have time to do
24 everything the way we normally do an on-the-job interview,
25 and I recall Rich being a little bit stressed out because

**Page 112**

1  he was busy.
2  Q. Mm-hm. Did he tell you how long he met with
3  Bey?
4  A. He said -- I'm going from my memory here --
5  that -- I don't think he -- as I said, he didn't get to do
6  the whole on-the-job process because it was very -- it was
7  busy or not a good time.
8  Q. Did he say how long he met with Bey?
9  A. No.
10 Q. Did he tell you what happened when Bey was
11 there?
12 A. Again, it was -- he didn't get to do the
13 interview the way we should do it -- the way that we
14 normally do an on-the-job interview. I believe he said
15 something about having him come back in because he didn't
16 get to complete it.
17 Q. I understand that you're saying that certain
18 things did not happen during the interview because he was
19 pressured for time.
20 A. Right.
21 Q. What I'm asking you to focus on now is what he
22 said did happen. Do you recall anything that Rich Perelli
23 told you about what did happen during his meeting with
24 Bey?
25 A. No.

**NAEGELI REPORTING CORPORATION**

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Page 113

1  Q. Nothing at all?
2  A. No. What I remember of the conversation is that
3  he -- he just -- he was telling me all of the things that
4  he couldn't do, and so we needed to kind of make him do it
5  again.
6  Q. Did there ever come a point in time where Rich
7  Perelli discussed with you his impressions of Bey?
8  A. I'm sure there was, but I don't -- I'm not
9  remembering it.
10 Q. Do you recall the substance of that conversation
11 at all?
12 A. No. I just -- I do remember that Rich was a new
13 Paisano, and I was just -- I was feeling his stress that
14 this was maybe something that -- he was new.
15 Q. Do you know whether there was a second meeting
16 between Rich and Bey?
17 A. I think -- I think that there was because he --
18 the -- to do the Batrus Hollweg personality profile, but I
19 don't know for a fact, Scott. I wouldn't be able to state
20 for a fact that I know that.
21 Q. Okay. Did Rich Perelli make a decision whether
22 to screen Bey out versus having him go to the next step in
23 the recruiting process for Paisano Partners?
24 A. I don't think Rich Perelli could make a decision
25 because he never got to do the interview the way it should

Page 114

1  have been done.
2  Q. If I'm recalling correctly -- when you were
3  describing the process for Paisano Partners --
4  A. Right.
5  Q. -- or the recruiting process, I should say --
6  after meeting with the Paisano Partner, a decision has to
7  be made whether to go to next step in the recruiting
8  process or, alternatively, to screen out the candidate?
9  A. Or -- I said the other alternative is if they're
10 not sure, they would still go on to meet with the DVP.
11 Q. And what happened in Bey's case after meeting
12 with Rich Perelli?
13 A. I believe that Rich wasn't able to really make a
14 definitive answer because he didn't really do the
15 interview the way you're supposed to it, and so because of
16 that, we said, "Well, we better have him meet with the
17 DVP."
18 Q. Before we discuss the meeting with the DVP, I
19 want to make sure that you have described for me all of
20 the conversations you had with Bey up to that point; have
21 you?
22 A. I don't know, Scott, because in between
23 interviewing and you're checking to see about the
24 paperwork, you might talk to someone a couple of times on
25 the phone. I don't know that off the top of my head.

Page 115

1  Q. Do you recall anything else regarding any
2  conversations you had with Bey or impressions you formed
3  about him?
4  A. I remember asking Bey if he had gotten his
5  paperwork yet, and he said he had not, and I said, "Oh,
6  let me make sure you get that."
7       I'm not sure why he didn't get it, you
8  know, so I called the home office to say, "Hey, please get
9  this information out."
10 Q. How did you send it to him?
11 A. I didn't send it.
12 Q. How did Buca send it; do you know?
13 A. I don't know. Typically we send it via regular
14 mail. Then if there's a problem -- if they didn't get
15 their packet, maybe it didn't go to the right address or
16 whatnot, sometimes we will Fed Ex it out. It depends on
17 what's happening and what happened.
18 Q. In Bey's case, do you recall whether there was
19 any urgency?
20 A. If I talk to someone when I call them back and
21 they haven't received the paperwork, then I feel that, you
22 know, "Hey, we need to make sure they get their
23 paperwork."
24      We may have had it Fed Exed just
25 because I want to make sure that we're looking

Page 116

1  professional.
2  Q. Prior to meeting with Rich -- I'm sorry.
3  Withdrawn.
4       Prior to meeting with the DVP, did you
5  receive the results of Bey's personality profile?
6  A. Did I? I don't know. And which DVP?
7       MR. GOLDBERG: Well, Ms. Reidt, I
8  think I'm going to ask you to take out two exhibits,
9  please, for the witness.
10      THE REPORTER: Okay.
11      MR. GOLDBERG: "P-17" and "P-18."
12      (Whereupon, a 3-page Batrus Hollweg
13 Information Sheet was marked Exhibit-P-17 for
14 identification.)
15      (Whereupon, a 2-page Management
16 Selection Profile was marked Exhibit-P-18 for
17 identification.)
18      THE REPORTER: Okay. I'm handing them
19 to the witness.
20      MR. GOLDBERG: I'm sorry?
21      THE REPORTER: I'm handing them to the
22 witness.
23      MR. GOLDBERG: Do you see what they
24 are, Dan?
25      MR. GERHAN: Yes.

