IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF PENNSYLVANIA

BEY DILEMANI                          :
                                      :
              Plaintiff               :        Civil Action No. 02-CV-2614
                                      :
       v.                             :
                                      :
BUCA, INC.                            :
                                      :        Jury Trial Demanded
              Defendant               :

---

### DILEMANI'S MEMORANDUM OF LAW IN OPPOSITION TO BUCA'S MOTION FOR SUMMARY JUDGEMENT

### **Preliminary Statement**

Defendant Buca, Inc., acting through a Divisional Vice President who has never hired a restaurant manager over fifty years old for the company, pulled the plug on 54 year old Plaintiff Bey Dilemani on the day of his final interview.  In so doing, that Divisional Vice President, Jim Cowler, inexplicably discarded Dilemani's strong performance at two prior interviews with Buca employees and Dilemani's impressive ranking in a company-sponsored personality profile, which Cowler himself admits is "an incredible tool" in the hiring process.  Instead, Cowler eventually hired a 32 year old with far less managerial experience than Dilemani to manage the restaurant.

When asked why Dilemani was rejected, Buca initially explained that Dilemani was intent on advancing up the company ranks too quickly, but then – when that stance was revealed as demonstrably false – the company recanted and put forth a new, but equally false, explanation for its decision.  In particular, the company now claims that it was actually Dilemani's alleged arrogance that led to his rejection, with hopes that such a purely subjective explanation could not, unlike the company's prior explanation, be revealed as a pretext for age discrimination.

However, the evidence of record strongly supports a finding that Buca's latest story is also pretextual, thus requiring denial of summary judgment under controlling Third Circuit precedent, for several reasons:

*First*, Buca's explanation for rejecting Dilemani has changed dramatically over time, which alone supports a finding of pretext.

*Second*, age discrimination is suggested by Cowler's quick rejection of Dilemani in favor of a much younger applicant while disregarding (i) Dilemani's substantial managerial experience, (ii) the favorable impressions of the two Buca employees who had also interviewed Dilemani, and (iii) the personality profile for Dilemani, which severely undercuts any claim of arrogance.

*Third*, Buca's current explanation for rejecting Dilemani is based entirely on a subjective factor that, by its very nature, requires a credibility determination by the jury.

*Fourth*, Buca's decision-maker has a career-long pattern of not hiring applicants over 50 years old, indicating bias against applicants in that age bracket, including Dilemani.

## Statement of Facts

This Court must accept the following facts of record for purposes of resolving Buca's motion for summary judgment:

*Buca Uses a Four-Stage Process for Recruiting Paisano Partners.*

Buca's recruiting process for restaurant managers, called "Paisano Partners," essentially consists of four stages. (Van Holmes Dep. at 47-72; Cowler Dep. at 146-151.) An applicant must pass each stage before advancing to the next. (*Id.*)

*First*, a recruiter employed by Buca reviews the applicant's resume and conducts an initial interview. (Van Holmes Dep. at 47-57.) The recruiter is responsible for screening out the

2

applicant if the applicant does not possess the "basic minimum qualifications" for the position. (Cowler Dep. at 163, 172-173.) Buca gives the recruiter authority to reject an applicant for other reasons as well, including "personality." (Van Holmes Dep. at 52-53, 56.)

*Second*, if the recruiter chooses not to screen out the applicant, a current Paisano Partner conducts a second interview and must decide whether to screen out the applicant. (Van Holmes Dep. at 57-62; Cowler Dep. at 148-149.) The interviewing Paisano Partner also provides the applicant with a two-part questionnaire that is used to generate a personality profile. (Van Holmes Dep. at 57-62; Cowler Dep. at 148-150.) Buca's purpose for the personality profile is to obtain objective information on the applicant's personality traits. (Van Holmes Dep. at 59.)

*Third*, if neither the recruiter nor the interviewing Paisano Partner screens out the applicant, the recruiter obtains all of the remaining written materials it uses to judge applicants. (Van Holmes Dep. at 62-64.) Those materials include the personality profile generated for the applicant, a written application by the applicant, and a Disclosure and Release Statement from the applicant that is used to conduct a background check. (Van Holmes Dep. at 62-68.) The Disclosure and Release Statement requires applicants to disclose their date of birth. (Dilemani Dep. at 80-81, Def.'s Ex. 4.)

*Fourth*, if the applicant's written materials are satisfactory, a Divisional Vice President conducts a final interview of the applicant and decides whether an employment offer will be made. (Cowler Dep. at 148-151, 156-157; Van Holmes Dep. at 68, 70.)[1] The Divisional Vice President, both before and after the applicant's final interview, consults with the recruiter

---

[1] Until recently, Buca's chief operating officer would have to approve the Divisional Vice President's selection, although in practice that approval was essentially a formality. (Cowler Dep. at 156-157; Def.'s Br. at 6.)

"[f]requently in the interview process."  (Cowler Dep. at 190-198; Van Holmes Dep. at 39, 71-72, 124-125.)  The Divisional Vice President may also consult with the  Paisano Partner who had interviewed the applicant.  (Cowler Dep. at 176-177.)