NAEGELI REPORTING CORPORATION

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Page 121

1  I don't know. Again, it could have
2  been faxed either to me or to Lucy. I don't know.
3  Q. On the same line, it says "Page 2/3"?
4  A. (Witness peruses document.)
5     Right.
6  Q. And the second page of P-18 says "3/3," right?
7  A. (Witness peruses document.)
8     The second? Yeah.
9  Q. To the best that you can determine, does that
10 mean that these two pages were part of a 3-page fax?
11 A. This is how every report would come up. I would
12 say that there's probably a cover page to it, if there's
13 three pages.
14 Q. There's a cover page -- well --
15 A. Well, a cover page that is not here.
16 Q. Do you know where the cover page is?
17 A. I have no idea.
18 Q. If Buca still had a copy of that, do you know
19 where it would be?
20 A. I would -- no. I would think it would be in
21 Bey's file, but I don't -- most people don't save cover
22 pages, but I don't know.
23 Q. During this litigation at any time did you look
24 for the cover page to this document -- fax?
25 A. Did I? No.

Page 122

1  Q. To your knowledge, did anyone?
2  A. I don't know.
3     MR. GOLDBERG: Can I ask you, Dan?
4     MR. GERHAN: I'm sure, Scott, that we
5  produced every document that was in the file. If there
6  was a cover page attached to that document, it would have
7  been produced.
8     MR. GOLDBERG: Okay. I just want to
9  make sure. I don't want to be in a situation where it
10 shows up later is all.
11    MR. GERHAN: Yeah.
12    MR. GOLDBERG: So I just want to --
13    MR. GERHAN: If there is a cover page
14 and it still exists, I'll get you a copy of it.
15    MR. GOLDBERG: Thank you.
16 BY MR. GOLDBERG:
17 Q. After meeting with Rich Perelli, who told Bey
18 what the next step in the process was?
19 A. I think it was myself talking about meeting with
20 Joe Talarico, who was the West Coast -- who was then the
21 West Coast divisional vice president.
22 Q. Did that meeting ever take place?
23 A. I do remember they were going to meet, and then
24 J.T. had had a change in schedule and neglected to tell
25 me, and I think Bey showed up for the interview and J.T.

Page 123

1  wasn't there.
2     Of course we -- you know, I talked to
3  Bey after that and apologized, and then -- I do believe
4  they met, but I'm not sure. They may have met on the
5  phone or in person. I'm not sure.
6  Q. Was J.T. the person who would have been the
7  divisional vice president for the Allentown or the Ohio
8  location?
9  A. No, he was the West Coast divisional vice
10 president. He was the divisional vice president for
11 Arizona and California.
12    Remember when I described earlier that
13 sometimes you might meet with more than one DVP if you're
14 out of the market?
15 Q. So this was one of those situations?
16 A. Correct.
17 Q. Did Bey ever meet with any divisional vice
18 president, to your knowledge?
19 A. Well, I'm not sure if he met with Joe Talarico,
20 but I know he met with Jim Cowler.
21 Q. Okay. Did you speak with Joe (sic) Cowler about
22 his meeting with Bey?
23 A. It's Jim Cowler.
24 Q. Jim Cowler. Excuse me.
25 A. Yes, I did.

Page 124

1  Q. When was that in relation to the meeting he had
2  with Bey?
3  A. It was after he met with Bey.
4  Q. Shortly after? Can you approximate how long
5  after?
6  A. I can't approximate. I don't know how long
7  after it was. I do remember that I picked up a message on
8  voicemail, and it was near the weekend time because I was
9  on my way to go camping. I do remember that.
10 Q. Was it before or after this lawsuit was filed?
11 A. Oh, it was definitely before. It was right
12 after the -- he was -- it was -- because I talked to
13 Jim -- after the weekend I called Bey.
14 Q. And did you speak to Mr. Cowler before he called
15 Bey?
16 A. Yeah, I did.
17 Q. How long did you speak with him?
18 A. Well, I had the voicemail, and I remember it
19 very clearly because he was very adamant about saying that
20 Bey was not a fit for him and not a fit for Buca di Beppo.
21 He was -- it was a voicemail that came through loud and
22 clear.
23    I just wanted to touch base with him
24 before I called Bey back to tell Bey that we were
25 concluding the interview process.

NAEGELI REPORTING CORPORATION

Portland, OR                        Seattle, WA
(503) 227-1544                                         (206) 622-3376

Spokane, WA                                            Coeur d'Alene, ID
(509) 838-6000                                         (208) 667-1163

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Lori A. Van Holmes                                                                                      December 23, 2002

Page 125

1   Q. Did you delete that voicemail?
2   A. Yeah. You --
3   Q. Can you please tell me everything you recall
4   about the voicemail aside from what you've already
5   described?
6   A. I just remember him going down a list, like what
7   I just described, and it was an emphatic voice saying that
8   he -- again, he's like, "I don't think he's a fit for
9   Buca. I don't think he's a fit for me." You know, He was
10  just really adamant about it.
11        He said, "You know, this guy was" -- I
12  think he said something like "This guy wants to be" -- you
13  know, "He doesn't want to be a Paisano Partner. He
14  wants -- He wants -- He's already talking divisional vice
15  president," or something along those lines.
16  Q. After receiving that voicemail, did you talk
17  with Jim Cowler about it?
18  A. I think I did. I think I talked -- because that
19  was -- like I said, I was on my way -- it was the weekend.
20  I was on my way -- because I was in the ferry line.
21        I think I touched base with him right
22  before I called Bey just because I wanted to make -- you
23  know, I got it loud and clear that he -- that Bey wasn't a
24  fit, but, you know, what -- I just wanted to touch base
25  with him.