*Dilemani Passed the First Interview.*

In May 2000, when Dilemani was 54 years old, he submitted his resume to Buca's recruiting department in response to a newspaper advertisement.  (Dilemani Dep. at 8; Van Holmes Dep. at 77-79.)  He sought a position as the general manager of a restaurant, which at Buca was called "Paisano Partner."  (Van Holmes Dep. at 42, 73-76, Ex. P-11.)  Buca received Dilemani's resume on or about May 31, 2000.  (Van Holmes Dep. at 77-79.)  Upon receipt of Dilemani's resume, Buca assigned primary responsibility for Dilemani's employment application to Lori Van Holmes, who Buca employed as a recruiter (and later as the Senior Manager of Family Resources).  (Van Holmes Dep. at 32-33, 76-77; Cowler Dep. at 148.)

On June 1, 2000, after reviewing Dilemani's resume, Van Holmes conducted a telephone interview of him.  (Van Holmes Dep. at 76-80, 82-87.)  Van Holmes explained to Dilemani that Paisano Partner openings existed in Ohio and in Allentown, Pennsylvania. (Dilemani Dep. at 64-65; Van Holmes Dep. at 82-84.)  Dilemani expressed his preference for the Allentown location. (Dilemani Dep. at 64-65; Van Holmes Dep. at 77-80, 83-84, Ex. P-13.)  Throughout the telephone interview, Van Holmes took extensive notes of her conversation with Dilemani.  (Van Holmes Dep. at 94-95, 105-106, Ex. P-16.)  She also completed a Management Candidate In-Depth Evaluation form for Dilemani.  (Van Holmes Dep. at 93-97, Ex. P-16.)  On that form, Van Holmes gave Dilemani a rating of "above expectation" for the category "Job Fit & Stability."

Based on Dilemani's June 1, 2000 telephone interview and his resume, Van Holmes

chose not to screen out Dilemani. (Van Holmes Dep. at 86-88.) Instead, she passed him along to

the next step in Buca's application process, which consisted of an "on-the-job" interview with a

current Paisano Partner. (Van Holmes Dep. at 60-61, 86-88.)

*Dilemani Passed the "On-the-Job" Interview.*

On or about June 10, 2000, Dilemani met with a current Paisano Partner, Rich Perelli for

an "on-the-job" interview. (Dilemani Dep. at 70; Van Holmes Dep. at 57, 111, 118-119, Ex. P-

17 at 2.) They got along well. (Dilemani Dep. at 67.) As part of the on-the-job interview, Buca

required Dilemani to complete a Batrus Hollweg questionnaire used to generate a personality

profile. (Van Holmes Dep. at 58-59.) Buca considers the personality profile "an incredible tool"

and a valuable part of the hiring process. (Cowler Dep. at 166-173.) Both the recruiter and the

Divisional Vice President review the personality profile generated by Batrus Hollweg. (Van

Holmes Dep. at 59.) That review occurs prior to the applicant's final interview with a Divisional

Vice President. (Van Holmes Dep. at 65-66.)

Based on Dilemani's on-the-job interview, Perelli chose not to screen out Dilemani.

(Van Holmes Dep. at 114.) Instead, Perelli chose to pass on Dilemani to the third step in Buca's

application process, which consisted of the recruiter obtaining all of the remaining

documentation on Dilemani that Buca required including his date of birth. (Van Holmes Dep. at

114.)

*Dilemani Passed the Third Stage of the Recruiting Process.*

On or about June 22, 2000, Batrus Hollweg provided Buca with a personality profile of

Dilemani based on a the questionnaire he had completed. (Van Holmes Dep. at 119-120, Ex. P-

18.) The personality profile rates Dilemani in various categories, including ratings of

5

"Excellent" in the category of "Acceptance of Authority"; "Good" in the category of

"Sociability"; and "Excellent" in the category of "People Relations."  (Van Holmes Dep. at 119-

120, Ex. P-18.)

In early July 2000, Van Holmes asked Dilemani to submit a written application and a

Disclosure and Release Statement.  (Dilemani Dep. at 79-81, Def.'s Ex. 3,4.)  As part of those

written materials, Buca required Dilemani to disclose his date of birth.  (*Id*.)  Dilemani complied,

disclosing his date of birth as December 12, 1945.  (*Id*.)  Dilemani provided that information to

Buca on or about July 12, 2000.  (*Id*.)

After obtaining all required documentation on Dilemani, Van Holmes passed him along

to the final stage of the recruiting process, which consisted of an interview with his potential

supervisor, Divisional Vice President Cowler.  (Dilemani Dep. at 82.)

*At the Final Interview Stage, Buca Rejected Dilemani for Purely Subjective Reasons.*

After passing the first three stages of Buca's recruiting process, in mid-July 2000,

Dilemani contacted Cowler to arrange for an interview as instructed by Van Holmes.  (Dilemani

Dep. at 82.)  During Cowler's phone conversation with Dilemani, he told Dilemani that he was

happy to have a person like him with New York experience.  (Cowler Dep. at 202-203.)  Their

phone conversation led Cowler to believe that Dilemani "had a partnership mentality" and "was a

skilled operator."  (Cowler Dep. at 201.)  Based on that phone conversation, Cowler concurred

with the recommendation by Van Holmes and Perelli to proceed with an in-person interview.