Page 126

1   Q. Mm-hm.
2   A. I usually do that with the DVPs, so --
3   Q. Do you recall ever telling Jim Cowler that Bey
4   had a personality profile and the results were that he
5   scored excellent on "Acceptance of Authority"?
6   A. I don't recall telling him that.
7   Q. Do you recall telling him that Bey scored
8   excellent on "People Relations"?
9   A. No, I don't remember discussing the personality
10  profile with Jim.
11  Q. Did you ever have any other conversations with
12  Jim Cowler regarding Bey?
13  A. Well, prior to him setting up the interview, I
14  called Jim to say "Where are you going to be? Are you
15  going to be" -- you know, "Where are you going to be in
16  the next few weeks? I have some people I want you to
17  interview," and then he would give me his schedule.
18  Q. Are there any other conversations you recall
19  with Jim Cowler regarding Bey?
20  A. Just setting up the interview and faxing up the
21  resume.
22  Q. And nothing since then?
23  A. Since then?
24  Q. Yes.
25  A. You mean after we turned Bey down?

Page 127

1   Q. Yes, at any time.
2   A. Well, I think you were there when Jim -- we were
3   all there at the mediation. We all talked then.
4        MR. GERHAN: She's talking about
5   the -- she's talking about the fact finding conference,
6   Scott, when, I think, Mike was there.
7        THE WITNESS: Oh, that wasn't you?
8        MR. GOLDBERG: I'm a different guy.
9        THE WITNESS: Oh, okay. Sorry.
10  Sorry, Scott. I thought you were the same person. I
11  apologize.
12       MR. GOLDBERG: That's okay.
13  BY MR. GOLDBERG:
14  Q. Aside from that, have you ever spoken with Jim
15  Cowler about Bey?
16  A. I don't think so. You know, but I -- the thing
17  is -- once this came up, and you're looking for -- you
18  know, you're looking for the file and all that -- I don't
19  know. I may have talked to him, but I couldn't say "Yes,
20  I have," or "No, I haven't."
21  Q. Mm-hm. Did it ever occur to you that after
22  receiving Jim Cowler's message that it would be a good
23  idea to check how Bey did on the personality profile?
24  A. Not really.
25  Q. In the past, have you relied on the personality

Page 128

1   profiles from Batrus Hollweg for other applicants?
2   A. We don't rely on the Batrus Hollweg. It's a
3   piece of the tools that we use to determine if someone is
4   going to be a good fit or not. It's a piece of -- it's a
5   piece of the tools that we use.
6        If a DVP has made a decision that they
7   don't want someone, there's no going back and saying,
8   "Well, Jim, what about this and this" because Jim could
9   have said, "Well, he didn't do very good on his mental
10  scores." You know, that's a deterrent -- or his drive,
11  energy, and stamina, which is something that we really
12  look for at Buca because it's high energy.
13       You don't go back and say to
14  somebody -- to a DVP who's interviewing people, "Oh, what
15  about this? What do you think about this?" They're
16  making their decision based on if they think that this
17  person -- if this is someone they want to let drive one of
18  their profit centers.
19       If they don't think it's a fit, then
20  they are the final decision. They are the person who
21  makes the decision on that.
22  Q. To your knowledge, did Jim Cowler consult with
23  anybody including yourself regarding his decision not to
24  hire Bey?
25  A. I don't know. He doesn't -- he doesn't



NAEGELI REPORTING CORPORATION

Portland, OR         Seattle, WA
(503) 227-1544       (206) 622-3376

Spokane, WA          Coeur d'Alene, ID
(509) 838-6000       (208) 667-1163

Phone: (800) 528-3335   www.naegelireporting.com   Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Page 129

1  consult -- usually consult with the recruiter. He makes
2  his own decisions.
3  Q. In Bey's case, did he?
4  A. Did he talk to me?
5  Q. Yes.
6  A. I don't recall. I don't think so.
7  Q. After receiving Jim Cowler's message, you called
8  Bey to inform him that he would not be hired as a Paisano
9  Partner, right?
10 A. Right.
11 Q. Tell me what you remember about that
12 conversation.
13 A. I remember telling Bey that, you know,
14 unfortunately we weren't going to continue the interview
15 process with him. I apologized. I usually do just
16 because it's a tough scenario for somebody.
17     I remember Bey getting very angry at
18 me and yelling at me for several minutes. He was very
19 angry just saying, you know, "This is" -- He didn't
20 understand why and he was just really upset.
21     Then he said, "Well, are you going to
22 pay for my plane ticket?" And I said "What plane ticket?"
23 He said, "I flew myself to Pittsburgh." And I said,
24 "Gosh, Bey, I didn't know that you were flying yourself to
25 Pittsburgh." When we talked before, I said, "Here is