(Cowler Dep. at 201.)  The interview was scheduled for later that month.  (Dilemani Dep. at 82-

83.)

Before the actual interview, Cowler reviewed Dilemani's resume.  (Cowler Dep. at 221.)

It did not precisely state Dilemani's date of birth, but it showed pretty clearly that he was no spring chicken, for example by stating that he earned a college degree in 1974. (Van Holmes Dep. at 77, Ex. P-13.) Without too much effort, it was easy for Cowler to calculate that from Dilemani's resume that he was at least in his late forties, if not older. (*Id*.)

On July 22, 2000, Cowler conducted an in-person interview of Dilemani, which is when Cowler saw Dilemani for the first time. (Dilemani Dep. at 83, 85; Cowler Dep. at 188-189, 205-206.) In Cowler's own words, Dilemani was "dressed very sharply," "had very good hygiene," did not show "any personal disrespect," and "was very cordial." (Cowler Dep. at 205-207.) But another observation by Cowler proved more important – Dilemani was in his mid-fifties, and therefore about five years older than any of the twenty-plus Paisano Partners who Cowler hired or promoted to that position during Cowler's three-year tenure at Buca. (Dilemani Dep. at 8; Cowler Dep. at 70, 95-118, 132-138.) In fact, during Cowler's entire career, he had hired well over 100 managers, and 94% to 98% of them, if not more, were younger than 50 years old. (Cowler Dep. at 8-69, 95-118, 132-138, 246-247.)

Upon seeing Dilemani's age, Cowler decided to interview him differently than other applicants. Contrary to Buca's representation to the PHRC that the interview lasted 90 minutes, both Cowler and Dilemani testified that the interview lasted about 30 minutes, which is well short of Cowler's typical interview of 60 to 90 minutes. (Cowler Dep. at 121-122, 205-206; Dilemani Dep. at 85.) In fact, Cowler's interview of Dilemani was at the very shortest end of his range for his interviews, which can last as long as three hours. (Cowler Dep. at 121-124.) The reason for Cowler's truncated interview of Dilemani was that Cowler had little or no interest in learning whether Dilemani would make a good Paisano Partner. Cowler hardly asked Dilemani

any questions regarding his managerial style, his expectations of what the job would entail, or anything at all for that matter. (Dilemani Dep. at 87.) As Cowler explained during his deposition, that is exactly what he does when he has already decided to reject the applicant and wants to end the interview early. (Cowler Dep. at 122-123.) In fact, Cowler openly expressed his lack of interest during the interview by suggesting that Dilemani was over-qualified and might get bored managing a single restaurant as required by the Paisano Partner position. (Dilemani Dep. at 87.)

Within 30 minutes after his interview of Dilemani had concluded, Cowler left Van Holmes a voice message stating his decision not to hire Dilemani. Van Holmes then called Dilemani and told him that Cowler had decided to hire someone else. (Dilemani Dep. at 88.) Ultimately, Cowler filled the position by hiring Tim Stenger. (Cowler Dep. at 227-228.) Stenger is more than 20 years younger than Dilemani, and has far less managerial experience than Dilemani. (Cowler Dep. at 234-235, 239, Ex. P-23.)

_The Two Faces of Buca's Explanation for Not Hiring Dilemani._

Based on Buca's decision not to hire him, Dilemani filed with the PHRC an administrative complaint of age discrimination. In response, Buca's attorneys provided the PHRC with a five-page "position statement," setting forth Buca's official position in opposition to Dilemani's claims. (Cowler Dep. at 261, Ex. P-20.) As later became clear in the course of this litigation, however, Buca's position statement does not even make a good faith attempt to truthfully explain its basis for rejecting Dilemani. Buca's dishonesty is readily apparent from the inconsistencies between Buca's position statement and the subsequent deposition testimony of

the company's decision-maker:

*In Buca's position statement*, Buca told the PHRC that Dilemani's desire for a multi-unit management job was the reason he was rejected.  To be sure, although Buca made non-committal references to Dilemani's alleged arrogance, the only fair characterization of Buca's position statement is that, at most, it presents Dilemani's alleged arrogance as a secondary factor in Buca's decision.  Here are all of the portions of Buca's position statement that directly concern its basis for rejecting Dilemani for the Paisano Partner position in Allentown:

> . . . *Buca chose not to offer him that position because, during the interview with his potential manager, Jim Cowler, Divisional Vice-President, Mr. Dilemani made it clear that he was much more interested in a multi-unit management job than he was in being in charge of a single restaurant*. In addition, Mr. Dilemani displayed an attitude during the meeting that suggested to Mr. Cowler that he would not take direction well, that he already knew all there was to know about restaurant operations – even though Buca was a different food concept than what he had previously handled. . . .

> . . .