Page 130

1  where Jim is going to be. He's going to be in this X, Y,
2  Z place this day, and X, Y, Z place that day," and he
3  said, "Oh, Pittsburgh. Great. I'm in the area. I'll go
4  meet him in Pittsburgh." I'm like "Great."
5      If somebody wants -- if we fly someone
6  to go interview with the DVP, I make the travel
7  arrangements because it is on our credit card bill, and we
8  totally take care of everything. I was a little bit
9  dumbfounded because he led me to believe in our
10 conversations that he was in the area.
11     He kept yelling, and he was really
12 upset. I go "Gosh, I apologize." You know, "I will take
13 care of that plane ticket." But again, typically, if I'm
14 going to make the arrangements, I do it myself. I've
15 never had anyone -- I've never had this happen before.
16     I said "I'm going to take care of
17 that," and, you know, I let him yell at me for a while
18 because I thought, "Oh, he just wants to vent and get it
19 out."
20     I just -- that's what I remember about
21 the conversation. It was -- it wasn't fun.
22 Q. When you say Bey yelled at you --
23 A. I would definitely say he yelled at me.
24 Q. -- did he raise the volume of his voice?
25 A. He raised the volume of his voice.

Page 131

1  Q. Did he use any curse words?
2  A. Not to the -- not that I recall.
3  Q. Did he insult you personally?
4  A. I felt like he thought I was an idiot. I mean
5  he definitely had a tone of voice and insinuating --
6  Q. Did you think there was any merit at all to
7  Bey's complaint of that conversation?
8  A. Not really. I mean the thing is, people go on
9  interviews. We interview people all -- you know, that's
10 the -- that's how it works. Some people we hire and some
11 people we don't.
12     I honestly, Scott, can say that in all
13 my years of doing recruiting, I've never really had anyone
14 yell at me like that. I was very taken aback.
15 Q. What exactly do you recall saying during the
16 conversation? I know you told me what Bey said.
17 A. As I said the first time you asked it, I said
18 I -- because it's uncomfortable, I usually say, you know,
19 "I want to let you know that we're not going to continue
20 the interview process," you know, "I apologize," or
21 something along those lines.
22     I always say "I apologize" just
23 because it's an uncomfortable situation. You know, "Gosh,
24 we've spent some time together now, and unfortunately,
25 you're not the person for the position."

Page 132

1  Q. Do you recall anything else about that
2  conversation with Bey that you haven't told me already?
3  A. Besides the yelling and the plane and all that?
4  Q. Aside from what you've already told me, what do
5  you recall about your conversation with Bey when you told
6  him --
7  A. I recall telling him to please fax over his
8  receipt so I could take care of the reimbursement for him
9  including the cab fare because he was going on about the
10 cab fare too.
11 Q. Mm-hm. Following that conversation, have you
12 ever spoken with Bey?
13 A. I don't think I've spoken with him, but I
14 received some information about his moving expenses and a
15 letter to Joe Micatrotto that he wrote.
16 Q. Is it your understanding that Bey moved to
17 Pennsylvania from Arizona during his recruiting process?
18 A. Well, at some point during the recruiting
19 process during one of our phone conversations, he said,
20 "I've moved to Philadelphia." I go, "Oh, my gosh. I
21 didn't know that. Good for you. Congratulations, you
22 moved to Philadelphia," so, you know, "Where" -- "What" --
23 "That's great that you've moved. Now you can meet with
24 Jim. It will be easy to meet with Jim. He's in the East
25 Coast. He's the East Coast DVP."

**NAEGELI REPORTING CORPORATION**



Portland, OR
(503) 227-1544

Seattle, WA
(206) 622-3376

Spokane, WA
(509) 838-6000

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335      www.naegelireporting.com      Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

**Page 133**

1    The last time we talked, he was in
2  Arizona, so things were on hold. Jim didn't have an
3  immediate need. Anyway, I just recall being very
4  surprised when he had told me that he had moved to
5  Philadelphia. I was very surprised.
6    Q. Do you recall specifically telling him, "Oh, my
7  gosh. I didn't know you moved."
8    A. I recall saying something like that, like "Oh,
9  wow. I didn't know that."
10   Q. Do you recall what his response was?
11   A. It was nothing. It was like, "Yeah," like he
12  moved.
13       Going back to the stiff -- Bey was
14  pretty stiff. He wasn't a person to kind of gush about
15  things.
16   Q. Did you at the time have any understanding as to
17  why he moved to Pennsylvania?
18   A. I don't have any understanding. I thought he
19  maybe mentioned something about family, but I wouldn't be
20  able to -- I don't remember for sure.
21       One thing, Scott, when we're
22  interviewing people and they're looking for a place to
23  live, we -- Buca opens restaurants up, so when people say,
24  "I'm willing to go anywhere," I always say, "You need to
25  narrow it down. I can't just have you go interview when