> . . . Mr. Cowler interviewed Mr. Dilemani in late July 2000 and concluded within the first 30 minutes of the 90 minute meeting that he would not hire him. He found that Mr. Dilemani was arrogant in his attitude, giving the impression that he already knew all that there was to know about the restaurant business.  *Perhaps even more importantly, however, Mr. Cowler concluded that [Dilemani's] employment goals did not fit with the position. Buca expects the persons whom it hires as Paisano Partners to take ownership in their restaurants literally and figuratively. It asks them to commit to a five year period to establish and build the business; it encourages this commitment with a stock ownership arrangement that provides stock options to the Paisano over a period of time, in exchange for a significant investment.*

> . . . *Mr. Dilemani made it abundantly clear to Mr. Cowler during the interview process that he had no such plan. Rather, he*

9

> *wanted to use the Paisano Partner job as a stepping stone for*
> *advancement to a multi-unit job and the sooner the better. While*
> *this is a laudable employment goal, it simply does not fit with what*
> *Buca wants in a Paisano Partner.  Accordingly, Mr. Cowler*
> *concluded that he did not want Mr. Dilemani to be the Paisano*
> *Partner at the Company's Allentown, Pennsylvania store.*
>
> . . .
>
>           . . . Buca rejected Mr. Dilemani for employment as a
> Paisano Partner because his interests did not meet those of the
> Company. Mr. Dilemani joined his then-current employer for the
> purpose, he said, of being in on the ground floor of a restaurant
> concept that was to expand nationally. He wanted to be a
> significant player in that company, responsible for multiple
> locations. When that dream failed to materialize, he looked to Buca
> for a similar opportunity. Realizing that Mr. Dilemani would never
> be happy at Buca without such an opportunity, and because no
> such opportunity was available, Mr. Cowler decided to reject his
> application.

(Cowler Dep. at 261, Ex. P-20.)

*During this litigation*, in contrast, Buca abandoned the explanation it gave to the PHRC –

that Dilemani was rejected primarily because of his desire for promotion to a multi-unit

management job – as soon as the evidence revealed it to be false.  First, the younger applicant

who was ultimately hired for the Allentown position, Tim Stenger, had also expressed a desire

for advancement throughout the interviewing process, including in his resume, in his written

application, and during his interview with Cowler.  (Cowler Dep. at 233-236, Ex. P-23; Van

Holmes Dep. at 189, Ex. P-24.)  Thus, Buca could not credibly contend that it rejected Dilemani

based on his desire for a multi-unit management job, because *the successful, much younger*

*applicant had expressed the same desire*.  (*Id*.)  Second, Buca has repeatedly promoted Paisano

Partners after less than five years in that position.  (Cowler Dep. at 141-143.)  In fact, of the half-

10

dozen Paisano Partners who Cowler knows to have been promoted, *all* were promoted after only 1½ to 3 years.  (*Id.*)  Thus, even if Dilemani's had ambitions to be promoted in less than five years, Buca could not credibly contend that it rejected him because company policy would prevent such ambitions from being realized.

Faced with that evidence, Buca completely disavowed the factor it had emphasized so heavily to the PHRC, admitting that Dilemani's desire for advancement played *no part* in the decision to reject Dilemani.  Buca's new litigation strategy, implemented by Cowler, was to revive the company's oblique references to Dilemani's alleged arrogance in its position statement.  Here is Cowler's testimony:

> Q.    So please tell me in detail all of the reasons that led you to the decision not to hire Mr. Dilemani.
>
> A.    I just gave them to you.  There's not a whole lot of detail. There's some things that are in this world black and white, and that's one of them.  And he was very arrogant in the way he handled the interview.  That's the detail I can give you.  And that was very evident, quickly.
>
> . . .
>
> Q.    Did you form an opinion as to whether Bey [Dilemani] was seeking a position at a higher level than paisano partner?
>
> A.    *I think he presented himself that he wanted to be in a regional spot, if I recall.*
>
> Q.    *Did that have an bearing on your decision not to hire him?*
>
> A.    *No.  No.  I mean, it's not abnormal to seek – to interview people who want more.*
>
> . . .
>
> Q.    *. . . Do you recall asking Mr. Dilemani if he would be willing to make a five-year commitment as a paisano*

11

> > > *partner?*
>
> > A.    It's part of the interview process, yes.
>
> > Q.    Do you recall what his answer was?
>
> > A.    No, I do not.
>
> > Q.    *Whatever his answer was, did that have a bearing on your decision not to hire him?*
>
> > A.    *No.*

(Cowler Dep. at 209-210, 216-217, 218, 241-242.)  Throughout his testimony, Cowler never even acknowledged that Buca had earlier taken a completely contradictory position.

<u>*Buca's Conflicting Statements of Fact.*</u>

Over time, Buca has molded its statement of facts to fit whatever explanation it was advancing at the time for Dilemani's rejection.  This is most evident from the testimony of Van Holmes, which took place after Buca submitted its position statement to the PHRC but before Cowler's testimony recanting the company's prior position:

*First*, in direct conflict with Cowler's subsequent testimony, Van Holmes tried to bolster the company's then-current position with evidence that Cowler told her that he decided to reject Dilemani because of his desire for a multi-unit management job.  Here is Van Holmes testimony regarding the voice mail she received from Cowler shortly after his interview of Dilemani:

> > Q.    How long did you speak with [Cowler]?
>
> > A.    Well, I had the voicemail, and I remember it very clearly because he was very adamant about saying that Bey [Dilemani] was not a fit for him and not a fit for Buca di Beppo.  He was – it was a voicemail that came through loud and clear.  I just wanted to touch base with him before I called Bey back to tell Bey that we were concluding the

12

interview process.