**Page 134**

1  we have several different DVPs. You need to narrow it
2  down to where you might want to live."
3       (Witness peruses document.)
4       If you look on P-13 -- back to P-13 --
5  those were a couple of the spots that he said he might
6  want to -- be interested in living.
7       Then when they tell me that -- I say,
8  "There should be a compelling reason to why you might want
9  to live there because if you just go move across the
10  country for a job, it doesn't always -- you're not always
11  happy. If you move somewhere and you don't have a
12  compelling reason to do that, you're not always happy, and
13  people tend to quit."
14   Q. Are you saying that you recall telling all of
15  this to Bey?
16   A. I definitely recall saying, "You need to narrow
17  it down, where you want to live," absolutely, because we
18  didn't have a spot in Arizona, and he was living in
19  Arizona. I have to know that, otherwise I don't know
20  which DVP to have him talk to.
21       Also do we even have an opening?
22  What's the -- you know, we can't -- we're just not just
23  interviewing -- you know, I don't know what the person
24  wants to do.
25       MR. GOLDBERG: Ms. Reidt, I'm going to

**Page 135**

1  ask you to please show the witness a document that's been
2  marked as "P-10."
3       (Whereupon, a 1-page Buca di Beppo
4  advertisement in Nation's Restaurant News was marked
5  Exhibit-P-10 for identification.)
6       THE REPORTER: Okay.
7       MR. GOLDBERG: Do you have that
8  document in front of you, Ms. Van Holmes?
9       THE WITNESS: Yes, I do.
10      MR. GOLDBERG: Dan, do you see that?
11      MR. GERHAN: Yes.
12  BY MR. GOLDBERG:
13   Q. What is that document?
14   A. (Witness peruses document.)
15      This looks like an ad out of "Nation's
16  Restaurant News."
17   Q. Is it an ad for a Paisano Partner position at
18  Buca?
19   A. (Witness peruses document.)
20      It's a general ad for management
21  positions. I don't see anywhere on here -- well, it says
22  that we have a Paisano Partner program, but this isn't
23  specifically geared toward the Paisano or a certain
24  location. It just says where we have locations -- "Now
25  hiring in these areas..."

**Page 136**

1    Q. Mm-hm. Is this an advertisement that Buca
2  placed in the "Nation's Restaurant News" on May 22, 2000?
3    A. (Witness peruses document.)
4       It appears to be.
5    Q. Is you're understanding that this is the ad that
6  Bey sent his resume in response to?
7    A. That's my understanding.
8    Q. Having reviewed this, do you now have the basis
9  for believing that Buca had openings for Paisano Partner
10  positions at the time that Bey applied?
11   A. Did they have openings?
12   Q. Yes.
13   A. I never said they didn't have openings.
14   Q. I'm not saying you did.
15   A. Okay.
16   Q. I'm asking if you -- I think you didn't say
17  either way. I'm now asking if you have a basis for
18  believing they did.
19   A. I'll go back to saying that we -- in opening
20  restaurants, we have different positions open at different
21  times, and we do place ads in "Nation's Restaurant News."
22      I couldn't tell you based on looking
23  at this ad where specifically we had openings, whether it
24  was a Paisano, an AKM, or KM or AGM. By looking at this
25  ad, I cannot tell you that.

NAEGELI REPORTING CORPORATION

Portland, OR                        Seattle, WA
(503) 227-1544                                          (206) 622-3376

Spokane, WA                                          Coeur d'Alene, ID
(509) 838-6000                                         (208) 667-1163

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Page 137

1  Q.  By looking at this ad, you can tell that there
2  was no location in Arizona they list that Buca was
3  hiring, right?
4  A.  (Witness peruses document.)
5      Well, I see Phoenix on here.
6  Q.  Do you know what that position was for?
7  A.  No. As I said, it could be -- a lot of times
8  we'll just be advertising in "Nation's Restaurant News" to
9  generate some resume flow for different positions in
10 different markets.
11     This isn't a specific ad. If we were
12 specifically going after somebody in a specific market, we
13 would typically place an ad in that newspaper.
14 Q.  Mm-hm.
15 A.  So seeing Phoenix on here and getting his resume
16 initially, we could have thought, "Oh, does he want to
17 work in Phoenix?" We don't know -- you know, you don't
18 know until you talk to the person.
19 Q.  Do you recall asking Bey if he wanted to work in
20 Phoenix?
21 A.  I don't recall asking, but I do recall that
22 we -- because we didn't have a spot in Phoenix, that's why
23 we've got -- why I wrote down on P-13 that he was
24 interested in some different locations if they became
25 available.

Page 138

1  Q.  You're the person who told Bey about the
2  openings in Pennsylvania and Ohio, right?
3  A.  I don't know. He might have brought it up to
4  me. Lucy might have mentioned something.
5  Q.  Is it your contention that Bey found out about
6  the openings in Pennsylvania and Ohio independently of the
7  recruiting process?
8  A.  I don't know. I mean there's ways to find out
9  if we've signed a deal, real estate wise. You know, we
10 have people contact us for locations two years in advance,
11 and we say, "We're not hiring yet, you know, because we're
12 in the negotiation process for real estate."
13 Q.  Mm-hm. Do you know who John Motchenbacher is?
14 A.  Yep. He's our vice president of finance.
15 Q.  Have you ever spoken to him about Bey?
16 A.  He may have called me and said, "Do you have any
17 files or anything?" Other than that, no. Maybe when the
18 fax came over -- I mean anything to do with him would have
19 been after the whole interview process when people started
20 asking for information.
21 Q.  Did you have conversations with him about what
22 happened aside from him asking you to send documents to
23 review?
24 A.  I don't know. I don't know. I don't know if it
25 was John or Dan. I don't know.