Q.    Did you delete that voicemail?

A.    Yeah.  You –

Q.    Can you please tell me everything you recall about the
voicemail aside from what you've already described?

A.    I just remember him going down a list, like what I just
described, and it was an emphatic voice saying that he –
again, he's like, "I don't think he's a fit for Buca.  I don't
think he's a fit for me."  You know, he was just really
adamant about it.  He said, "you know, this guy was" – I
think he said something like "This guy wants to be" – you
know, "He doesn't want to be a Paisano Partner.  He wants
– He wants – He's already talking divisional vice president,
or something along those lines."

(Van Holmes Dep. at 124-125.)  Cowler did not corroborate that testimony, because the

company's explanation for rejecting Dilemani had changed.  Regarding Cowler's alleged voice

message to which Van Holmes testified, Cowler admitted that he spoke with Van Holmes after

his interview of Dilemani but could not recall the specifics of what he told Van Holmes.  (Cowler

Dep. at 189-198.)

   *Second*, throughout Van Holmes' lengthy testimony regarding her impressions of

Dilemani during her deposition, she never once described him as "arrogant."  (Van Holmes Dep.

at 82-86, 87-111.)  That is not surprising, though, because at that time Buca was still contending

that Dilemani's desire for a multi-unit management job was the reason for his rejection.

   *Third*, Van Holmes tried to underplay the importance of her telephone interview and

written evaluation of Dilemani, because she had rated Dilemani highly for job fit contrary to

Buca's then-current position that Dilemani was rejected for lack of job fit.  In this regard, Van

13

Homes offered testimony that oftentimes lacks credibility *on its face*.  Here is her spontaneous

testimony regarding the scope of her authority and her subsequent recanting of that testimony:

> Q.    Okay.
>
> A.    A recruiter can't make any decisions without the opinions
>        of other people.  They don't have that latitude whatsoever.
>
> Q.    Except when it comes to the initial screening, right?
>
> A.    Correct.
>
> Q.    And when it comes to screening after the telephone
>        conversation, right?
>
> A.    The screening after the telephone conversation, yes.

(Van Holmes Dep. at 72.)  Here is Van Holmes' testimony regarding her written evaluation of

Dilemani, in which she incredulously tries to circumvent her rating of him as "above

expectations" in the category "Job Fit & Stability":

> Q.    Mm-hm.  If you thought there was a question of Bey
>        [Dilemani]'s personality based on his getting too focused
>        on getting to the next level, why did you rate him as
>        "Above expectation" for "Job Fit"?
>
> A.    That's his current job fit.  This – when I'm rating someone
>        on job fit, that's what they've done in their past and what
>        they currently are.  It's not what I think it's going to be in
>        the future.
>
> Q.    Are you saying that when you rate "Above expectation" on
>        "Job Fit," you are rating him based on his job fit at
>        Spaghetti Western [where he was then working]?
>
> A.    And his past.
>
> Q.    And you weren't rating his job fit for Paisano Partner?
>
> A.    No.  I rate it on how they've done in their past.

14

(Van Holmes Dep. at 97.)   And here is Van Holmes' testimony where she, quite remarkably, suggests that her "meets expectation" rating of Dilemani in certain categories is below average, even though the form's three rating categories are "above expectation," "meets expectation," and "below expectation":

> Q.    On "People Relations/Team Building" –
>
> A.    Yes.
>
> Q.    – you rated Bey [Dilemani] a "Meets expectation plus," right?
>
> A.    Yep.
>
> . . .
>
> Q.    . . . I just wanted to know why you chose that particular ranking.
>
> A.    Yeah.  That's just an average ranking right there.
>
> Q.    Is "Meets expectation plus" is an average rating?
>
> A.    Yes.

(Van Holmes Dep. at 100.)  Such testimony regarding Dilemani's job fit and "meets expectation plus" rating is so outlandish that, on its face, it raises a credibility issue for a jury to decide.

*Fourth*, Van Holmes completely disavowed the following portion of Buca's position statement to the PHRC, which the company used to create the false impression that it went out of its way for Dilemani even after the vacancy he sought was no longer available:

> Buca first had contact with Mr. Dilemani in conjunction with the prospective opening of a restaurant in Mesa, Arizona [near Phoenix]. . . . Per Buca's hiring process, Mr. Dilemani first interviewed for a position as a Paisano Partner with Lori Van

15

> Holmes . . . . However, after her interview, Buca changed its time-table for opening the Mesa location. Accordingly, Ms. Van Holmes post-phoned [sic] Mr. Dilemani's next interview. Eventually, after Mr. Dilemani indicated that he was planning to relocate to the East Coast, and it was clear that the Mesa store was on an indefinite hold, Ms. Van Holmes raised the possibility of Mr. Dilemani pursuing the Paisano position at the Allentown, Pennsylvania restaurant.