Page 139

1  Q.  Who at Buca have you spoken with regarding Bey's
2  application process other than Jim Cowler, Lucy Lea, John
3  (sic) Perelli and John Motchenbacher?
4  A.  Well, it's --
5      MR. GERHAN: Rich Perelli you mean.
6      THE WITNESS: It's Rich Perelli.
7      Are you talking about after the
8  interview process or during the interview process?
9  BY MR. GOLDBERG:
10 Q.  I'm talking about ever.
11 A.  Ever? Well, during the interview process I
12 talked to Joe Talarico, which we've already talked about.
13 Q.  Mm-hm.
14 A.  Jim Cowler, the divisional vice president, Bey
15 himself. After -- well, once we got -- once --
16 afterwards, Dan got involved when we went to the fact
17 finding.
18 Q.  You're referring to Dan Gerhan now?
19 A.  Yeah. That was -- the first time I met Dan was
20 at the fact finding.
21 Q.  Okay. Anyone else?
22 A.  Probably my boss, Jennifer. Most recently -- my
23 current boss because I told him I wasn't going to be in my
24 office today because I'll be at a deposition.
25 Q.  Anyone else?

Page 140

1  A.  I think that's it. Well, maybe John's boss --
2  John Motchenbacher's boss, Greg Gadle.
3      Well, Joe Micatrotto because when that
4  fax came -- well, Bey wrote Joe Micatrotto the letter
5  about his moving and whatnot, and then Joe Micatrotto
6  called me about that.
7  Q.  Okay. Do you recall anything you said to John
8  Motchenbacher's boss or anything that he said to you
9  during your conversation about Bey?
10 A.  No. It was just basically John -- John's boss,
11 Greg, said that I had to go to the fact finding in
12 Philadelphia; that was it.
13 Q.  Do you recall anything that was said during your
14 conversation with Jennifer regarding Bey?
15 A.  No.
16 Q.  How about with your current boss?
17 A.  Nope, just what I said. I had to be at a
18 deposition, so I wouldn't be in my office today.
19 Q.  Joe Talarico?
20 A.  Nope, not since the interview process.
21 Q.  When is the first time you received any
22 information at all pertaining to Bey's age?
23     MR. GERHAN: Objection; assumes facts
24 not in evidence.
25     You can answer.

**NAEGELI REPORTING CORPORATION**

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Coeur d'Alene, ID
(208) 667-1163

Seattle, WA
(206) 622-3376

Phone: (800) 528-3335   www.naegelireporting.com   Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Page 141

1  BY MR. GOLDBERG:
2  Q. Ms. Van Holmes, you know that Bey Dilemani has
3  filed an age discrimination suit, right?
4  A. I do know that.
5      You know what? That is the first time
6  I found out his age. When I went to that fact finding
7  mission -- or meeting in Philadelphia, that was the first
8  time I knew about his age.
9  Q. Do you know, from your training, that a person
10 needs to be at least 40 years old to bring a lawsuit under
11 federal age discrimination loss?
12 A. I don't think -- I don't know if I could tell
13 you verbatim every nuance of the law, so I would say -- if
14 you asked if I knew that when this all got started, I
15 would say that I probably didn't know that, but that
16 doesn't come into play for me.
17     I'm just talking to people on the
18 phone and ascertaining their skills and then push them on
19 to the next interview -- put them on the next interview.
20 Q. Please tell me each piece of information you've
21 ever received pertaining to Bey's age.
22 A. To his age?
23     MR. GERHAN: Objection; asked and
24 answered.
25     MR. GOLDBERG: It wasn't answered.

Page 142

1      MR. GERHAN: It was answered.
2      THE WITNESS: I didn't get anything on
3  Bey's age until we went on the fact finding in
4  Philadelphia.
5  BY MR. GOLDBERG:
6  Q. Did you receive Bey's employment application?
7  A. No, that goes to the home office.
8  Q. You've never seen it?
9  A. Well, I've seen it since we went to the fact
10 finding.
11 Q. Mm-hm.
12 A. But before that, no.
13 Q. Does that have any information pertaining to
14 Bey's age on his employment application?
15 A. I would have to look at it to tell you that.
16 Q. Okay. Let's do that.
17 A. Okay.
18 Q. I'm finding which exhibit it is.
19     MR. GOLDBERG: Let's take a look at
20 "P-14," please, Ms. Reidt.
21     THE REPORTER: Okay.
22     (Whereupon, a 3-page Buca di Beppo
23 Application for Employment was marked Exhibit-P-14 for
24 identification.)
25 BY MR. GOLDBERG:

Page 143

1  Q. Do you have it?
2  A. Yes, I do.
3  Q. P-14 is a 3-page document beginning with big
4  stamp No. "D 01 02 03" and continuing through
5  "D 01 02 05," right?
6  A. (Witness peruses document.)
7      Except that this isn't one document.
8  These are two separate documents. The "03, 04" is a
9  back -- a back-to-back document. That's one page on its
10 own, and the other one is a page on its own.
11 Q. Okay. What is P-14?
12 A. Pardon?
13 Q. My question is -- what is exhibit P-14?
14 A. (Witness peruses document.)
15     Well, P-14 is two different documents.
16 "D 01 02 03" and "D 01 02 04" is the application in two
17 pages. Why? I don't know. It's usually -- well,
18 probably because it was faxed. It's a back-to-back
19 document, which is called the "Job application."
20 Q. Okay.
21 A. "D 01 02 05" is a disclosure statement that the
22 people who do our background information receive.
23     Nobody else gets that except the
24 person who receives it, and they fax it to the background
25 check people.