(Cowler Dep. at 261, Ex. P-20.)   Van Holmes had no choice but to back off of that position, because of a document showing that Dilemani discussed the Allentown position with Van Holmes the very day after Dilemani first contacted Buca.  (Van Holmes Dep. at 77-80, 83-84, Ex. P-13.)  After being confronted with that evidence, Van Holmes admitted that, even at the time of her first conversation Dilemani, Buca "didn't have a spot in Phoenix."  (Van Holmes Dep. at 137.)

        Cowler's testimony, in addition, completely undermines other efforts by Buca to create the false impression that it accommodated Dilemani.  In particular, Cowler's testimony guts the following claim made by Buca in its position statement to the PHRC that it interviewed Dilemani for the Allentown position earlier than it normally would interview a candidate:

> In short, the process by which Buca agreed to continue interviewing Mr. Dilemani was an unusual one. Normally, Buca would not interview a potential candidate five months before an opening. However, Ms. Van Holmes found that Mr. Dilemani was very anxious to interview with Jim Cowler, the DVP for the East region.

(Cowler Dep. at 261, Ex. P-20.)  As revealed during Cowler's deposition, the hiring process for a Paisano Partner normally begins at least five months before the scheduled opening of the restaurant.  (Cowler Dep. at 153-154.)  Thus, the timing of Dilemani's interview was not unusual at all.  In fact, Cowler did not testify to anything that was unusual about the process of recruiting

for the Paisano Partner position in Allentown, other than perhaps the necessity of finding an applicant, like Dilemani, with knowledge of the community halfway between New York City and Philadelphia.  (Cowler Dep. at 180-182; Dilemani Dep. at 54, Ex. D-2.)

## Argument

### Point 1:

### SUMMARY JUDGMENT MUST BE DENIED BECAUSE (1) BUCA DOES NOT DISPUTE THAT DILEMANI CAN ESTABLISH A *PRIMA FACIE* CASE AND (2) THE RECORD SUPPORTS A FINDING OF  PRETEXT

In an employment discrimination case, a summary judgment motion by the defendant must, at the onset, be viewed with skepticism.  Not only is the plaintiff entitled to the benefit of all reasonable inferences from the evidence of record, but the Third Circuit has warned that "[t]his standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues."  *Stewart v. Rutgers, The State University*, 120 F. 3d 426, 431 (3d Cir. 1997).

The law is clear that a plaintiff defeats summary judgment by presenting evidence that would permit (1) a finding that the plaintiff has established a *prima facie* case and (2) "a finding that the reasons proffered [for the adverse employment action] are pretextual."  *Sheridan v. E.I. DuPont*, 100 F. 3d 1061, 1066 (3d Cir. *en banc* 1996) (reversing the district court's entry of judgment for defendant), *cert. denied*, 521 U.S. 1129 (1997).[2]  Controlling Third Circuit precedent provides that nothing more is required of the plaintiff at the summary judgment stage.

---

[2]    The Third Circuit routinely cites to case law under Title VII of the Civil Rights Act of 1964 and the ADEA interchangeably. *Newman v. GHS Osteopathic, Inc.*, 60 F. 3d 153, 157 (3d Cir. 1995).  Moreover, the same analysis applies to claims under the ADEA and the Pennsylvania Human Relations Act. *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998).

*Id.*

Here, Buca does not dispute that Dilemani can establish a *prima facie* case of age discrimination under the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act.  (Def.'s Br. at 11-12.)  Thus, the sole issue presented by Buca's motion is whether the record contains sufficient evidence to support a finding of pretext.  To resolve that issue, the Court must determine whether the evidence of record shows

> such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them "unworthy of credence."

*Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted).  Such a showing alone entitles the jury to infer "that the employer did not act for the asserted non-discriminatory reasons" and "that the defendant intentionally discriminated against the plaintiff."  *Fuentes*, 32 F.3d at 765; *Sheridan*, 100 F.3d at 1066, 1067.

Dilemani has easily made the required showing, providing a reasonable jury with ample basis to discredit Buca's current explanation for not hiring Dilemani.  Indeed, Buca's brazen and fundamental change in its explanation practically screams out "*PRETEXT!*," as does Buca's substantial revamping of the facts used in support.  *Cf. McGarry v. Bd. of Cty. Comm. of Cty. of Pitkin*, 175 F. 3d 1193, 1200 (10th Cir. 1999) ("[T]he shift in Ms. Cumnock's story from relying on Meraz's and Oliver's assertedly better qualifications to relying on their being 'minorities' is indicative of pretext.").  A further basis for discrediting Buca's position is its absurd contention that "Cowler had no idea how old Dilemani was" (Def's. Br. at 8), despite Cowler's admission that he reviewed Dilemani's resume and met with Dilemani face-to-face.  Based on the evidence

of record, a reasonable jury could certainly find that Cowler knew that Dilemani was in his fifties, and that upon that basis Cowler took a disinterested approach to Dilemani's final interview, keeping it as short as possible. Cowler's eventual hiring of the much younger and less experienced Stenger for the same job adds support to the inference of age discrimination. *See Sempier v. Johnson & Higgins*, 45 F. 3d 724, 729-30 (3d Cir.), *cert. den.*, 515 U.S. 1159 (1994).