Page 144

1  Q. Mm-hm.
2  A. So they're two separate documents.
3  Q. They were received by Buca at the same time,
4  right?
5  A. I don't know. This wouldn't have gone to me.
6  Q. Please take a look at the very bottom of these
7  documents. There is a faxed line, right?
8  A. (Witness peruses document.)
9      Yes.
10 Q. The first page says "Page 3," and it's from July
11 13, 19:16 a.m., right?
12 A. (Witness peruses document.)
13     Uh-huh. (Witness answers
14 affirmatively.)
15 Q. And the next page is Page 4. It says "July 13,
16 9:16 a.m.," right?
17 A. (Witness peruses document.)
18     Uh-huh. (Witness answers
19 affirmatively.)
20 Q. And the final page is "Page 2, July 13, 9:15
21 a.m.," right?
22 A. (Witness peruses document.)
23     Yep.
24 Q. Having reviewed that, do you have any opinion as
25 to whether the three pages comprised in P-14 were received

**NAEGELI REPORTING CORPORATION**

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Seattle, WA
(206) 622-3376

Coeur d'Alene, ID
(208) 667-1163

Phone: (800) 528-3335   www.naegelireporting.com   Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

Page 145

1  at the same time by Buca?
2       MR. GERHAN: Objection. The document
3  speaks for itself.
4       You may answer.
5       THE WITNESS: (Witness peruses
6  document.)
7       It looks like they were received --
8  not at the same exact time, but a minute -- it looks like
9  a minute difference.
10 BY MR. GOLDBERG:
11 Q. Okay. When was the first time you had seen any
12 portion of P-14?
13 A. At the fact --
14      MR. GERHAN: Objection; asked and
15 answered.
16      You may answer.
17      THE WITNESS: At the fact finding in
18 Philadelphia.
19 BY MR. GOLDBERG:
20 Q. Let's take a look back at P-13. Do you have
21 that in front of you?
22 A. Yep. Yes, I do.
23 Q. I changed my mind. I'm not going to ask you
24 questions about it. I'm sorry.
25 A. Okay.

Page 146

1  Q. Aside from the "Application for Employment" and
2  the "Disclosure and Release Statement" that are comprised
3  in P-14, have you ever received any information pertaining
4  to Bey's age?
5       MR. GERHAN: Objection. I object to
6  the form of the question. I think it assumes facts not in
7  evidence, Scott.
8       MR. GOLDBERG: What fact could that
9  be?
10      MR. GERHAN: Well, I don't think
11 you've established that there's anything on P-13 that
12 refers to his age.
13      MR. GOLDBERG: I was talking about
14 P-14.
15      MR. GERHAN: Oh, but you said -- I
16 thought -- the way your question was phrased, it sounded
17 like it was assuming that P-13 had information about his
18 age, and I don't -- well --
19 BY MR. GOLDBERG:
20 Q. To be clear then, I'm going to talk to you for a
21 minute just about P-14. Okay, Ms. Van Holmes?
22 A. Okay.
23 Q. Let's focus on P-14. Without reference to any
24 other document or a parts of the conversation we've had
25 today during this deposition -- aside from the three pages

Page 147

1  that comprise P-14, have you ever received any information
2  pertaining to Bey's age?
3  A. I have never received any information pertaining
4  to Bey's age ever until -- I never received this
5  information. I saw it at the fact finding in
6  Philadelphia.
7       MR. GOLDBERG: Before I go into a new
8  line of questioning, does anybody need a break?
9       MR. GERHAN: I could use a short one,
10 Scott. Do you have any idea how much longer you're going
11 to go? I mean we've covered a lot of the substance here I
12 would think.
13      MR. GOLDBERG: Yeah. Off the record I
14 can tell you my estimate, but it's impossible to know
15 before it's done.
16      MR. GERHAN: Okay. Then why don't we
17 go off the record and you can tell me.
18      (Pause in the proceedings.)
19      MR. GOLDBERG: I'm going to ask right
20 to ask Ms. Reidt to please show the witness the document
21 marked as "P-15."
22      (Whereupon, a 1-page letter to Mr.
23 Dilemani from Ms. Lori Van Holmes was marked Exhibit-P-15
24 for identification.)
25      THE REPORTER: Okay

Page 148

1  BY MR. GOLDBERG:
2  Q. Do you have before you a 1-page document with
3  big stamp No. "D 01 02 06"?
4  A. (Witness peruses document.)
5       Yes.
6       MR. GOLDBERG: Have you seen it, Dan?
7       MR. GERHAN: Yep.
8  BY MR. GOLDBERG:
9  Q. What is this letter?
10 A. (Witness peruses document.)
11      This is a form letter we send out to
12 people after the first interview.
13 Q. When you say it's a "form letter," can you point
14 out to me what is the form part of this letter?
15 A. It would be "Dear" blank. The date would
16 change. Obviously, the address would change. "Dear" --
17 "Dear" would always be there, but the person's name would
18 be changing.
19      The whole -- every paragraph, one, two
20 and three and "Ciao!" would always be there. And then
21 depending on which person interviewed somebody, that would
22 be a different name at the bottom.
23      And this -- Lucy would sign for me. I
24 didn't sign this letter.
25 Q. Mm-hm. What is this form used for? Withdrawn.