Moreover, Buca cannot escape a jury trial by its recent articulation of a wholly subjective rationale for not hiring Dilemani. Although arrogance cannot be measured objectively, that does not entitle Buca to summary judgment because, as courts have recognized,

> distinguishing legitimate employment decisions based entirely on subjective criteria and those in which subjective criteria serve as pretext for discrimination can only be made by weighing the employer's credibility.

*Medina v. Ramsey Steelcompany, Inc.*, 238 F. 3d 674, 681 (5th Cir. 2001); *accord Goosby v. Johnson & Johnson Medical, Inc.*, 228 F. 3d 313, 321 (3d Cir. 2000) (holding that the employer's adverse employment action was based on a factor that "can not be evaluated objectively and therefore should not be relied upon to overcome a *prima facie* case of discrimination"); *Miles v. M.N.C. Corp.*, 750 F. 2d 867, 871 (11th Cir. 1985) ("[S]ubjective and vague criteria may be insufficient reasons given by employer for its failure to rehire because such criteria do not allow a reasonable opportunity for rebuttal."). Indeed, summary judgment is particularly inappropriate given that Cowler struggled during his deposition to point to anything specific that led him to conclude that Dilemani was arrogant, even when pressed:

> Q.    Do you recall what led you to the conclusion that he was arrogant?
>
> A.    It must have been his actions, his verbiage, what he said

19

> and how he said it.  My perception was he was very
> arrogant.
>
> . . .
>
> Q.     The reason that I'm asking all of these questions is because
>        I'm trying to see if I can jog your memory as to what led
>        you to the conclusion that he was arrogant.
>
> A.     It must be in the way he presented himself, like I said
>        previously, in his verbiage, in the way he talked about what
>        he could do, what he was capable of done [sic], what had
>        happened to him in the past. It is very tough to define while
>        – you can pull something out of Webster's version of what
>        arrogance is and what the lack of humility is.  There was a
>        pompousness about him that he portrayed.  And as an
>        interviewer, it's not something I'm looking for in Buca
>        diBeppo.

(Cowler Dep. at 205-209.)  Furthermore, Cowler's dubious claim that he never reviewed

Dilemani's personality profile – which rates Dilemani inconsistently with Cowler's supposed

assessment that Dilemani is arrogant – is undermined by Van Holmes' testimony that Divisional

Vice Presidents conduct a review of the personality profiles of applicants like Dilemani.  (Van

Holmes Dep. at 59.)  These weakness in Cowler's explanation for why he thought Dilemani was

arrogant requires a jury to assess Cowler's credibility.

     Buca's entire argument for summary judgment misses the point, in several respects.

Under the law, Dilemani is not required to prove that Buca or its decision-maker knew

Dilemani's exact date of birth, and Buca can cite nothing establishing the contrary.  *Cf. Sheridan*,

100 F. 3d at 1066.  To be sure, it is clear that Buca is entitled to argue that "Cowler had no

knowledge of Dilemani's age when he declined to hire him" (Def.'s Br. at 1; *see also* Def.'s Br.

at 11), but it is equally clear that a jury is entitled to weigh the credibility of that position against

Dilemani's evidence that Cowler did have knowledge of Dilemani's age. For purposes of this motion, of course, this Court must give Dilemani the benefit of all reasonable inferences from his evidence, including that Cowler did have knowledge of Dilemani's age when deciding not to hire him.

Buca is also mistaken in its premise that Cowler's past hires of applicants over 40 somehow "preclude[s] any inference of discrimination." (Def. Br. at 14.) Recent precedent of the U.S. Supreme Court reveals the error of Buca's premise that favorable treatment towards one person who is over 40 years old establishes that the decision-maker does not harbor age bias against an older person:

> The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age. Or to put the point more concretely, there can be no greater inference of age discrimination (as opposed to "40 or over" discrimination) when a 40-year-old is replaced by a 39-year-old than when a 56-year-old is replaced by a 40-year-old. . . . Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is that fact that the plaintiff was replaced by someone outside the protected class.

*O'Connor v. Consolidated Coin Caterers*, 517 U.S. 308, 312-13 (1998). Applying the *O'Connor* reasoning here, not only Buca's reasoning flawed but, viewing Cowler's hiring patterns in the manner most favorable to Dilemani (as required by this motion), they strongly *support* Dilemani's age discrimination claims by showing a bias against applicants over 50 years old.[3]

---

[3] Buca's limitation of its analysis to the pre-2001 period is without justification. The relevance of the ages of Cowler's past hires is that they can reveal an ageist bias on his part. Unless Buca is taking the highly strained position that Cowler was not ageist before 2001 but became ageist afterwards (and Dilemani would certainly welcome such a position!), then all of

Similarly, Cowler's inclusion in the protected class of people older than 40 cannot carry the day for Buca. The U.S. Supreme Court recently reaffirmed its 20-year precedent that:

> Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of that group.