**NAEGELI REPORTING CORPORATION**

Portland, OR
(503) 227-1544

Spokane, WA
(509) 838-6000



Coeur d'Alene, ID
(208) 667-1163

Seattle, WA
(206) 622-3376

Phone: (800) 528-3335    www.naegelireporting.com    Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204

## Page 149

1  Is this the form that is used for
2  every Paisano Partner applicant?
3  A. It's for any applicant for AKM, KM, Assistant
4  General Manager or Paisano.
5  Q. So part of the form you use tells people that
6  Buca is "looking for someone with your kind of
7  enthusiasm"?
8  A. Right. Everybody -- we send this letter to
9  everybody.
10 Q. It doesn't matter whether the person actually
11 shows a particular type of enthusiasm?
12 A. Nope.
13 Q. Okay. I'm done with that document.
14    MR. GOLDBERG: I would like to ask
15 Ms. Reidt to please show you a document that's been marked
16 as "P-31."
17    (Whereupon, a 4-page letter from
18 Mr. Dilemani to Mr. Micatrotto was marked Exhibit-P-31 for
19 identification.)
20    THE REPORTER: Okay.
21 BY MR. GOLDBERG:
22 Q. Okay. Before you is a document that is a 4-page
23 document beginning with "D 01 02 21" and continuing
24 through "D 01 02 24"?
25 A. (Witness peruses document.)

## Page 150

1  Yes.
2  Q. When did you first see this document?
3  A. I saw it after Joe Micatrotto received it, and
4  he -- I think he faxed it to me. I'm not sure. And he
5  called me about it.
6  Q. Prior to your conversation with Joe Micatrotto
7  regarding this letter, did you ever talk to Joe Micatrotto
8  about Bey?
9  A. No.
10 Q. After that conversation with Joe Micatrotto,
11 have you ever talked to him about Bey?
12 A. No. In fact, I don't even think Joe even talked
13 to me. He left a voice mail saying, you know, "What is
14 this? I want you to -- we need to get a response out."
15 Q. Tell me what you recall about the voicemail.
16 A. He said that he received a letter from a
17 candidate, and he wanted me to let him know what happened
18 and respond back.
19 Q. What was his tone on the voicemail?
20 A. His usual tone like if he's giving sales or just
21 making a request.
22 Q. Do you know when approximately he received this?
23 A. I don't know.
24 Q. Do you understand that this is a letter from Bey
25 to Joe Micatrotto --

## Page 151

1  A. Right.
2  Q. -- dated August 16th, 2000 on the last page?
3  A. (Witness peruses document.)
4    So -- yeah, I see that on there. I
5  don't know exactly when it came into my hands.
6    I don't know if you have the response
7  back to Bey. I would assume it was just a few days before
8  that or around that time.
9  Q. We'll get to it.
10 A. Okay.
11 Q. Do you see handwritten notes on the first two
12 pages of this document?
13 A. (Witness peruses document.)
14    Yes.
15 Q. Whose notes are those?
16 A. I think they're my notes. Well, they are my
17 notes. I'm basically making notes to write the reply
18 back.
19 Q. Mm-hm. Did you take those notes before speaking
20 with Joe Micatrotto?
21 A. I didn't speak with Joe Micatrotto. He left me
22 a voicemail, and I voicemailed him back.
23 Q. Oh. What did you say in your voicemail?
24 A. I said I'd take a look at what he faxed over and
25 I'd do what he asked -- what Joe asked, which is come up

## Page 152

1  with a reply.
2  Q. You drafted the reply for Joe Micatrotto?
3  A. Correct.
4    MR. GOLDBERG: I would like to ask
5  Ms. Reidt to please show you a document that has been
6  marked as "P-31." No, I just did that -- "P-32."
7    (Whereupon, a 1-page letter from
8  Ms. Van Holmes to Mr. Dilemani was marked Exhibit-P-32 for
9  identification.)
10    THE REPORTER: Okay.
11 BY MR. GOLDBERG:
12 Q. Do you have in front of you, Ms. Van Holmes, a
13 single-page document marked "P-32" that has a big stamp
14 No. "D 01 02 07"?
15 A. (Witness peruses document.)
16    Yes.
17 Q. Is this is letter that you drafted for Joe
18 Micatrotto's signature?
19 A. Yes.
20 Q. Is this a letter that Joe Micatrotto in fact
21 sent to Bey?
22 A. I don't know.
23 Q. Do you know whether Joe Micatrotto in fact ever
24 sent any letter to Bey?
25 A. I don't know.

**NAEGELI REPORTING CORPORATION**

Portland, OR (503) 227-1544          Seattle, WA (206) 622-3376

Spokane, WA (509) 838-6000                               Coeur d'Alene, ID (208) 667-1163

Phone: (800) 528-3335   www.naegelireporting.com   Fax: (503) 227-7123
Corporate Office: 2020 US Bancorp Tower, 111 S.W. Fifth Avenue, Portland, OR 97204