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (rejecting the defendant's argument that a sex discrimination claim does not lie where members of one sex are alleged to have discriminated against members of the same sex). Applying the same rationale here, this Court cannot grant summary judgment because Cowler happened to be 43 years old when he rejected Dilemani, who was more than 10 years his senior.

Finally, Buca's reliance on the unpublished opinion in *Sandler v. Marriott Int'l, Inc.*, No. Civ. A. 98-762, 1999 WL 357381 (E.D. Pa. June 3, 1999), is misplaced. The *Sandler* court granted summary judgment because, unlike here, the plaintiff had not adduced any evidence from which a reasonable jury could find pretext. *Id.* Dilemani has produced evidence of several factors not present in *Sandler* that allow a reasonable jury to find pretext, as follows:

(1)    Buca has repeatedly lied in the course of defending against Dilemani's age discrimination claims, as revealed by the change in its explanation for rejecting Dilemani and the various changes in its statement of facts in support of the company's decision. In contrast, the *Sandler* opinion contains no indication that the employer ever changed its story in defending against the plaintiff's discrimination claims.

---

Cowler's hires should be examined – including all the hires of people under 50 who Buca has omitted.

(2)    Buca favorably processed Dilemani's application until the very end stages of the company's recruiting process (by which time he had passed two interviews and a recruiter's review of his written materials), and then, shortly after learning Dilemani age, the company's decision-maker suddenly rejected Dilemani without even conducting the final interview in good faith.  In contrast, the employer in *Sandler* had never demonstrated any sustained interest in the plaintiff prior to learning his age, and instead rejected the plaintiff after a single interview and a review of written materials.

(3)    Buca's current explanation for not hiring Dilemani is based wholly on a subjective factor which by nature requires a jury to evaluate the decision-maker's credibility.  In relying on that factor, Buca ignored the objectively-administered personality profile for Dilemani which contradicted the decision-maker's subjective views.  In contrast, the employer in *Sandler* based its decision not only on an interview of the plaintiff, but also based on a review of an objective "computer-controlled personal assessment program" that analyzed the plaintiff's responses to a questionnaire.

(4)    Buca's rejection of Dilemani follows the decision-maker's pattern of never hiring a single manager for the company who, like Dilemani, was over 50 years old.  In contrast, the employer in *Sandler* hired two people older than the plaintiff within six months of the plaintiff's rejection.

23

## Conclusion

For the reasons stated above, Buca's motion for summary judgment must be denied.


Dated: February 12, 2003

                                 _____
                                 Scott B. Goldshaw, Esquire
                                 Atty. I.D. 85492
                                 Michael J. Salmanson, P.C.
                                 1515 Locust Street, 10th Floor
                                 Philadelphia, PA 19102
                                 (215) 772-0150

                                 *Attorneys for Plaintiff Bey Dilemani*

## **Certificate of Service**

I certify that on this date I caused a copy of Dilemani's Memorandum of Law in Opposition to Buca's Motion for Summary Judgment, with all exhibits, to be served by first class mail (overnight delivery) to:

     Daniel C. Gerhan
     Faegre & Benson LLP
     2200 Wells Fargo Center
     90 South Seventh Street
     Minneapolis, MN 55402-3901.

Dated: February 12, 2003          _____

IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BEY DILEMANI | : | |
| | : | |
| Plaintiff | : | Civil Action No. 02-CV-2614 |
| | : | |
| v. | : | |
| | : | |
| BUCA, INC. | : | |
| | : | Jury Trial Demanded |
| Defendant | : | |

### *EXHIBITS TO*

DILEMANI'S MEMORANDUM OF LAW IN OPPOSITION TO BUCA'S
MOTION FOR SUMMARY JUDGEMENT

Exhibit                         Description

A        Deposition of Lori Van Holmes, Selected Portions of the Transcript and Exhibits

B        Deposition of James M. Cowler, Selected Portions of the Transcript and Exhibits

C        Deposition of Bey Dilemani, Selected Portions of the Transcript and Exhibits

IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BEY DILEMANI | : | |
| | : | |
| Plaintiff | : | Civil Action No. 02-CV-2614 |
| | : | |
| v. | : | |
| | : | |
| BUCA, INC. | : | |
| | : | Jury Trial Demanded |
| Defendant | : | |

## NOTICE OF NAME CHANGE

By order of the Philadelphia Court of Common Pleas dated January 28, 2003, the name of

counsel having appeared for Plaintiff Bey Dilemani has been changed from Scott B. Goldberg to

Scott B. Goldshaw.  A copy of the order is attached.


Dated: February 12, 2003


Scott B. Goldshaw, Esquire
Atty. I.D. 85492
Michael J. Salmanson, P.C.
1515 Locust Street, 10th Floor
Philadelphia, PA 19102
(215) 772-0150

*Attorneys for Plaintiff Bey Dilemani*

27

## <u>Certificate of Service</u>

I certify that on this date I caused a copy of the foregoing Notice of Name Change, with attachment, to be served by first class mail (overnight delivery) to:

      Daniel C. Gerhan
      Faegre & Benson LLP
      2200 Wells Fargo Center
      90 South Seventh Street
      Minneapolis, MN 55402-3901.

Dated: February 12, 2003                _____